**2016-1901**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**GOOGLE INC.,**

**Appellant**

**v.**

**SIMPLEAIR, INC.,**

**Appellee**

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2015-00180**

---

## BRIEF FOR APPELLANT

---

Jon E. Wright
Michael V. Messinger
Brian W. Lee
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600

*Counsel for Appellant,*
*Google Inc.*

Dated: June 24, 2016

**US 8,601,154 B2**

1. A method to transmit data from an information source via a central broadcast server to remote computing devices, the method comprising:

    (a) generating data at the information source, wherein the information source is associated with an online service relating to the generated data;

    (b) identifying one or more users that have subscribed to receive a notification relating to the generated data;

    (c) transmitting the generated data to a central broadcast server configured to process the generated data using at least one parser and transmit the processed data to receivers communicatively coupled with remote computing devices associated with subscribed users, wherein the central broadcast server:

        (i) comprises one or more servers associated with a parser to parse the generated data received from the information source;

        (ii) is communicatively coupled to at least one information gateway, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks; and

        (iii) is communicatively coupled to at least one transmission gateway, the transmission gateway configured   to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers, and wherein the transmission is made whether the remote computing devices are online or offline from a data channel associated with the remote computing devices.

# CERTIFICATE OF INTEREST

Counsel for the Appellant, Jon E. Wright, certifies the following:

1.     The full name of every party or amicus represented by me is:

Google Inc.

2.     The name of the real party in interest represented by me is:

Google Inc.

3.     Alphabet Inc., a publicly held company (NASDAQ: GOOG, GOOGL), has more than 10% ownership of Google Inc. No publicly held company owns 10% or more of Alphabet Inc.'s stock.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Sterne Kessler Goldstein & Fox PLLC**: Jon E. Wright, Michael V. Messinger, Brian W. Lee, Joseph E. Mutschelknaus


Dated: June 24, 2016                    /s/ Jon E. Wright
                                        Jon E. Wright
                                        **Sterne Kessler Goldstein & Fox PLLC**
                                        1100 New York Ave., N.W.
                                        Washington, DC 20005
                                        202.371.2600

                                        *Counsel for Appellant,*
                                        *Google Inc.*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................5

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE................................................................3

STATEMENT OF THE FACTS ............................................................4

I.    Overview of U.S. Patent No. 8,601,154 and the claimed "central broadcast server." ..............................................................................................4

II.   Overview of the Yan and Kane prior art combination. .................................10

    A.    Yan describes a SIFT server that notifies users via email as information becomes available at an existing information source......11

    B.    Kane allows Yan's SIFT to provide time-critical email notifications to users. ..................................................................................................12

III.   The Board (incorrectly) determined that Yan does not disclose the claimed "central broadcast server."....................................................................13

SUMMARY OF THE ARGUMENT ....................................................15

STANDARD OF REVIEW .................................................................17

ARGUMENT ....................................................................................17

I.    The Board erred by explicitly construing the claimed "central broadcast server" of the '154 patent to require reception of data from a *plurality* of information sources. ..................................................................................19

    A.    The construction of "central broadcast sever" is the same under either the *Phillips* or the BRI standard. ........................................................19

    B.    Requiring the "central broadcast server" to receive data from a *plurality* of information sources contradicts the plain language of the claims....................................................................................................21

    C.    Nothing in the specification requires a departure from the plain language of the claims.......................................................................23

    D.    Under a correct construction, Yan discloses a "central broadcast server" that receives data from at least one information source. ........26

II.    The Board separately erred by implicitly requiring the claimed "central broadcast server" to receive data *directly* from a plurality of information sources. .........................................................................................26

    A.    Nothing in the claims nor in the specification require the "central broadcast server" to receive data *directly* from a plurality of information sources. ..........................................................................27

    B.    Under the Board's own construction, Yan discloses a "central broadcast server" that receives data *indirectly* from a plurality of information sources. ..........................................................................30

III.    The Board additionally erred by implicitly requiring that the "one or more servers" constituting the claimed "central broadcast server" be *interconnected*..............................................................................................31

    A.    Neither claim 1 nor the specification require that the one or more servers of a "central broadcast server" be *interconnected.* .................31

    B.    Under the Board's own construction, Yan discloses at least two *non-interconnected* servers that constitute a "central broadcast server."...37

CONCLUSION AND RELIEF SOUGHT ............................................................39

# TABLE OF AUTHORITIES

**Cases:**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338, (Fed. Cir. 2008)...........................................................22

*Cuozzo Speed Techs, LLC v. Lee*,
579 U. S. ____, No. 15-446 (June 6, 2016) ..........................................19

*Ferring B.V. v. Watson Labs., Inc.-Florida*,
764 F.3d 1401 (Fed. Cir. 2014).......................................................30, 38

*In re Cuozzo Speed Techs.*, LLC,
793 F.3d 1268, 1277 (Fed. Cir. 2015), *cert. granted sub nom.*
*Cuozzo Speed Techs., LLC v. Lee*, No. 15-446, 2016 WL 205946
(U.S. Jan. 15, 2016) ..............................................................................20

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)............................................................16

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
814 F.3d 1343 (Fed. Cir. 2016)......................................25, 29, 33, 34

*Microsoft Corp. v. Proxyconn, Inc.*,
789 F.3d 1292 (Fed. Cir. 2015).......................................................22, 37

*Phillips v. AWH Corp*,
415 F.3d 1303 (Fed. Cir. 2005)..............................1, 19, 21, 23, 28, 36

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016)......................................................19, 29, 36

*SimpleAir, Inc. v. Apple Inc., et al.*,
No. 2:09-CV-289-CE (E.D. Tex.)........................................................17

*SimpleAir, Inc. v. Google, Inc. and YouTube LLC*,
No. 2:14-CV-0011-JRG (E.D. Tex.)....................................................17

*SimpleAir, Inc. v. Microsoft Corp., et al.*,
No. 2:11-CV-0416-JRG (E.D. Tex.)........................................................................17

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
No. 2015-1251, 2016 WL 1274445 (Fed. Cir. April 1, 2016)........................4, 6, 36

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015)........................................................................19, 23

*Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)............................................................................................16

*Vitronics Corp. v. Conceptronix, Inc.*,
90 F.3d 157 6 (Fed. Cir. 1996)........................................................................21, 23

**Regulations:**

37 C.F.R. § 1.321(a).................................................................................................3

## STATEMENT OF RELATED CASES

This Appeal arises from the United States Patent and Trademark Office's *inter partes* review of U.S. Patent No. 8,601,154 in case no. IPR2015-00180. The '154 patent was not the subject of any prior appeals, and is not the subject of any pending appeals or civil actions. The Court's decision here may directly affect, or be directly affected by, a number of cases related to the '154 patent between Appellee/patent owner SimpleAir, Inc. and Appellant/ petitioner Google Inc.

SimpleAir asserted the '154 patent and U.S. Patent No. 8,572,279 (which shares the same specification with the '154 patent) against Google in the United States District Court for the Eastern District of Texas in case no. 2:14-cv-00011. In that district court action, the '154 patent was dismissed with prejudice prior to trial and a jury found no infringement of the '279 patent. Post-trial motions are pending in that action and Google anticipates that SimpleAir will appeal the '279 patent verdict.

U.S. Patent No. 7,035,914, a parent of the '154 patent sharing the same specification, was previously the subject of an appeal to this Court in case nos. 2015-1251 (*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB, Google Inc.*) and 2015-1253 (*SimpleAir, Inc. v. Google Inc., M Motorola Mobility LLC, Sony Ericsson Mobile Commc'ns (USA), Inc., Microsoft Corp.*). The panel comprised Judges Moore, Reyna, and Wallach, who issued a consolidated decision on April 1,

2016. *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, No. 2015-1251, 2016 WL 1274445 (Fed. Cir. April 1, 2016). The '914 patent appeal arose from civil actions in the United States District Court for the Eastern District of Texas case nos. 2:11-cv-00416 and 2:13-cv-00587 in which SimpleAir asserted the '914 patent and U.S. Patent No. 6,021,433 (which also shares the same specification with the '154 patent) against Google and other defendants. In that action, the '433 patent was dismissed with prejudice prior to trial, and the '914 patent was found by a jury to be infringed by Google. The '914 patent jury verdict was overturned by this Court in the aforementioned consolidated decision. A petition filed by SimpleAir on June 1, 2016, for *en banc* rehearing of that decision is pending.

U.S. Patent Nos. 8,639,838 and 8,656,048, which also share the same specification with the '154 patent and claim priority to the '914 patent, are presently being asserted by SimpleAir against Google in the United States District Court for the Eastern District of Texas in case no. 2:16-cv-00388 (complaint filed on April 8, 2016).

U.S. Patent No. 9,356,899, which also shares the same specification with the '154 patent and claims priority to the '914 patent, is presently at issue in a declaratory judgment action brought by Google against SimpleAir in the United States District Court for the Central District of California in case no. 2:16-cv-3758 (complaint filed on May 31, 2016).

## INTRODUCTION

Google appeals the Board's construction of the claim 1 term "central broadcast server." The Board erred in its explicit construction of that key term by requiring a limitation that is flatly contradicted by the claim's plain language, and unsupported by the patent specification. The Board then erred twice more in applying its own (incorrect) construction to the prior art by implicitly reading in two more unwarranted limitations. The result is a claim construction that is far narrower than can be supported under either the "broadest reasonable construction" or even this Court's *Phillips* standard. Any *one* of these errors is a sufficient ground to reverse the Board's finding of patentability.

## JURISDICTIONAL STATEMENT

The United States Patent and Trademark Office ("USPTO") Patent Trial and Appeal Board ("Board") had jurisdiction under 35 U.S.C. § 6 over the underlying *inter partes* review of U.S. Patent No. 8,601,154 in case no. IPR2015-00180. The Board issued a Final Written Decision pursuant to 35 U.S.C. § 318(a) on February 16, 2016. Appx1-26. Google filed and timely served a Notice of Appeal on March 11, 2016. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

The Board construed the claim 1 term "central broadcast server" as "*one or more servers that are configured to receive data from a plurality of information sources and process the data prior to its transmission to one or more selected remote computing devices.*" In this appeal, Google raises three claim construction issues centered on that term.

1.     Did the Board err in explicitly construing "central broadcast server" to require reception of data from a *plurality* of information sources when the plain language of the claim and the specification only require reception of data from a *single* information source?

2.     If reception of data from a plurality of information sources *is* required, which Google disputes, did the Board err in implicitly requiring the "central broadcast server" to receive data *directly* from the plurality of information sources when no such requirement is present in the claims or in the specification?

3.     Finally, did the Board err in implicitly requiring that if more than one server constitutes the claimed "central broadcast server," that those servers be *interconnected*, when no such requirement is present in claim 1, or in the specification?

Any one of these errors, standing alone, is a sufficient ground for this Court to reverse the Board's finding of patentability.

2

## STATEMENT OF THE CASE

This appeal arises from the Board's determination that the challenged claims 1-4, 6, 8-11, 13, 14, 16, 20, 21, and 29-31 of the '154 patent are not unpatentable.[1] Appx25. Claim 1 is the sole independent claim of the '154 patent. Google, in its petition for *inter partes* review, challenged claim 1 as being unpatentable over Yan[2] in view of Kane.[3] Google challenged the remaining claims, which depend from claim 1, as being invalid over Yan and Kane, and several other secondary references not relevant here. Appx146-148.

Based on Google's petition, the Board instituted an *inter partes* review of the challenged claims. Appx287-316. But following a trial on the merits, it found that Google had not established that the challenged claims are unpatentable. Appx25. As the Board stated in its final written decision, "[t]he dispositive issue with respect to claim 1 is whether Yan teaches or suggests a "central broadcast server." Appx00013. And indeed, the only basis for the Board's denial was that,

---

[1] SimpleAir disclaimed under 37 C.F.R. § 1.321(a) claims 19, 24, 27, 33, and 34 of the '154 patent. Appx6302. The Board did not institute trial on claims 7, 15, 17 and 32. Appx315. Google did not challenge claims 5, 12, 18, 22, 23, 25, 26 and 28. Appx127-Appx189.

[2] Yan *et al.*, "SIFT: a tool for wide-area information dissemination," Proceedings of the 1995 USENIX Technical Conference, 177-86 (January 16, 1995). Appx2829-840.

[3] Kane, WIPO Patent Application Publication No. 94/08419 (published April 14, 1994). Appx951-975.

under the Board's construction, Yan did not disclose or teach the claimed "central broadcast server."

## STATEMENT OF THE FACTS

**I.     Overview of U.S. Patent No. 8,601,154 and the claimed "central broadcast server."[4]**

The '154 patent is entitled "System and Method for Transmission of Data." Appx27. The specification teaches that, at the time of invention (*i.e.*, 1996), computer users could connect to a variety of information sources such as the Internet using a modem. Appx75, 3:35-36; Appx77, 7:32-33; *see also SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, No. 2015-1251, 2016 WL 1274445, *6 (Fed. Cir. April 1, 2016) (interpreting the parent '914 patent, which shares the same specification). The specification further explains that while such information sources "have revolutionized the distribution of information in our society" these technologies suffered from numerous disadvantages including the inability to provide "immediate notification of information." Appx74, 1:66-2:32. The

---

[4] The '154 patent claims priority to and shares a specification with U.S. Patent No. 7,035,914. This Court previously considered the '914 patent and issued a decision construing the terms "data channel" and "whether said computing devices are online or offline from a data channel associated with each device"— terms that also appear in the '154 patent—but has not yet ruled on the meaning of the claimed "*central broadcast server*" at issue here. *See SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, No. 2015-1251, 2016 WL 1274445 (Fed. Cir. April 1, 2016).

specification and the claimed invention were thus focused on "immediate notification" to subscribers when information of interest is available.

To address that alleged need for immediate notification of information, the '154 patent discloses a system utilizing a "central broadcast server" or "CBS." Figure 1 (illustrated with colored highlighting and arrows) shows the basic configuration:



As illustrated, the specification describes that a CBS 34 (shown in yellow) can be placed between an existing information source 12 (shown in pink) and an existing personal computer or other computing devices 14 (shown in blue). The CBS, in turn, is coupled to a wireless network 36. Appx44. This allows the CBS to receive data from an information source and wirelessly transmit notifications

corresponding to the data to a receiver coupled to the personal computer or other computing devices. Appx75, 3:61-4:3; Appx76, 6:46-52.

As this Court previously noted, "[b]y transmitting information wirelessly via the central broadcast server, the present invention enables remote computer 14 to receive information instantly—*even while it is off-line (i.e., not connected to the Internet* or some other on-line service)." *SimpleAir*, 2016 WL 1274445 at *7 (internal citations and quotes omitted, emphasis in the original). As Figure 1 shows, and as this Court ruled, the CBS accomplishes this task by transmitting data along a different path than the one used by a remote computer to connect to the Internet, *i.e.* connection 24 in Figure 1. *Id.*

Accordingly the "key aspect of the invention is the ability of a remote device to receive notifications even when it is not connected to the Internet by traditional means." *Id.* Because the focus of the '154 patent is on immediate notification, even when the subscriber is off-line, it places no special significance or restriction on the number of information sources communicating with the CBS. Nor does it place any significance or restriction on the specific configuration of the one or more servers that comprise the CBS.

This basic operation of the CBS is reflected in the sole independent claim 1 of the '154 patent, which is reproduced below with the relevant terms and phrases emphasized:

6

1. A method to *transmit data from an information source via <u>a central broadcast server</u> to remote computing devices*, the method comprising:

(a) *generating data at the information source*, wherein the information source is associated with an online service relating to the generated data;

(b) identifying one or more users that have subscribed to receive a notification relating to the generated data;

(c) *transmitting the generated data to <u>a central broadcast server</u> configured to process the generated data* using at least one parser *and transmit the processed data to receivers* communicatively coupled with remote computing devices associated with subscribed users, <u>*wherein the central broadcast server*</u>:

> (i) *comprises one or more servers* associated with a parser to parse the generated data received from *the information source*;

> (ii) is communicatively coupled to at least one information gateway, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks; and

> (iii) is communicatively coupled to at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers, and wherein the transmission is made whether the remote computing devices are online or offline from a data channel associated with the remote computing devices.

Appx89, 32:38-67 (emphasis added).

7

There are three important takeaways from the claim's plain language. First, the claim specifies that the CBS receives data from *an* information source; it does not require multiple information sources. Second, the claim specifies "transmitting generated data to a central broadcast server"; it does not require that the CBS receive the data *directly* from the information source. And third, the claim contains no language requiring that the "one or more servers" comprising the CBS be *interconnected* with each other.

These three important aspects of claim 1 are also consistent with the '154 patent specification. First, the specification discloses that a CBS can operate with a single information source. Specifically, it teaches that "[w]hen the central broadcast server 34 receives data packets from *the information source* 12, it pre-processes the data packets and wirelessly transmits the data packets to both on- and off-line computers 14." Appx79, 12:7-10 (emphasis added). Indeed, the specification explains that a CBS can receive a variety of real time data including "stock quotes, weather, lotto, E-mail, etc." from a single information source. Appx77, 8:12-21. It also teaches that "real time data feeds from the Internet 13 in the information source 12 are provided to a network of servers 33 in the central broadcast server 34…." *Id.*

Second, the '154 patent specification similarly does not require that data from an information source be provided *directly* to a CBS. Rather, the specification

states generally that information is simply provided by an information source to a CBS without any further description of how that transmission of information occurs: "*information provided* from the information sources 12 and transmitted to the central broadcast server 34 [are] transmitted wirelessly nationwide to personal computers 14 and other computing devices." Appx89, 32:11-20 (emphasis added).

And third, the '154 patent specification similarly does not require the servers that make up the CBS to be *interconnected*. In fact, it discloses the opposite: it discusses different servers including a file transfer protocol (FTP) server and a simple mail transfer protocol (SMTP) server that can operate separately and be included in the CBS to receive different data. Appx77, 7:25-28; 8:12-21. Figure 2 illustrates this configuration.



9

In Figure 2, FTP server 102 (shown in yellow) and SMTP server 104 (shown in green) are *not* interconnected. They can operate independently from each other to receive the different types of data via the Internet and provide them to separate parsers 106, 108, 110, and 112 (shown in pink and shades of blue) for further processing. *Id.* The specification therefore does not require those servers to be "interconnected."

Thus, in summary, the '154 patent discloses a CBS that can receive data (either directly or indirectly) from one information source via one or more reception servers (which can operate independently from each other) in order to provide remote devices with immediate notifications about information that becomes available at the information source. Claim 1 does not require multiple information sources, that the CBS receive data from the information sources directly, or that servers that comprise the CBS be interconnected. It was error for the Board to impose these three additional requirements, and but for any of these three errors, the Board should have found claim 1 unpatentable over Yan in view of Kane.

## II.     Overview of the Yan and Kane prior art combination.

In the underlying *inter partes* review, Google challenged the sole independent claim 1 of the '154 patent as being invalid over Yan, Appx2829-840 in view of Kane, Appx951-975. In rejecting Google's petition, the Board focused

on the combination of Yan and Kane as applied to independent claim 1, and specifically on claim 1's "central broadcast server." Appx23-24. The Board provided no other rationale for denying Google's petition. Google thus provides an overview of only Yan and Kane, and the Board's assessment of that combination.

### A. Yan describes a SIFT server that notifies users via email as information becomes available at an existing information source.

Yan, as the Board correctly summarized, describes a Stanford Information Filtering Tool (SIFT) server. Appx10; Appx2831 at Abstract. A SIFT server can be used to notify users of articles that become available from an existing source of information such as from a USENET News ("Netnews") server. Appx296-97; Appx2831-32. Yan discloses a second SIFT server that notifies users of Computer Science Technical Reports. Appx2835.

To receive such notifications from a SIFT server, a user subscribes to the SIFT server using either an email or a World Wide Web (WWW) interface and provides the SIFT server with a profile of interests by topic and parameters such as update frequency. Appx296; Appx2833. Specifically, the Board found that "[a]s the SIFT server receives new documents, a filtering engine processes them against stored subscriptions and sends notifications [to users] based on user-specified parameters." Appx296; Appx2833.

To notify the user when relevant information is available, the Board correctly found that "SIFT server sends email messages with excerpts of a certain

11

number of lines (as specified by the user) of new, potentially relevant documents." Appx297; Appx2834. After reading the emailed excerpt, a user may then retrieve and read the entire document. Appx297; Appx2835.

Yan's SIFT server thus operates similarly to a CBS in the '154 patent. A SIFT server is centrally placed between an existing source of information (*i.e.,* Netnews) and existing user devices to provide users with email notifications of new data (*i.e.,* Netnews articles) that becomes available at the information source. Yan's email notifications, however, are not provided wirelessly so that subscribers can receive time-critical notifications even if their devices are off-line, or not connected to the Internet or some other on-line service. For that feature, Google turned to Kane.

## B.    Kane allows Yan's SIFT to provide time-critical email notifications to users.

Kane fills the gap in Yan to provide time-critical notifications to subscribers even when the subscriber is off-line. Kane, as the Board correctly found, discloses an "electronic mail message delivery system 100, which […] transmits email messages over a paging communication channel to remote [] receiver[s]." Appx11-12; Appx951 at Abstract. Accordingly, Google argued that it would have been obvious to one of ordinary skill in the art to combine Yan and Kane such that Yan's time-critical email notifications could be provided to users via the wireless paging network of Kane. Appx153-54. Combining Kane with Yan thus allows

12

Yan's SIFT server to provide its email notifications wirelessly to provide time-critical notifications to users, and renders obvious the purported invention of the '154 patent.

### III. The Board (incorrectly) determined that Yan does not disclose the claimed "central broadcast server."

The Board correctly found that Yan discloses two separate SIFT servers for providing notifications to users—a first SIFT server that notifies users of Netnews articles, and a second SIFT sever that notifies users of Computer Science Technical Reports. Appx11. The Board also found that each of these two SIFT servers are connected to at least one "information source." Appx14 ("the Netnews SIFT server [] is configured to receive all Netnews data from a single information source"); Appx15 ("Yan teaches that a second SIFT server is used to receive and disseminate data from a second information source—Computer Science Technical Reports."). Accordingly, the Board acknowledged that Yan (and thus necessarily the combination of Yan and Kane) discloses at least two separate SIFT servers, each receiving data from a separate information source.

The Board also acknowledged that one of the SIFT servers in Yan, the Netnews SIFT server, receives data indirectly from numerous sources around the world: even though the Netnews articles are received by the Netnews SIFT server via a single local Netnews server, those "articles originate from Netnews servers around the world." Appx15. SimpleAir's expert Dr. Knox agreed, explaining in his

declaration that each of the various Netnews servers is "typically a single content provider—controlled by a different individual or organization" and "if a user access[ed] two different Netnews hosts[,] typically the user [] access[ed] two different content providers (and thus [would have] access[ed] two different information sources, provided the other requirements are met for the Netnews hosts to be an information source." Appx4033-34 at ¶ 218. Thus, the Netnews SIFT server disclosed in Yan receives articles from multiple information sources, even if it does so indirectly.

So despite the fact that Yan discloses **(a)** at least one SIFT server (the Netnews SIFT server) that receives data *indirectly* from *multiple* information sources, and also **(b)** two separate SIFT servers (the Netnews SIFT server and the Computer Science Technical Reports SIFT server) that each receives data *directly* from *a different* information source, the Board nonetheless found that Yan fails to disclose the claimed CBS, or render it obvious.

\*      \*      \*

To summarize, the Board erred because its construction of the claimed "central broadcast server" and its application of the CBS construction to the prior art incorrectly required (1) a *single server* configured to receive data *directly* from *plural* information sources, or (2) *multiple servers* that are *interconnected* to receive data from *plural* information sources. Appx13-16. As set forth below, that

14

false binary choice is premised on three separate claim construction errors, one explicit and two implied.

## SUMMARY OF THE ARGUMENT

The Board committed three successive errors in construing the '154 patent's "central broadcast server," each of which is a sufficient basis for this Court to reverse the Board's decision that Google did not prove unpatentability.

*First*, the Board erred by explicitly requiring the claimed "central broadcast server" to receive data from *a plurality* of information sources. This construction flatly contradicts the plain language of the claim, which requires only a single information source. If the claimed CBS is correctly construed to only require a single information source, then Yan's SIFT server meets that limitation because Yan's SIFT server unambiguously receives information directly from a *single* information source. Appx14 (the Board found that Yan's "Netnews SIFT server, which Google asserts to be a central broadcast server [], is configured to receive all Netnews data from a single information source").

*Second*, the Board erred by implicitly requiring the claimed "central broadcast server" to receive data *directly* from a plurality of information sources. Appx14-16. Even if the claims required a plurality of information sources—which they do not—they only require that the data is transmitted from the information source(s) to the CBS. There is no further requirement in either the claims or the

15

specification that the CBS must receive data *directly* from the information source(s), without any other intermediate steps along the transmission path. Without this erroneous extra requirement, Yan's SIFT server meets the limitation of the claimed CBS because it unambiguously receives data from a plurality of information sources—albeit indirectly. *Id.* (the Board acknowledged that while the Netnews SIFT server in Yan receives articles through a single local Netnews host server, the "articles originate from Netnews servers around the world").

*Third*, the Board erred by implicitly requiring that the "one or more servers" constituting the claimed "central broadcast server" be *interconnected*. The plain language of claim 1 does not require interconnection, and neither does the specification. Here too, if this erroneous extra requirement is not imposed, then Yan's plurality of SIFT servers qualify as a CBS because, together, they receive information directly from a plurality of information sources even though they are not interconnected. Appx20 (the Board agreed that Yan "uses two separate SIFT servers to process data from two different information sources").

If this Court agrees that the Board made any one of the three above-noted errors, it should reverse the Board's decision and find the challenged claims to be unpatentable. In the alternative, the Court should remand to the Board for further proceedings consistent with the correct construction of the "central broadcast server."

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions *de novo*, and its factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000). Claim construction is an issue of law that is reviewed *de novo*. *Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841-42 (2015). But underlying factual determinations concerning extrinsic evidence are reviewed for substantial evidence. *See id*. The central issue on appeal here is the Board's construction of the term "central broadcast server." And because the Board did not rely on expert testimony to construe the term CBS, the Board construction is reviewed *de novo*.

## ARGUMENT

The Board's first error in construing the term "central broadcast server"—that the CBS requires receipt of data from a *plurality* of information sources—has a long history behind it. This construction was originally propounded in a district court action captioned *SimpleAir, Inc. v. Apple Inc., et al.*, No. 2:09-CV-289-CE (E.D. Tex.) involving a different SimpleAir patent—namely, U.S. Patent No. 7,035,914 ("the '914 patent"), a parent of the '154 patent at issue here. Appx7-9; *see also* Appx3818-868. Google was not a party to that original action, and critically, the defendants there did not raise the issue of whether the CBS is required to receive data from a *plurality* of information sources, or whether receiving data from *one* information source is sufficient. Appx3823-34. That

original flawed construction was then adopted in subsequent district court actions[5] involving the '914 patent as well as the '154 patent against Google and numerous other defendants. Appx1707-09; Appx6258-60.

That construction, among others, was adopted into this IPR proceeding. But whatever the district court's original reasoning in the early civil action on the '914 patent, the Board erred when it adopted that construction, in its entirety, in this IPR proceeding. Just like the '154 patent, the two independent claims in the '914 patent each only require "transmitting data from *an information source* to a central broadcast server." Appx3917, 1:16-35; Appx3919, 38:37-55. (emphasis added). So the Board's explicit construction on this point (requiring the CBS to receive data from a *plurality* of information sources) is directly contrary to the actual claim language.

The Board made the other two implicit claim construction errors when it applied its CBS construction to Yan and Kane —namely that the CBS requires *direct* reception of data from information sources, and that multiple CBS servers must be *interconnected*.

Google addresses each of the three errors separately below.

---

[5] *SimpleAir, Inc. v. Microsoft Corp., et al.*, No. 2:11-CV-0416-JRG (E.D. Tex.); *see also* Appx1669-Appx1715.

*SimpleAir, Inc. v. Google, Inc. and YouTube LLC*, No. 2:14-CV-0011-JRG (E.D. Tex.); *see also* Appx6232-Appx6301.

I.     **The Board erred by explicitly construing the claimed "central broadcast server" of the '154 patent to require reception of data from a *plurality* of information sources.**

The Board's explicit construction requiring the CBS to receive data from a plurality of information sources is not consistent with the broadest reasonable interpretation of the claim, nor is it consistent with any construction under *Phillips v. AWH Corp*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). It is contrary to plain language of claim 1, and it does not find any support in the specification. Properly construed, the claimed CBS need receive data from only a single information source.

A.     **The construction of "central broadcast sever" is the same under either the *Phillips* or the BRI standard.**

In an IPR proceeding before the USPTO, the claims are given their broadest reasonable interpretation ("BRI") in light of the specification. *Cuozzo Speed Techs, LLC v. Lee*, 579 U. S. _, No. 15-446 (June 6, 2016). District courts, on the other hand, seek "out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out in *Phillips*.…" *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016). Here, under either BRI or this Court's standard in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), the correct

construction[6] of CBS is the same: "*one or more servers that are configured to receive data from <u>an information source</u>[7] and process the data prior to its transmission to one or more selected remote computing devices*." As detailed in the sections that follow (*infra* §§ I.B, I.C), the correct construction of CBS under either BRI or *Phillips* only requires reception of data from *one or more* information sources; not a *plurality* of information sources.

And even if the correct construction differed under the BRI standard, it could only be broader, or more inclusive—it could not properly be narrowed to *only* encompass the reception of data from *plural* information sources. *See In re Cuozzo Speed Techs.*, LLC, 793 F.3d 1268, 1277 (Fed. Cir. 2015), *cert. granted sub nom. Cuozzo Speed Techs., LLC v. Lee*, No. 15-446, 2016 WL 205946 (U.S. Jan. 15, 2016) (The USPTO can only reasonably broaden the construction under the BRI standard to "reduce[] the possibility that, after the patent is granted, the claims may be interpreted as giving broader coverage than is justified."). So

---

[6] Here, the '154 patent will expire on January 24, 2017, and the Board applies the *Phillips* standard for expired patents. *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.,* 806 F.3d 1356, 1359 (Fed. Cir. 2015). Hence, there is a possibility that the standard under which the claims of the '154 patent are to be construed may shift—from BRI to *Phillips*—during the pendency of this Appeal or if this Appeal results in a remand, when the Board reconsiders the '154 patent. *Id.* at 1360.

[7] The only difference between the correct construction and the Board's stated construction is that the correct construction requires reception of data from only "an information source" rather than from a "plurality of information sources."

because the broader construction—*i.e.*, "one or more" instead of only "a plurality"—is the correct construction, the Board erred under either claim construction standard.

> **B.    Requiring the "central broadcast server" to receive data from a *plurality* of information sources contradicts the plain language of the claims.**

The Board's construction of CBS as "one or more servers that are configured to receive data from a *plurality* of information sources …" Appx9 (emphasis added), contradicts the plain language of the claims of the '154 patent. Claim 1, the sole independent claim, plainly and unambiguously states that a CBS only needs to receive data from *one* information source. Claim construction begins with the claims, and "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1341, *citing Vitronics Corp. v. Conceptronix, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Claim 1 is reproduced below:

1. A method *to transmit data from <u>an</u> information source via a central broadcast server to remote computing devices*, the method comprising:

(a) *generating data at <u>the</u> information source*, wherein the information source is associated with an online service relating to the generated data;

…

(c) *transmitting the generated data to a central broadcast server* configured to process the generated data using at least one parser and transmit the processed data to receivers communicatively coupled with remote computing devices associated with subscribed users, *wherein the central broadcast server*:

(i) *comprises* one or more servers associated with *a parser to parse the generated data received from <u>the</u> information source*; ….

Appx89, 32:38-67 (emphasis added in underline).

The remaining claims of the '154 patent, which all depend from independent claim 1, likewise only refer to *the* information source first identified in the preamble of claim 1 as *an* information source. *See* Appx90, claims 8, 20-23, 26, 30. It is well-settled that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.,* 512 F.3d 1338, 1342 (Fed. Cir. 2008). To narrow the claim to require reception from a plurality of information sources is legal error. *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("the protocol of giving claims their broadest reasonable interpretation does not include giving claims a legally incorrect interpretation").

Accordingly, the '154 patent claims plainly do not require that data be received from a *plurality* of information sources; instead a proper interpretation of

these claims is that the CBS may receive data from *an* information source—that is, from one or more information sources.

## C.  Nothing in the specification requires a departure from the plain language of the claims.

There is no disclaimer or definition of a CBS in the specification to justify narrowing or changing the plain meaning of the CBS to instead require that it must receive data from a *plurality* of information sources. Although claims "must be read in view of the specification, of which they are a part," *Vitronics*, 90 F.3d at 979, "[w]hen claim language has as plain a meaning on an issue as the language does here, leaving no genuine uncertainties on interpretive questions relevant to the case, it is particularly difficult to conclude that the specification reasonably supports a different meaning." *Straight Path*, 806 F.3d at 1361. So "unless there is a disclaimer or redefinition, whether explicit or implicit, the proper construction of any claim language must, among other things, stay true to the claim language." *Id.* "For that reason, the court has repeatedly stated since *Phillips* that redefinition or disavowal is required where claim language is plain, lacking a range of possible ordinary meanings in context." *Id.*

The '154 patent does not disclaim a CBS that receives data from a single information source nor define a CBS as necessarily receiving data from plural information sources. With reference to its Figures 1 and 2, which depicts a "schematic diagram … in accordance with [its] present invention" Appx75, 4:14-

21, the specification refers to an information source labeled as 12 in the figures in both the singular and in the plural. For example, the specification refers to item 12 in the singular in some instances in making statements such as, "real time data feeds […] in *the information source* 12 are provided to […] the central broadcast server 34." Appx77, 8:12-15 (emphasis added); *see also* Appx79, 11:44-53; 11:65-12:2; 12:7-10.

In other instances, the specification refers to item 12 in the plural such as in stating that "information *sources* 12, such as the Internet, on-line services and other information sources, provide data feeds […] to […] the central broadcast server 34." Appx77, 7:59-62 (emphasis added). Hence, the specification describes both a singular information source 12 and plural information sources 12 that provide data to a CBS. Accordingly, there is no clear disavowal or definition of a CBS that excludes a CBS that receives data from a single information source.

The portions of the specification that the district courts previously relied upon when construing the CBS as receiving data from a plurality of information sources (Appx3832-33; Appx6258-59) which the Board then subsequently adopted (Appx7-9), do not support such a disavowal or a definition of the CBS. More specifically, in determining that a CBS should be construed to require reception of data from a plurality of information sources, the district court reasoned:

24

"The specification explains that 'information *sources* … provide the information basis for outgoing broadcast,' ['433 Patent[8]] 11:56-57, and the central broadcast server 'operates effectively as network operations center,' *id.* at 6:10-12, where 'the information [is] consolidated,' *id.* at 12:1-2, before its transmission to 'one or more personal computers 14 or other computing sources via selective receivers.' *Id.* at 12:26-29."

Appx3832-33; Appx6258-59 (emphasis added).

But those passages of the specification do not indicate that a CBS cannot receive data from only one information source. As noted above, the specification in other instances refers to only a single information source providing multiple data feeds to a CBS. Appx77, 8:12-15; Appx79, 11:44-53, 11:65-12:2, 12:7-10. Hence, the passages the district court relied on do not evidence a clear disavowal or definition of a CBS to exclude reception of data from a single information source. As this Court recently recognized, "[t]he standards for finding lexicography and disavowal are 'exacting'." *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (finding that disavowal "must be clear and unmistakable") (internal citations omitted). Thus the Board thus erred in adopting a claim construction of CBS that requires reception of data from a *plurality* of information sources.

---

[8] Citing to U.S. Patent No. 6,021,433, which is a parent of the '154 patent and shares a common specification with the '154 patent.

**D.      Under a correct construction, Yan discloses a "central broadcast server" that receives data from at least one information source.**

Because the Board erred in construing the claimed CBS to require reception of data from a *plurality* of information sources, the Board erred in finding that Yan's SIFT server was not equivalent to the claimed CBS. More specifically, the Board found two servers in Yan that receive and disseminate data, but found that each of these servers only receives data from a single information source. Appx14 (finding Yan discloses a first "SIFT server [that] is configured to receive all Netnews data from a *single information source*.") (emphasis added); Appx15 (finding Yan "teaches that a second SIFT server is used to receive and disseminate data from *a second information source* —Computer Science Technical Reports.") (emphasis added). The Board, therefore, wrongly determined that neither of Yan's servers constituted a CBS. Appx13-16.

If the Board had correctly construed CBS as only needing to receive data from *one or more* information sources, as recited by the claim language, the Board would have correctly found that Yan's SIFT servers satisfy the requirement of a CBS, as Google contended in its Petition. Appx148-54.

**II.      The Board separately erred by implicitly requiring the claimed "central broadcast server" to receive data *directly* from a plurality of information sources.**

Having adopted the district court's incorrect construction of CBS as "one or more servers that are configured to *receive data from a plurality of information*

26

*sources* and process the data prior to its transmission to one or more selected

remote computing devices" Appx9 (emphasis added), the Board further erred in

applying that construction by reading an additional limitation into the claim—

namely that a CBS receive data *directly* from the plurality of information sources.

Appx14-15.

### A.    Nothing in the claims nor in the specification require the "central broadcast server" to receive data *directly* from a plurality of information sources.

Nothing in the claims or in the specification of the '154 patent justifies the

Board's additional requirement to its construction of CBS that the CBS receive

data *directly* from a plurality of information sources. The plain language of claim 1

does not require the CBS to receive data *directly* from an information source. It

only requires that data from an information source be transmitted to, and ultimately

received by, a CBS. It is silent as to whether the CBS needs to receive the data

*directly* or *indirectly* from the information source. The relevant portions of claim 1

are reproduced below with emphasis:

> 1. A method to transmit data from an information source via a central
> broadcast server to remote computing devices, the method
> comprising:
> (a) *generating data at the information source*, wherein the information
> source is associated with an online service relating to the generated
> data;
> …

> (c) *transmitting the generated data to a central broadcast server* configured to process the generated data using at least one parser and transmit the processed data to receivers communicatively coupled with remote computing devices associated with subscribed users, *wherein the central broadcast server:*
>
> (i) *comprises* one or more servers associated with *a parser to parse the generated data received from the information source*; ….

Appx89, 32:38-67 (emphasis added).

By contrast, the patentee knew how to explicitly specify when a direct connection between two components was required because it did so in other cases. For example, dependent claim 20 recites, "wherein the launch of the viewer *establishes an Internet connection between the remote computing device and the information source*." Appx90, 33:62-65 (emphasis added); *see also* Appx90, claims 21, 22, 23, 30. But there is no similar requirement for such a specific or direct connection between a CBS and an information source in any of the claims of the '154 patent. Accordingly, the claims of the '154 patent plainly do not require that data transmitted by an information source be *directly* received by a CBS. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) (noting that "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms").

The specification is consistent with claim 1. It does not disavow or redefine the plain meaning of the claims to require the CBS to receive data *directly* from a

28

plurality of information sources. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) ("Absent lexicography or disavowal, we do not depart from the plain meaning of the claims."). To the contrary, the specification describes in various instances and in general terms an information source providing data to a CBS without specifying whether the data is to be provided directly or indirectly. For example, it states: "information *provided* from the information sources 12 and transmitted to the central broadcast server 34 [can] be consolidated in accordance with the present invention." Appx83, 20:36-46 (emphasis added); *see also* Appx79, 12:3-7; Appx81, 15:27-29; Appx89 32:11-20.

Hence, there is no clear intention to redefine, nor is there a clear and unmistakable disavowal in the specification that requires a CBS to receive data only *directly* from an information source. *Luminara Worldwide,* 814 F.3d at 1353 ("The standards for finding lexicography and disavowal are 'exacting.'") (internal citations omitted). So the Board erred in implicitly imposing an additional requirement that the CBS receive data *directly* from an information source. *PPC Broadband*, 815 F.3d at 740 (the *Phillips* standard seeks "out the correct construction—the construction that most accurately delineates the scope of the claimed invention").

**B.** **Under the Board's own construction, Yan discloses a "central broadcast server" that receives data *indirectly* from a plurality of information sources.**

If the Board's own construction is properly applied, without the added limitation requiring direct reception of data, then Yan's SIFT server reads on the claimed CBS. Specifically, the Board acknowledged that a Netnews SIFT server, which Google contends is the claimed CBS, receives Netnews articles and that those "articles originate from Netnews servers around the world." Appx14-15. SimpleAir's expert Dr. Knox explained that each of those Netnews server would typically be a different content provider and therefore a different source of information. Appx4033-34 at ¶ 218.

But because the last step in the path from which Yan's Netnews SIFT server receives the articles comes through a single local Netnews host (even though those articles originate from various Netnews hosts around the world) Appx14-15, the Board mistakenly determined that the Netnews SIFT server receives data *directly* from only a single information source and therefore could not be a CBS. Appx13-16. Nothing in the Board's construction of CBS, however, requires the plural information sources to transmit data directly to the CBS. The Board thus committed reversible error by not applying its own stated construction. *See Ferring B.V. v. Watson Labs., Inc. Florida*, 764 F.3d 1401, 1410-11 (Fed. Cir. 2014) (noting that a district court's application of a construction other than its stated

30

construction "alone would constitute reversible error as it would not follow its own claim construction").

The Board's misapplication of its own construction led it to incorrectly find that Yan's Netnews SIFT server is not the claimed CBS, and to erroneously deny Google's petition on that basis Appx13-16, Appx23. Had the Board applied its construction correctly, Yan's Netnews SIFT server would easily meet the requirements of a CBS because it plainly receives data (albeit indirectly) from a plurality of information sources.

## III. The Board additionally erred by implicitly requiring that the "one or more servers" constituting the claimed "central broadcast server" be *interconnected*.

After adopting the district court's construction of CBS as "*one or more servers* that are configured to receive data from a plurality of information sources and process the data prior to its transmission to one or more selected remote computing devices" Appx9 (emphasis added), the Board further erred in applying that construction by additionally requiring that the servers forming a CBS be interconnected (Appx20-21).

### A. Neither claim 1 nor the specification require that the one or more servers of a "central broadcast server" be *interconnected*.

Neither the plain language of the claims nor the specification requires that multiple servers be *interconnected* in order to qualify as a CBS. Rather claim 1 requires only that a CBS include one or more servers; there are no further

31

requirements that the one or more servers of a CBS that receives data must be interconnected to operate with each other. Claim 1 is reproduced below with relevant portions emphasized:

1. A method to transmit data from an information source via a central broadcast server to remote computing devices, the method comprising:

(a) *generating data at the information source* …

…

(c) *transmitting the generated data to a central broadcast server* configured to process the generated data using at least one parser and transmit the processed data to receivers communicatively coupled with remote computing devices associated with subscribed users, *wherein the central broadcast server:*

(i) *comprises one or more servers* associated with a parser to parse the generated data received from the information source;

(ii) is communicatively coupled to at least one information gateway, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks; and

(iii) is communicatively coupled to at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers, and wherein the transmission is made whether the remote computing devices are online or offline from a data channel associated with the remote computing devices.

Appx89, 32:38-67 (emphasis added).

Again, the patentee knew how to explicitly require some level of interconnection with a CBS when he intended to do so. For example, independent claim 1, as shown above, requires that "at least one information gateway" and "at least one transmission gateway" be "communicatively coupled" to the CBS. But none of the claims of the '154 patent require that each server of a CBS be coupled or interconnected with every other server of the CBS. Hence, the claims of the '154 patent plainly do not require that the "one or more servers" of a CBS that receive data from plural information sources must be interconnected to operate with each other.

And like before, the specification neither disavows nor redefines the plain meaning of the claims as to require that each of the one or more servers of a CBS be interconnected. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) ("Absent lexicography or disavowal, we do not depart from the plain meaning of the claims."). In fact, the specification describes servers, which can be a part of a CBS, that receive data from information sources but do not communicate with each other. These CBS servers are therefore <u>not interconnected</u>. For example, the specification discloses that a CBS can include both a "FTP server 102 and [a] SMTP server 104 as illustrated in FIG.2" that can receive data from information sources. Appx77, 8:6-15. Figure 2 of the '154 patent, which is reproduced below, depicts the FTP server 102 (shown in yellow)

33

and SMTP server 104 (shown in green) as operating without communicating with each other—*i.e.* not interconnected. Those servers are shown operating separately from each other and providing data (depicted by arrows) such as stock quotes, weather information, lotto information and personal e-mail not to each other, but instead to separate downstream parsers (shown in red and different shades of blue) that ultimately provide parsed data separately to a content manager. *Id.* at 8:12-21.

Hence, the FTP server 102 and SMTP server 104 are depicted and described as being a part of a CBS, but operating separately and not communicating with each other. Thus, far from there being a clear intention to redefine or a clear and unmistakable disavowal that requires that each of the one or more servers of a CBS be interconnected with each other, the specification in fact explicitly describes components of a CBS that are *not* interconnected; and it was error for the board to impose a requirement of interconnectedness that is not supported by the claim language and is directly contradicted by the example in the specification. *Luminara Worldwide,* 814 F.3d at 1353 ("The standards for finding lexicography and disavowal are 'exacting.') (internal citations omitted)).

Furthermore, contrary to the Board's assertion, the term "central" in "central broadcast server" does not impose a requirement that each of the one or more servers of a CBS be underlined interconnected with each other. Appx19-20. Figure 2 is illustrative:

34



Appx45.

As shown in the annotated Figure 2 above, two non-interconnected servers—FTP server 102 and SMTP server 104—would still be located centrally between one or more information sources 12 and remote computing devices 14 (shown in Figure 1 coupled to the wireless broadcast network 36 of Figure 2) regardless of whether they are "interconnected" with each other.

As discussed above (*supra* Statement of the Case § I), a key aspect of a CBS is its ability to extend the reach of an existing information source to provide

notifications to remote computing devices even when those devices are not connected to the Internet. *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, No. 2015-1251, 2016 WL 1274445, at *7 (Fed. Cir. Apr. 1, 2016) (noting while discussing the '914 patent, a parent of the '154 patent sharing the same specification, that "a key aspect of the invention is the ability of a remote device to receive notifications even when it is not connected to the Internet by traditional means."). Moreover, the '154 patent explains that "[i]n operation, data parsed from a plurality of incoming data feeds from existing information sources is prepared for optimized wireless transmission and then transmitted nationwide to … non-connected computing devices thereby extending the reach of existing information sources." Appx75, 3:30-36. Hence, the "central" aspect of CBS refers to location— that is, its servers being logically located *between* an existing information source and numerous remote devices to extend the ability of the existing information source to reach those remote devices. It does not impose any requirement that every server of a CBS be interconnected with each other.

Accordingly, a correct construction of CBS under the *Phillips* standard would not require that the one or more servers of the CBS be interconnected. *PPC Broadband*, 815 F.3d at 740 (Fed. Cir. 2016) (the *Phillips* standard seeks "out the correct construction—the construction that most accurately delineates the scope of the claimed invention"). And, that construction cannot be narrowed to impose that

requirement under the BRI standard. *See supra* § I.A. Thus under the BRI standard as well, it would not be proper to require that the one or more servers of the CBS be interconnected. *Microsoft Corp. v. Proxyconn, Inc.,* 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("giving claims their broadest reasonable interpretation does not include giving claims a legally incorrect interpretation").

> **B.     Under the Board's own construction, Yan discloses at least two *non-interconnected* servers that constitute a "central broadcast server."**

Even though the Board's own construction of CBS does not require interconnectedness between the one or more servers of a CBS that receives data from plural information sources, the Board, however, imposed that additional requirement in incorrectly concluding that Yan does not disclose a CBS.

There is no dispute that Yan discloses at least two SIFT servers that collectively receive data from a plurality of information sources as required by the Board's adopted construction of CBS. SimpleAir's expert Dr. Knox agrees. He testified that Yan "uses two separate SIFT servers to process data from two different information sources." Appx20. Indeed, in its institution decision, before the Board mistakenly inserted the additional requirement of interconnectedness, it found that the two separate SIFT servers in Yan could qualify as a CBS because "[e]ach server can receive data from one … information sources" such that the two

separate servers together would receive data from a plurality of information sources. Appx301-02.

But later, in its final decision, the Board wrongly concluded that the two SIFT servers in Yan do not qualify as a CBS because they are not interconnected— a requirement that appears neither in the claims nor in the Board's construction. Appx9; Appx19-21. Here too the Board committed reversible error by misapplying its own stated construction. *Ferring*, 764 F.3d at 1410-11 (noting that a district court's application of a construction other than its stated construction "alone would constitute reversible error as it would not follow its own claim construction").

This error prevented the Board from finding that the two SIFT servers in Yan constitute a CBS and ultimately from finding that the challenged claims of the '154 patent are invalid. Appx16-23 Accordingly, if the Board had not required that the one or more servers of a CBS be interconnected, it would not have denied Google's petition on that basis.

## CONCLUSION AND RELIEF SOUGHT

Correcting any one of the claim construction errors would necessitate a finding that Yan's SIFT server(s) qualify as the claimed "central broadcast server," and that claim 1 is unpatentable over the combination of Yan and Kane. Accordingly, Google respectfully requests that the Board's Final Written Decision be reversed and that claims 1-4, 6, 8-11, 13, 14, 16, 20, 21, and 29-31 of the '154 patent be found invalid. In the alternative, Google respectfully requests that this case be remanded to the Board for further proceeding based on a correct construction of "central broadcast server."


Dated: June 24, 2016

Respectfully submitted,

/s/ Jon E. Wright
Jon E. Wright
Michael V. Messinger
Brian W. Lee
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellant,*
*Google Inc.*

# CERTIFICATE OF SERVICE

I, Jon E. Wright, hereby certify that a copy of **PRINCIPAL BRIEF FOR APPELLANT** was served by electronic mail via the CM/ECF system, addressed to:

> John Jeffrey Eichmann
> Dovel & Luner, LLP
> 201 Santa Monica Blvd, Suite 600
> Santa Monica, CA 90401
> Tel.: 310-656-7066
> Fax: 310-656-7069
> jeff@dovel.com

Dated: June 24, 2016                Respectfully submitted,

/s/ Jon E. Wright
Jon E. Wright
Michael V. Messinger
Brian W. Lee
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellant,*
*Google Inc.*

## **Addendum Table of Contents**

Final Written Decision, Paper 37, February 16, 2016 ................................................ Appx00001

U.S. Patent 8,601,154 to Payne et al. ......................................................................... Appx00027

Trials@uspto.gov
571-272-7822

Paper 37
Date:  February 16, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE INC.,
Petitioner,

v.

SIMPLEAIR, INC.,
Patent Owner.

_____

Case IPR2015-00180
Patent 8,601,154 B2

_____

Before JAMES P. CALVE, JUSTIN T. ARBES, and TINA E. HULSE,
*Administrative Patent Judges.*

CALVE, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2015-00180
Patent 8,601,154 B2

## I.    BACKGROUND

Petitioner Google Inc. ("Google") filed a Petition (Paper 1, "Pet.")
seeking *inter partes* review of claims 1–4, 6–11, 13–17, 19–21, 24, 27, and
29–34 of U.S. Patent No. 8,601,154 B2 (Ex. 1001, "the '154 patent").
Patent Owner SimpleAir, Inc. ("SimpleAir") filed a Preliminary Response.
Paper 9 ("Prelim. Resp.").  Based on these submissions, we instituted trial as
to claims 1–4, 6, 8–11, 13, 14, 16, 20, 21, and 29–31 of the '154 patent. *See*
Papers 11 ("Dec. on Inst."), 15 (noting SimpleAir filed a statutory disclaimer
of claims 19, 24, 27, 33, and 34 of the '154 patent); Ex. 3002.  SimpleAir
filed a Response.  Paper 22 ("PO Resp.").  Google filed a Reply.  Paper 26
("Pet. Reply").

An oral argument was conducted on December 15, 2015.  A transcript
of the argument is entered in the record.  Paper 36 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written
Decision is entered pursuant to 35 U.S.C. § 318(a).

### A. Related Proceedings

The parties identify the following proceedings as affecting or being
affected by a decision in this proceeding:  *SimpleAir, Inc. v. Amazon.com
Inc.*, No. 2-14-cv-00679 (E.D. Tex.); *SimpleAir, Inc. v. Microsoft Corp.*, No.
2-11-cv-00416 (E.D. Tex.); *SimpleAir, Inc. v. Google Inc.*, No. 2-13-cv-
00587 (E.D. Tex.); *SimpleAir, Inc. v. Google Inc.*, No. 2-13-cv-00937 (E.D.
Tex.); and *SimpleAir, Inc. v. Google Inc.*, No. 2-14-cv-00011 (E.D. Tex.).
Pet. 55; Paper 4, 1–2.

IPR2015-00180
Patent 8,601,154 B2

### B. The '154 Patent (Ex. 1001)

The '154 patent discloses wireless communication system 10. *See* Ex. 1001, 5:40–43. Internet and on-line information sources 12 provide data feeds 16 to a network of servers 33 in central broadcast server 34 where data feeds are parsed, compressed, encrypted, and packetized for broadcast. *Id.* at 7:59–66. Central broadcast server 34 operates as a network operations center. *Id.* at 6:29–30. Data parsed from plural incoming data feeds 16 from information sources 12 is transmitted wirelessly by central broadcast server 34 through wireless network 36 to connected and non-connected computing devices 14, as illustrated in Figure 1, reproduced below. *Id.* at 6:46–50.



FIG. 1

Figure 1 is a schematic diagram of a communication network. Once data is received at the user end, communications server 38 in message server design 18 notifies user interface panel 50, which presents an icon that, when clicked, notifies viewers 20 that are registered to display particular data on user computer 14 and alerts users to incoming messages. *Id.* at 6:52–62.

3

IPR2015-00180
Patent 8,601,154 B2

Real time data feeds from information sources 12 are provided to a
network of servers 33 in central broadcast server 34, such as FTP server 102
and SMTP server 104, shown in Figure 2, reproduced below. *Id.* at 8:9–15.



Figure 2 is a block diagram of the wireless communication network of
Figure 1. Data, such as stock quotes, weather, lotto, and email, are parsed
by stock quote parser 106, weather parser 108, lotto parser 110, and mail
parser 112, and transmitted to content manager 114 in central broadcast
server 34. *Id.* at 8:16–21. Content manager 114 specifies priorities for
different types of information, determines what information is transmitted or
rejected, and also applies scheduling rules 132 to determine when messages
are transmitted to users and the format used. *Id.* at 8:42–51. Content

4

IPR2015-00180
Patent 8,601,154 B2

manager 114 communicates with information gateway 134, which builds and addresses data blocks. *Id.* at 8:62–67, 22:13–18. Wireless gateway 136 packetizes, compresses, and encrypts data blocks for transmission over wireless broadcast network 36. *Id.* at 9:18–20, 11:31–40.

### C.  Illustrative Claim

Claim 1, the sole independent claim, is reproduced below.

1.  A method to transmit data from an information source via a central broadcast server to remote computing devices, the method comprising:

(a) generating data at the information source, wherein the information source is associated with an online service relating to the generated data;

(b) identifying one or more users that have subscribed to receive a notification relating to the generated data;

(c) transmitting the generated data to a central broadcast server configured to process the generated data using at least one parser and transmit the processed data to receivers communicatively coupled with remote computing devices associated with subscribed users, wherein the central broadcast server:

(i) comprises one or more servers associated with a parser to parse the generated data received from the information source;

(ii) is communicatively coupled to at least one information gateway, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks; and

(iii) is communicatively coupled to at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers, and wherein the transmission is made whether the remote computing devices are online or offline from a data channel associated with the remote computing devices.

5

IPR2015-00180
Patent 8,601,154 B2

### D. Prior Art

Google relies on the following references:

| Reference | Patent/Printed Publication | Date | Exhibit |
|---|---|---|---|
| Kane | WO 94/08419 A1 | Apr. 14, 1994 | 1009 |
| Verkler | US 5,850,517 | Dec. 15, 1998 (filed Aug. 31, 1995) | 1040 |
| Yan | SIFT – A Tool for Wide-Area Information Dissemination, Proceedings of the 1995 USENIX Technical Conference, 177–186 | Jan. 16–20, 1995 | 1042 |
| Simon | The Windows 95 User Interface, PC Magazine, Vol. 14, No. 13, 310–314 | July 1995 | 1043 |
| Reilly | US 5,740,549 | Apr. 14, 1998 (filed June 12, 1995) | 1044 |
| Olazabal | US 5,323,148 | June 21, 1994 (filed May 9, 1993) | 1045 |

### E. Instituted Grounds of Unpatentability

We instituted proceedings as to claims 1–4, 6, 8–11, 13, 14, 16, 20, 21, and 29–31 of the '154 patent on the following grounds:

| References | Basis | Claim(s) Challenged |
|---|---|---|
| Yan, Kane | § 103 | 1–3, 6, 8, 29 |
| Yan, Kane, Verkler | § 103 | 4 |
| Yan, Kane, Reilly | § 103 | 9, 10, 14, 16, 20, 21 |
| Yan, Kane, Olazabal | § 103 | 11 |
| Yan, Kane, Reilly, Simon | § 103 | 13 |
| Yan, Kane, Verkler, Reilly | § 103 | 30, 31 |

6

IPR2015-00180
Patent 8,601,154 B2

## II.    ANALYSIS

### A.    *Claim Interpretation*

In an *inter partes* review, claims of an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1278 (Fed. Cir. 2015) ("Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation"), *cert. granted sub nom. Cuozzo Speed Techs. LLC v. Lee*, 84 U.S.L.W. 3218 (Jan. 15, 2016) (No. 15-446); 37 C.F.R. § 42.100(b). Claim terms are given their ordinary, customary meaning as understood by a skilled artisan in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

In co-pending litigation for U.S. Patent No. 7,035,914 B1 ("the '914 patent"), a parent of the '154 patent, the district court interpreted terms of the '914 patent. Ex. 1026. Google sets forth the district court's construction of seven limitations and asserts the Board may adopt a broader construction but should not read identical claim terms more narrowly than the district court did for the '914 patent. Pet. 9–11; *see* Ex. 1002 ¶¶ 73–74. SimpleAir argues that the district court's constructions are consistent with the broadest reasonable interpretation of those terms. PO Resp. 8; *see* Ex. 2005 ¶ 73.

On April 27, 2015, the district court in co-pending litigation relating to the '154 patent construed terms of the '154 patent. Ex. 3001. The district court's interpretations are largely the same as the interpretations proposed by the parties and are set forth below. *See id.* at 8–70. Google agrees that the district court's interpretations also represent the broadest reasonable interpretation of the terms for purposes of this proceeding. Tr. 9:9–20.

7

IPR2015-00180
Patent 8,601,154 B2

| Claim Term | Construction |
|---|---|
| "data channel" | "one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network" (Ex. 3001, 61) |
| "whether the remote computing devices are online or offline from a data channel associated with the remote computing devices" | "whether the remote computing devices are or are not connected via the Internet or another online service to a data channel associated with each computing device at the time the addressed data block is received by the receivers, wherein the data channel is for accessing information from the information source that sent the data" (Ex. 3001, 61–62) |
| "an information source" | "one or more content or online service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages, or emails" (Ex. 3001, 8–9) |
| "process the generated data using at least one parser" | "using one or more computer software programs, routines, or functions to break or divide data received from an information source into components whose content or format can be analyzed, processed or acted upon" (Ex. 3001, 33) |
| "at least one information gateway, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks" | "one or more software programs (or a portion of a program) that act as an interface between other software resources and that build data blocks from the parsed data and assign addresses to the data blocks" (Ex. 3001, 40–41) |

8

IPR2015-00180
Patent 8,601,154 B2

| Claim Term | Construction |
|---|---|
| "at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers" | "one or more software programs (or a portion of a program) that interface with other resources used to transmit the addressed data blocks and that are configured to prepare the addressed data blocks for transmission to receivers and configured to cause the addressed data blocks to be transmitted to the receivers"  (Ex. 3001, 51) |
| "a central broadcast server" | "one or more servers that are configured to receive data from a plurality of information sources and process the data prior to its transmission to one or more selected remote computing devices" (Ex. 3001, 29) |
| "contextual graphics" | "graphics relating to the context of the transmitted data that has been receive[d]"  (Ex. 3001, 70) |

After considering the trial record, we determine that the constructions set forth above are consistent with the broadest reasonable interpretation of those terms and adopt these constructions for purposes of this Final Written Decision.[1]

---

[1] It appears that the '154 patent will expire on January 24, 2017.  Under the facts developed during trial, our constructions of these terms would not vary under the *Phillips* standard, which the district court applied.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1311–24 (Fed. Cir. 2005); Ex. 3001, 3.

9

IPR2015-00180
Patent 8,601,154 B2

> B.    *Asserted Grounds of Unpatentability*
>
> 1. *Claims 1–3, 6, 8, and 29*
> *Obvious over Yan and Kane*
>
> a. *Overview of Yan (Ex. 1042)*

Yan describes an information dissemination service using a Stanford Information Filtering Tool (SIFT) that filters large volumes of information against a large number of user/subscriber profiles.  Ex. 1042, Abstract, 178.  SIFT filtering engines operate on hardware such as a DECstation 5000/240.  *Id.* at 180.  Figure 1 of Yan, reproduced below, illustrates this system.



Figure 1 provides an overview of SIFT.  *Id.* at 179.

Users send subscription requests to a SIFT server via email or a World Wide Web ("WWW") graphical client interface specifying areas of interest, such as underwater archeology.  *Id.* at 179.  As the SIFT server receives new documents, the filtering engine processes them against stored subscriptions and sends out notifications based on user-specified parameters.  *Id.*  A SIFT server sends email messages with excerpts of a certain number of lines (as specified by the user) of new, potentially relevant documents.  *Id.* at 180.  After reading the excerpt, a user may access the SIFT server to retrieve the

10

IPR2015-00180
Patent 8,601,154 B2

entire document via an email interface or WWW viewer. *Id.* Thus, users can access the Netnews SIFT server via email or the WWW. *Id.* Users may access their local news host to access an article, or they may request that the entire article be sent from the SIFT server. *Id.* at 181.

Yan discloses use of a SIFT server to disseminate tens of thousands of Netnews articles daily to some 13,000 subscribers. *Id.* at 178. Yan discloses another SIFT server disseminating Computer Science Technical Reports to around 1,000 subscribers. *Id.* at 181. Yan discloses that limits to the load a SIFT server can handle require SIFT servers to be replicated at other sites in the United States and Europe to provide the same service. *Id.* at 180.

### b. *Overview of Kane (Ex. 1009)*

Kane discloses electronic mail message delivery system 100, which includes electronic mail network 113 and paging terminal 102 that receives, stores, encodes, and transmits email messages over a paging communication channel to remote selective call receiver 130. Ex. 1009, Abstract. Figure 1, reproduced below, illustrates this system.



11

IPR2015-00180
Patent 8,601,154 B2

Figure 1 is a block diagram of a communication system. System 100 includes encoder 120, communication path 122, and transmitters 124, 126, to deliver messages to portable remote units (call receiver 130). *Id.* at 4:3–13. Central terminal 102 has input sections 110 that interface with public switched telephone network (PSTN) 107 so personal computers and other computing devices 104 can access input sections 110 and central terminal 102 through PSTN 107 using a dial-up telephone line and modem. *Id.* at 4:7–18. Other input sections 112 of central terminal 102 receive requests from local personal computers, a console, or other terminal device. *Id.* at 4:26–30. Controller 114 couples messages to paging encoder 120 over bus 116 for encoding the messages for transmission over a paging channel. *Id.* at 6:1–3. Paging encoder 120 couples encoded messages to communication path 122 and paging transmitter systems 124, 126, for transmission over a paging communication channel and reception by one or more selective call receivers 130. *Id.* at 6:3–6, Fig. 1.

### c. Analysis

Regarding claim 1, Google asserts that Yan discloses a method to transmit data from an information source via a central broadcast server, as a SIFT server disseminates tens of thousands of Netnews articles daily and can disseminate additional sources such as Computer Science Technical Reports. Pet. 20. Google asserts that Kane discloses email delivery system 100 and email network 113 that deliver messages from originating devices to remote computing devices 130. *Id.* Google asserts that it would have been obvious to use Kane's email delivery system to deliver email notifications from Yan's SIFT server as a way to improve a similar system for predictable results. *Id.* at 21–22 (citing Ex. 1002 ¶¶ 93–94).

12

IPR2015-00180
Patent 8,601,154 B2

The dispositive issue with respect to claim 1 is whether Yan teaches or suggests a "central broadcast server." Under our interpretation set forth above, a "central broadcast server" can be (1) a single server configured to receive data from plural information sources *or* (2) multiple servers that are collectively configured to receive data from plural information sources. As set forth more fully below, Google has not established by a preponderance of evidence that Yan teaches or suggests a single server configured to receive data from multiple information sources, or multiple servers configured as a central broadcast server to receive data from multiple information sources.

*Single server receiving data from plural information sources*

A central broadcast server can comprise a single server if that server is configured to receive data from multiple information sources. We interpret "an information source," in part, as "one or more content or online service providers that provide data to the central broadcast server."

Google asserts that Yan discloses two SIFT servers, each of which receives data from a single information source. *See* Pet. 20. Google asserts that "Yan discloses *an* information source whose information is associated with an online service, *e.g.*, 'Netnews is an extremely diverse source of information.'" Pet. 22 (emphasis added). Google also asserts that Yan "set up another SIFT server, disseminating Computer Science Technical Reports." *Id.* at 20 (quoting Ex. 1042, 181). However, Google asserts that a single Netnews SIFT server is the central broadcast server. *Id.* at 23–24. Google also contends that the Netnews system provides the articles from *an* electronic bulletin board system. *Id.* at 22–23. Google's contention that Yan discloses a single SIFT server that disseminates Netnews articles and another SIFT server that disseminates Computer Science Technical Reports

13

IPR2015-00180
Patent 8,601,154 B2

does not persuade us that Yan discloses a single SIFT server configured to receive data from multiple information sources. *See* Pet. 20; Pet. Reply 3.

Google's declarant, Vijay Madisetti, Ph.D., treats Netnews as *an* information source. Ex. 1070 ¶ 4 (opining that Yan discloses a central broadcast server as "a SIFT server distributing Netnews articles and a SIFT server distributing computer science technical reports—that receive information from two information sources, one for Netnews and one for technical reports."); Ex. 1002 ¶ 96 (stating Netnews, an online information source, "provides articles from an electronic bulletin board service").

In its Reply, Google asserts that Yan's Netnews SIFT server receives information from a plurality of information sources. Pet. Reply 4. Google asserts that Netnews is a network of News Servers or News Hosts and when Yan's SIFT server receives articles from a local news host, the articles originate from Netnews servers around the world and each of these servers is an information source. *Id.* at 4–5. Google thus contends that Yan's SIFT server receives data from multiple information sources *indirectly* through an intermediate device, i.e., a local Netnews news host. *Id.* at 5.

We are not persuaded by this argument. Although Yan discloses that the Netnews SIFT server receives tens of thousands of Netnews articles daily, the articles come from a *single* electronic bulletin board (Pet. 23) or Netnews Host, as Google acknowledges. *See* Ex. 1042, 177–79, 181–82, Fig. 1; Pet. Reply 4. Thus, the Netnews SIFT server, which Google asserts to be a central broadcast server (Pet. 23), is configured to receive all Netnews data from a single information source – a local host. Ex. 1042, 182 (38,000 Netnews articles were received by "our department's news host" and filtered with subscriber profiles in *the* Netnews SIFT server); PO Resp.

14

IPR2015-00180
Patent 8,601,154 B2

18.  SimpleAir's declarant, James Knox, Ph.D., testified that Yan's SIFT
server is configured to receive articles from a single information provider, a
Netnews news host.  Ex. 2005 ¶ 103.  Dr. Madisetti testified that Yan's SIFT
server is configured for Netnews only and is connected to only one Netnews
server.  Ex. 2006, 33:4–8, 51:19–52:12 ("There is just one Netnews server
that is connected to the Netnews SIFT server in Yan."), 57:10–20; Ex. 1070
¶ 7 (testifying that users access Netnews articles through a newsreader that is
connected to a "local Netnews host," although the articles originate from
Netnews servers around the world); Tr. 13:24–14:2 (acknowledging that the
"Netnews SIFT server . . . would be receiving from *a* Netnews server"
(emphasis added)).  This testimony from the parties' declarants is supported
by the disclosure of Yan itself, as explained above.  Google therefore has not
established Yan's Netnews SIFT server as being configured to receive data
from more than one information source.

Google also asserts that "Yan suggests that any of the SIFT servers
could have additional sources of information" by teaching that "[s]ifting
Netnews is just one application of SIFT" and "[w]e have set up another SIFT
server, disseminating Computer Science Technical Reports."  Pet. 20
(quoting Ex. 1042, 181).  This portion of Yan does not disclose a single
SIFT server configured to receive data from multiple information sources,
however.  Rather, Yan teaches that a second SIFT server is used to receive
and disseminate data from a second information source – Computer Science
Technical Reports.  Ex. 1042, 181; PO Resp. 18–19; Ex. 2005 ¶¶ 104–105.

Google further asserts that Dr. Knox agreed that an information
source need not provide the data directly to the central broadcast server.  Pet.
Reply 5.  This argument is not persuasive either.  When asked whether a

15

IPR2015-00180
Patent 8,601,154 B2

Netnews server that was coupled to another server that was sending information to users would be an information source, Dr. Knox testified, "I don't see any reason based just on what you said that it would be no." Ex. 1065, 27:8–9. Thus, Dr. Knox did not agree that a remote server transmitting information to a user via a local server is an information source as recited in claim 1. Even if he had, his testimony would be inapposite because we interpret "information source," in part, as "one or more content or online service providers that provide data to the *central broadcast server*." The relevant inquiry is the provision of data to a central broadcast server, not to a user. Dr. Knox testified that data travels over the Internet via backbone routers, servers, and other things. *Id.* at 157:1–4. This testimony does not support a finding that Yan's Netnews SIFT server is configured to receive data from more than one information source, however.

For all these reasons, Google has not established that a Netnews SIFT server is a central broadcast server, which must be configured to receive data from multiple information sources.

*Plural servers receiving data from plural information sources*

Google also asserts that Yan discloses a central broadcast server as a SIFT server that distributes Netnews articles and another SIFT server that distributes Computer Science Technical Reports. Pet. Reply 3 (citing Pet. 20). Google does not explain sufficiently how these two different SIFT servers collectively comprise a central broadcast server configured to receive data from more than one information source, rather than two individual servers, each of which receives data separately from a single information source, i.e., Netnews or computer science technical reports. Pet. 20; Pet. Reply 3.

16

IPR2015-00180
Patent 8,601,154 B2

In the Petition, Google asserts that Yan discloses a method to transmit data from an information source via a central broadcast server, as recited in the *preamble* of claim 1, by a SIFT server disseminating Netnews articles daily and another SIFT server disseminating Computer Science Technical Reports. Pet. 20. Google did not assert that these two separate SIFT servers together form a central broadcast server. *Id.* at 23–25; Ex. 1002 ¶¶ 98–100, Claim Chart A, 1.3, 1.3a. Google relied on Yan's Netnews SIFT server to disclose a central broadcast server by asserting "Yan discloses a central broadcast server which receives and parses data" and as "the SIFT server receives new documents [from Netnews], the filtering engine will process them against stored subscriptions." Pet. 23 (quoting Ex. 1042, 179). Dr. Madisetti also testified that a single Netnews SIFT server is the central broadcast server that receives documents from a single information source – Netnews – and parses the data. Ex. 1002 ¶ 98, Claim Chart A, 1.3.

Google asserts in the Petition that "Yan discloses parsing the received data message where the processing involves parsing of the documents by *the* SIFT server because a part of a document (a number of lines) is identified and serves as the excerpt in an email message." Pet. 24–25 (citing Ex. 1042, 180) (emphasis added). This portion of Yan discusses a single SIFT server that receives and disseminates only Netnews articles. Ex. 1042, 180. The Petition does not explain how a Netnews SIFT server and a separate SIFT server for Computer Science Technical Reports form a central broadcast server, or how they are "associated with a parser," as claimed. Google does not assert that the separate SIFT servers work with the same parser or share a single parser that parses for both servers. Tr. 49:1–24 (discussing the shared functionality of a single parser "associated with" multiple servers).

17

IPR2015-00180
Patent 8,601,154 B2

Google and Dr. Madisetti illustrate Yan's "Central Broadcast Server" as a *single* SIFT engine receiving information from a *single* "Information Source" with Kane's Gateways, reproduced below.  Pet. 19; Ex. 1002 ¶ 88.



Google's figure above combines Figure 1 of Yan with Figure 1 of Kane.  Neither Google nor Dr. Madisetti explain how Yan's separate SIFT servers are configured as a central broadcast server to receive data from a plurality of information sources.  *See* Pet. 23–25; Ex. 1002 ¶¶ 88, 89, 95–98.

Google belatedly asserts in its Reply that a Netnews SIFT server that receives data from one information source (Netnews) and a separate SIFT server that receives data from another information source (Computer Science Technical Reports) together form a central broadcast server (Pet. Reply 3–5).  *See* PO Resp. 19–20.  This theory for how Yan allegedly teaches the

18

IPR2015-00180
Patent 8,601,154 B2

"central broadcast server" limitation of claim 1, however, was not set forth
in the Petition, and is inappropriate to raise for the first time in a reply. *See*
Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14,
2012); Rules of Practice for Trials Before the Patent Trial and Appeal Board
and Judicial Review of Patent Trial and Appeal Board Decisions; Final Rule,
77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2012) ("Oppositions and replies may
rely upon appropriate evidence to support the positions asserted. Reply
evidence, however, must be responsive and not merely new evidence that
could have been presented earlier to support the movant's motion."); *see
also* 37 C.F.R. § 42.104(b)(4) ("petition must specify where each element of
the claim is found in the prior art patents or printed publications relied
upon"); Pet. 23–25 (identifying only a single Netnews SIFT server as the
central broadcast server that "comprises one or more servers" as claimed).

Regardless, though, Google's argument is not supported by a
preponderance of the evidence. PO Resp. 18–19. Google has not explained
sufficiently how two separate servers, each of which is configured to receive
data from a different single information source, disclose a central broadcast
server, which must be configured to receive information from multiple
information sources. In essence, Google would read the term "central" out
of "central broadcast server" so any two separate servers would be a central
broadcast server no matter how they are configured or related to one another.
Tr. 15:21–16:22. We, however, decline to do so. *See Stumbo v. Eastman
Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (denouncing claim
constructions that render phrases in claims superfluous). Rather, we agree
with Patent Owner that two servers that are "separately configured to receive
and independently broadcast data from two different information sources"

19

IPR2015-00180
Patent 8,601,154 B2

do not constitute a "central broadcast server" as we have interpreted the term. *See* PO Resp. 9.

Yan discloses each SIFT server as self-contained and independently operated with separate subscriber lists. Ex. 1042, 181. A user "subscribes to *a* SIFT server with one or more subscriptions." *Id.* at 179 (emphasis added). Each SIFT server processes data from a separate source. *Id.* at 180–81. The Netnews SIFT server filters data from Netnews differently and separately from the Computer Science Technical Reports SIFT server. *Id.* at 185.

Dr. Knox testifies that Yan does not disclose any connection between the Netnews SIFT server and Computer Science Technical Reports SIFT server. Ex. 2005 ¶ 108. Dr. Madisetti agrees that these two SIFT servers are not connected. Ex. 2006, 51:9–17, 54:17–55:5; *see* PO Resp. 20. Dr. Knox also testifies that Yan uses two separate SIFT servers to process data from two different information sources independently using different filters, and teaches away from a central broadcast server configured to receive data from multiple information sources. Ex. 2005 ¶¶ 103–14. Dr. Knox's testimony is supported by the evidence of record and is persuasive.

To characterize Yan's two SIFT servers as a network of servers in a central broadcast server because they are on the Stanford.edu network, as Google asserts for claim 6[2] (Pet. Reply 18–19; Ex. 1070 ¶ 15), is tantamount to saying *any* server on the stanford.edu network is part of the same network and the same central broadcast server. Google has not pointed to persuasive evidence that these two SIFT servers are interconnected or networked as a

---

[2] Claim 6, which depends from claim 1, recites that "the central broadcast server comprises a network of servers."

20

IPR2015-00180
Patent 8,601,154 B2

central broadcast server, as claimed. *See* Tr. 24:10–14 (acknowledging that Yan does not teach any communication between the Netnews SIFT server and Computer Science Technical Reports SIFT server). Dr. Madisetti's first declaration does not address this issue. Ex. 1002 ¶ 121.

In his Rebuttal Declaration, Dr. Madisetti testifies that using the same stanford.edu DNS suffix means that the two SIFT servers are on the same IP subnet, which means the two servers are networked as a network of servers. Ex. 1070 ¶ 15. Dr. Knox testifies that sharing the same email sub-domain does not mean the two SIFT servers are on the same local network, let alone that they are interconnected in any way. Ex. 2005 ¶ 115. Dr. Knox testifies that the sub-domains indicate the two SIFT servers are both associated with the Stanford database organizational group, not the same physical network. *Id.* We agree with Dr. Knox's analysis, and are not persuaded that Yan's Netnews and Computer Science and Technical Reports SIFT servers form a network of servers or that they are networked together or interconnected to form a central broadcast server.

Google also asserts that Yan teaches a network of servers because a Netnews SIFT server or a Computer Science Technical Reports SIFT server can be replicated. *See* Pet. 35; Pet. Reply 18–19; Ex. 1002 ¶ 121. Google, however, does not explain how replication of a SIFT server to handle high loads results in the original SIFT server and any replicated SIFT server(s) forming a network of servers that together operate as a central broadcast server configured to receive data from multiple information sources.

Yan discloses replicated SIFT servers as a way to handle loads that are excessive for a single SIFT server. Ex. 1042, 180 ("Even though we believe SIFT is efficient, there is a limit to the load that it can handle. It is

21

IPR2015-00180
Patent 8,601,154 B2

necessary to replicate the server . . . .").  Replication does not configure a
SIFT server to receive data from more than one information source.  Instead,
the SIFT server and any replicated server(s) still receive data from a single
information source, e.g., Netnews.  *Id.*; Pet. Reply 18–19; Ex. 1002 ¶ 121.

Nor has Google explained how replication results in a Stanford SIFT
server being networked with a replicated SIFT server as a central broadcast
server.  Yan discloses that a replicated SIFT server may be operated at other
sites in the United States and Europe "that expressed interests in providing
the same service" for other subscribers who cannot be handled by the
Stanford Netnews SIFT server.  Ex. 1042, 180.  Thus, Yan *replicates* SIFT
servers at other sites to provide Netnews articles to different subscribers.
Yan does not network Stanford's SIFT server to a replicated SIFT server or
configure both SIFT servers to operate together as a central broadcast server.

Dr. Knox testifies that Yan teaches that other organizations at other
sites in the United States and Europe may provide the same service as the
Stanford SIFT server by operating replicated SIFT servers independently for
different subscribers.  Ex. 2005 ¶¶ 243–47.  Dr. Knox also testifies that Yan
teaches that the replicated servers function independently to provide the
same service as Stanford's SIFT server and does not teach creating a central
broadcast server made up of multiple, networked servers.  *Id.*  Dr. Knox also
testifies that because Yan teaches "replicated" servers that each have all the
components necessary to function independently, there is no need to network
the SIFT servers to "provide[] the same service."  *Id.* ¶ 243–44.  We agree.

We are not persuaded by Dr. Madisetti's testimony that replication
requires some degree of interconnection or coordination (*see* Ex. 1070 ¶ 6)
because Yan teaches that the replication involves separate sites operated by

22

IPR2015-00180
Patent 8,601,154 B2

different entities "interest[ed] in providing the same service" for additional, different subscribers. Ex. 1042, 180. Indeed, Dr. Madisetti testified in his first declaration that the SIFT server can be replicated into multiple servers, without indicating how the servers are networked together. Ex. 1002 ¶ 121.

Google has not established by a preponderance of evidence that Yan discloses a central broadcast server comprising one or more servers that are configured to receive data from multiple information sources. Google therefore has not established, by a preponderance of the evidence, that claims 1–3, 6, 8, and 29 would have been obvious over Yan and Kane.[3]

### 2.     *Claim 4 Obvious Over Yan, Kane, and Verkler*

Google relies on Verkler to disclose features of dependent claim 4, rather than to overcome the deficiencies of Yan for claim 1. Pet. 36–37. Thus, Google has not established, by a preponderance of the evidence, that claim 4 is unpatentable.

### 3.     *Claims 9, 10, 14, 16, 20, and 21 Obvious Over Yan, Kane, and Reilly*

Google relies on Reilly to disclose features of dependent claims 9, 10, 14, 16, 20, and 21, rather than to overcome the deficiencies of Yan for claim 1. Pet. 37–40. Thus, Google has not established, by a preponderance of the evidence, that claims 9, 10, 14, 16, 20, and 21 are unpatentable.

### 4.     *Claim 11 Obvious Over Yan, Kane, and Olazabal*

Google relies on Olazabal to disclose features of dependent claim 11, rather than to overcome the deficiencies of Yan for claim 1. Pet. 42–43.

---

[3] Because we agree with Patent Owner as to the "central broadcast server" limitation of claim 1, we need not address the other arguments made by Patent Owner in its Response.

IPR2015-00180
Patent 8,601,154 B2

Thus, Google has not established, by a preponderance of the evidence, that claim 11 is unpatentable.

     5.    *Claim 13 Obvious over Yan, Kane, Reilly, and Simon*

Google relies on Reilly and Simon to disclose features of dependent claim 13, rather than to overcome the deficiencies of Yan for claim 1. Pet. 43–44. Thus, Google has not established, by a preponderance of the evidence, that claim 13 is unpatentable.

     6.  *Claims 30 and 31 Obvious over Yan, Kane, Verkler, and Reilly*

Google relies on Verkler and Reilly to disclose features of dependent claims 30 and 31, rather than to overcome any deficiencies of Yan for claim 1. Pet. 45–52. Thus, Google has not established, by a preponderance of the evidence, that claims 30 and 31 are unpatentable.

     7.    *Google's Motion to Exclude*

Google argues that SimpleAir's Exhibits 2008, 2009, 2010, 2025, 2026, 2043, and portions of Dr. Knox's declaration (Ex. 2005) that rely on these exhibits, are inadmissible hearsay. Paper 29 ("Mot."). Google argues that SimpleAir offers this evidence as secondary considerations of nonobviousness. Mot. 1. Because Google has not demonstrated that any of the challenged claims are unpatentable under 35 U.S.C. § 103(a), we need not consider SimpleAir's evidence of secondary considerations of nonobviousness. Google's motion to exclude is thus dismissed as moot.

## III. CONCLUSION

Google has not demonstrated by a preponderance of evidence that any of claims 1–4, 6, 8–11, 13, 14, 16, 20, 21, and 29–31 of the '154 patent are unpatentable in this proceeding.

24

IPR2015-00180
Patent 8,601,154 B2

## IV. ORDER

Accordingly, it is

ORDERED that Google's request to cancel claims 1–4, 6, 8–11, 13, 14, 16, 20, 21, and 29–31 of U.S. Patent No. 8,601,154 B2 is denied;

FURTHER ORDERED that Google's motion to exclude evidence is dismissed as moot; and

FURTHER ORDERED that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2015-00180
Patent 8,601,154 B2

For PETITIONER:

Michael V. Messinger
Joseph E. Mutschelknaus
mikem-PTAB@skgf.com
jmutsche-PTAB@skgf.com


For PATENT OWNER:

Charles F. Wieland III, Esq.
Robert G. Mukai, Esq.
charles.wieland@bipc.com
robert.mukai@bipc.com

26



US008601154B2

(12) **United States Patent**
Payne et al.

(10) **Patent No.:** **US 8,601,154 B2**
(45) **Date of Patent:** ***Dec. 3, 2013**

(54) **SYSTEM AND METHOD FOR TRANSMISSION OF DATA**

(75) Inventors: **John M. Payne**, Newport Beach, CA (US); **Tim Von Kaenel**, Coto de Casa, CA (US); **Jeffrey Wang**, Horsham, PA (US); **Jeffrey Odell**, Newport Beach, CA (US); **David Starr**, New York, NY (US); **Jason Katz**, New York, NY (US)

(73) Assignee: **SimpleAir, Inc.**, Plano, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/018,421**

(22) Filed: **Jan. 31, 2011**

(65) **Prior Publication Data**

US 2011/0138021 A1    Jun. 9, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/409,396, filed on Apr. 21, 2006, now Pat. No. 8,489,707, which is a continuation of application No. 09/350,467, filed on Jul. 9, 1999, now Pat. No. 7,035,914, which is a continuation of application No. 08/788,613, filed on Jan. 24, 1997, now Pat. No. 6,021,433.

(60) Provisional application No. 60/010,651, filed on Jan. 26, 1996, provisional application No. 60/014,341, filed on Mar. 29, 1996, provisional application No. 60/014,735, filed on Apr. 1, 1996, provisional application No. 60/026,471, filed on Sep. 23, 1996.

(51) Int. Cl.
*G06F 15/16* (2006.01)
*G08B 5/22* (2006.01)

(52) U.S. Cl.
USPC .......................................... **709/236**; 340/7.29

(58) **Field of Classification Search**
USPC ......................................... 709/236; 340/7.29
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,388,645 | A | 6/1983 | Cox et al. |
| 4,473,824 | A | 9/1984 | Claytor |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0503813 | 9/1992 |
| EP | 0514360 A2 | 11/1992 |

(Continued)

OTHER PUBLICATIONS

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 77B: Notable Technologies AirNote Messaging System, Aug. 1994, Claim Chart.

(Continued)

*Primary Examiner* — Larry Donaghue
(74) *Attorney, Agent, or Firm* — SoCal IP Law Group LLP; Steven C. Sereboff; Mark A. Goldstein

(57) **ABSTRACT**

A system and method for data communication connecting on-line networks with on-line and off-line computers. The present system provides for broadcast of up to the minute notification centric information thereby providing an instant call to action for users who are provided with the ability to instantaneously retrieve further detailed information. The notification centric portions of information is wirelessly broadcast to wireless receiving devices which are attached to computing devices. Upon receipt of the information at the personal computer, the user is notified through different multimedia alerts that there is an incoming message. Wirelessly broadcasted URL's, associated with the data, are embedded in data packets and provide an automated wired or wireless connection back to the information source for obtaining detailed data.

**34 Claims, 30 Drawing Sheets**



GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 1 of 64

US 8,601,154 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,525,779 | A | 6/1985 | Davids et al. |
| 4,531,184 | A | 7/1985 | Wigan et al. |
| 4,554,418 | A | 11/1985 | Toy |
| 4,642,425 | A | 2/1987 | Guinn, Jr. et al. |
| 4,644,351 | A | 2/1987 | Zabarsky et al. |
| 4,829,558 | A | 5/1989 | Welsh |
| 4,845,491 | A | 7/1989 | Fascenda et al. |
| 4,951,039 | A | 8/1990 | Schwendeman et al. |
| RE33,417 | E | 10/1990 | Bhagat et al. |
| 5,014,125 | A | 5/1991 | Pocock et al. |
| 5,043,721 | A | 8/1991 | May |
| 5,045,850 | A | 9/1991 | Andros et al. |
| 5,090,051 | A | 2/1992 | Muppidi et al. |
| 5,117,449 | A | 5/1992 | Metroka et al. |
| 5,138,653 | A | 8/1992 | Le Clercq |
| 5,140,419 | A | 8/1992 | Galumbeck et al. |
| 5,151,929 | A | 9/1992 | Wolf |
| 5,175,758 | A | 12/1992 | Levanto et al. |
| H1173 | H | 4/1993 | Davis et al. |
| 5,245,656 | A | 9/1993 | Loeb et al. |
| 5,247,347 | A | 9/1993 | Litteral et al. |
| 5,263,195 | A | 11/1993 | Panther et al. |
| 5,281,962 | A | 1/1994 | Vanden Heuvel et al. |
| 5,289,497 | A | 2/1994 | Jacobson et al. |
| 5,307,399 | A | 4/1994 | Dia et al. |
| 5,311,570 | A | 5/1994 | Grimes et al. |
| 5,327,486 | A | 7/1994 | Wolff et al. |
| 5,327,558 | A | 7/1994 | Burke et al. |
| 5,335,276 | A | 8/1994 | Thompson et al. |
| 5,337,044 | A | 8/1994 | Folger et al. |
| 5,392,452 | A | 2/1995 | Davis et al. |
| 5,396,537 | A | 3/1995 | Schwendeman |
| 5,398,280 | A | 3/1995 | MacConnell |
| 5,410,343 | A | 4/1995 | Coddington et al. |
| 5,414,750 | A | 5/1995 | Bhagat et al. |
| 5,416,473 | A | 5/1995 | Dulaney, III et al. |
| 5,418,908 | A | 5/1995 | Keller et al. |
| 5,423,086 | A | 6/1995 | Cannon et al. |
| 5,426,422 | A | 6/1995 | Vanden Heuvel et al. |
| 5,436,900 | A | 7/1995 | Hammar et al. |
| 5,438,611 | A | 8/1995 | Campana, Jr. et al. |
| 5,442,652 | A | 8/1995 | Jacobson |
| 5,465,401 | A | 11/1995 | Thompson |
| 5,487,100 | A | 1/1996 | Kane |
| 5,493,692 | A | 2/1996 | Theimer et al. |
| 5,506,902 | A | 4/1996 | Kubota |
| 5,509,000 | A | 4/1996 | Oberlander |
| 5,512,935 | A | 4/1996 | Majeti et al. |
| 5,519,506 | A | 5/1996 | D'Avello et al. |
| 5,541,976 | A | 7/1996 | Ghisler |
| 5,548,814 | A | 8/1996 | Lorang et al. |
| 5,555,241 | A | 9/1996 | Lazaridis et al. |
| 5,555,446 | A | 9/1996 | Jasinski |
| 5,559,800 | A | 9/1996 | Mousseau et al. |
| 5,559,859 | A | 9/1996 | Dai et al. |
| 5,559,860 | A | 9/1996 | Mizikovsky |
| 5,559,862 | A | 9/1996 | Bhagat et al. |
| 5,561,703 | A | 10/1996 | Arledge et al. |
| 5,570,084 | A | 10/1996 | Ritter et al. |
| 5,576,952 | A | 11/1996 | Stutman et al. |
| 5,581,594 | A | 12/1996 | McAfee |
| 5,588,009 | A | 12/1996 | Will |
| 5,600,573 | A | 2/1997 | Hendricks et al. |
| 5,608,786 | A | 3/1997 | Gordon |
| H1641 | H | 4/1997 | Sharman |
| 5,623,589 | A | 4/1997 | Needham et al. |
| 5,625,670 | A | 4/1997 | Campana, Jr. et al. |
| 5,631,946 | A | 5/1997 | Campana, Jr. et al. |
| 5,649,186 | A | 7/1997 | Ferguson |
| 5,652,789 | A | 7/1997 | Miner et al. |
| 5,657,345 | A | 8/1997 | Lazaridis |
| 5,663,717 | A | 9/1997 | DeLuca |
| 5,673,299 | A | 9/1997 | Fuller et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,680,615 | A | 10/1997 | Marlin et al. |
| 5,689,641 | A | 11/1997 | Ludwig et al. |
| 5,694,546 | A | 12/1997 | Reisman |
| 5,699,053 | A | 12/1997 | Jonsson |
| 5,701,302 | A | 12/1997 | Geiger |
| 5,701,580 | A | 12/1997 | Yamane et al. |
| 5,706,211 | A | 1/1998 | Beletic et al. |
| 5,714,943 | A | 2/1998 | Rasor |
| 5,717,725 | A | 2/1998 | Campana, Jr. |
| 5,732,074 | A | 3/1998 | Spaur et al. |
| 5,732,338 | A | 3/1998 | Schwob |
| 5,737,595 | A | 4/1998 | Cohen et al. |
| 5,740,549 | A | 4/1998 | Reilly et al. |
| 5,742,668 | A | 4/1998 | Pepe et al. |
| 5,742,905 | A | 4/1998 | Pepe et al. |
| 5,742,906 | A | 4/1998 | Foladare et al. |
| 5,752,191 | A | 5/1998 | Fuller et al. |
| 5,754,939 | A | 5/1998 | Hertz et al. |
| 5,758,088 | A | 5/1998 | Bezaire et al. |
| 5,761,006 | A | 6/1998 | Sri-Jayantha et al. |
| 5,761,606 | A | 6/1998 | Wolzien et al. |
| 5,761,662 | A | 6/1998 | Dasan |
| 5,768,509 | A | 6/1998 | Gunluk |
| 5,781,614 | A | 7/1998 | Brunson |
| 5,784,608 | A | 7/1998 | Meske, Jr. et al. |
| 5,790,958 | A | 8/1998 | McCoy et al. |
| 5,802,312 | A | 9/1998 | Lazaridis et al. |
| 5,808,566 | A | 9/1998 | Behr et al. |
| 5,809,128 | A | 9/1998 | McMullin |
| 5,809,415 | A | 9/1998 | Rossmann |
| 5,819,172 | A | 10/1998 | Campana, Jr. et al. |
| 5,862,325 | A | 1/1999 | Reed et al. |
| 5,870,680 | A | 2/1999 | Guerlin et al. |
| 5,903,262 | A | 5/1999 | Ichihashi et al. |
| 5,905,777 | A | 5/1999 | Foladare et al. |
| 5,905,865 | A | 5/1999 | Palmer et al. |
| 5,905,944 | A | 5/1999 | Goldman et al. |
| 5,907,793 | A | 5/1999 | Reams |
| 5,907,811 | A | 5/1999 | Foladare et al. |
| 5,909,651 | A | 6/1999 | Chander et al. |
| 5,913,040 | A | 6/1999 | Rakavy et al. |
| 5,933,478 | A | 8/1999 | Ozaki et al. |
| 5,946,322 | A | 8/1999 | Moura et al. |
| 5,954,793 | A | 9/1999 | Stutman et al. |
| 5,956,521 | A | 9/1999 | Wang |
| 5,978,837 | A | 11/1999 | Foladare et al. |
| 5,987,321 | A | 11/1999 | Miyake |
| 5,987,432 | A | 11/1999 | Zusman et al. |
| 6,021,433 | A | 2/2000 | Payne et al. |
| 6,035,104 | A | 3/2000 | Zahariev |
| 6,047,327 | A | 4/2000 | Tso et al. |
| 6,049,291 | A | 4/2000 | Kikinis |
| 6,065,047 | A | 5/2000 | Carpenter et al. |
| 6,065,048 | A | 5/2000 | Higley |
| 6,067,082 | A | 5/2000 | Enmei |
| 6,067,451 | A | 5/2000 | Campana, Jr. et al. |
| 6,104,912 | A | 8/2000 | Fuller et al. |
| 6,108,704 | A | 8/2000 | Hutton et al. |
| 6,167,426 | A | 12/2000 | Payne et al. |
| 6,243,390 | B1 | 6/2001 | Kahane et al. |
| 6,278,862 | B1 | 8/2001 | Henderson |
| 6,289,337 | B1 | 9/2001 | Davies et al. |
| 6,317,592 | B1 | 11/2001 | Campana, Jr. et al. |
| 6,343,115 | B1 | 1/2002 | Foladare et al. |
| 6,411,684 | B1 | 6/2002 | Cohn et al. |
| 6,430,607 | B1 | 8/2002 | Kavner |
| 6,473,609 | B1 | 10/2002 | Schwartz et al. |
| 6,571,296 | B1 | 5/2003 | Dillon |
| 6,711,158 | B1 | 3/2004 | Kahane et al. |
| 6,807,558 | B1 | 10/2004 | Hassett et al. |
| 6,870,523 | B1 | 3/2005 | Ben-David et al. |
| 7,035,914 | B1 | 4/2006 | Payne et al. |
| 7,113,152 | B2 | 9/2006 | Ben-David et al. |
| 7,145,898 | B1 | 12/2006 | Elliott |
| 7,268,757 | B2 | 9/2007 | Ben-David et al. |
| 7,417,799 | B2 | 8/2008 | Roth |
| 7,471,822 | B2 | 12/2008 | Roth et al. |
| 7,483,871 | B2 | 1/2009 | Herz |
| 7,577,745 | B2 | 8/2009 | Mason et al. |
| 2003/0167300 | A1 | 9/2003 | Ultman et al. |

US 8,601,154 B2

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0733983 | 9/1996 |
| EP | 0798899 A1 | 10/1997 |
| EP | 0897632 B1 | 2/1999 |
| EP | 0872128 B1 | 1/2005 |
| EP | 0212761 | 8/2007 |
| JP | 5-503619 | 6/1993 |
| JP | 4944 | 6/1993 |
| JP | 5-505285 | 8/1993 |
| WO | WO 9214330 | 8/1992 |
| WO | WO 9323930 | 11/1993 |
| WO | WO 9415431 | 7/1994 |
| WO | WO 9420916 | 9/1994 |
| WO | WO 9526113 | 9/1995 |
| WO | WO 9609714 | 3/1996 |
| WO | WO 9611542 | 4/1996 |
| WO | WO 9619068 | 6/1996 |
| WO | WO 9636142 | 11/1996 |
| WO | WO 9710558 | 3/1997 |
| WO | WO 9717682 | 5/1997 |
| WO | WO 9728518 | 8/1997 |
| WO | WO 9734410 | 9/1997 |
| WO | WO 9749251 | 12/1997 |
| WO | WO 9800787 | 1/1998 |
| WO | WO 9818237 | 4/1998 |

OTHER PUBLICATIONS

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 78A: The Apple Mobile Message System, Jan. 3, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 78B: The Apple Mobile Message System, Jan. 3, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 78C: The Apple Mobile Message System, Jan. 3, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 78D: The Apple Mobile Message System, Jan. 3, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 79A: The Motorola Embarc System/Service, Mar. 1993, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 79B: The Motorola Embarc System/Service, Mar. 1993, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 80A: The Motorola Envoy System, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 80B: The Motorola Envoy System, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 80C: The Motorola Envoy System, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 80D: The Motorola Envoy System, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 81A: The Sony Magic Link System, Sep. 29, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 81B: The Sony Magic Link System, Sep. 29, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 81C: Tthe Sony Magic Link System, Sep. 29, 1994, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 81D: The Sony Magic Link System, Sep. 29, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 82A: The AirBoss Scout System, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 82B: The AirBoss Scout System, 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 85A: U.S. Patent No. 5,758,088 to Bezaire, issued May 26, 1998, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 85B: U.S. Patent No. 5,758,088 to Bezaire, issued May 26, 1998, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 87A: U.S. Patent No. 5,559,860 to Mizikovsky, issued Sep. 24, 1996, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 87B: U.S. Patent No. 5,559,860 to Mizikovsky, issued Sep. 24, 1996, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 88A: The AirMobile System: AirMobile Wireless Comm Client for cc:Mail User Guide, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 88B: The AirMobile System: AirMobile Wireless Comm Client for cc:Mail User Guide, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 89A: Individual, Inc.'s SMART System, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 89B: Individual, Inc.'s SMART System, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 89C: Individual, Inc.'s SMART System, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 89D: Individual, Inc.'s SMART System, 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 91A: U.S. Patent No. 5,956,521 to Wang, issued Sep. 21, 1999, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 91B: U.S. Patent No. 5,956,521 to Wang, issued Sep. 21, 1999, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 92A: The SkyTel System: "SkyTel Turns on 2-Way" Article Exemplar Teachings, Nov./Dec. 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 92B: The SkyTel System: "SkyTel Turns on 2-Way" Article Exemplar Teachings, Nov./Dec. 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 93A: The SWiMS Socket System, Sep. 1995, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 94A: RadioMail Service, Mar. 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 94B: RadioMail Service, Mar. 1994, Claim Chart.
Anderson, Mark, By the iBook, Corporate News, Commentary special to ABSnews.com, Aug. 1999.

**US 8,601,154 B2**

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

Wireless Services Corporation, AirNote Signup—User Information, pp. 1-4., Wireless Services, Corporation, 1995.
Wireless Services Corporation, AirNote Wireless E-Mail, pp. 1-9, Wireless Services, Corporation, 1995.
Post-News Week Business Information, Inc., Apple Offers Wireless Mobile Message System, Jan. 3, 1995.
Wellington Newspapers Limited, E-Mail to GSM Digital Phone System Unveiled, Sep. 25, 1995.
America Online, Inc., America Online Brochure, 1994.
Gillford et al.,The Application of Digital Broadcast Communication to Large Scale Information Systems, IEEE Journal on Selected Areas in Communications, vol. SAC-3, No. 3, May 1985.
Unknown, Proceedings of the Twenty-Seventh Internet Engineering Task Force, SURFnet and RARE Amsterdam, The Netherlands, Corporation for National Research Initiatives, Jul. 12, 1993.
Imielinski et al., Mobile Wireless Computing: Solutions and Challenges in Data Management, Department of Computer Science Rutgers University, 1993.
Frivold et al., ITU-T Teleconferencing Overview Minutes of the Multiparty Multimedia Session Control Networking Group, 4 pages, Jan. 19, 1995.
Weinrib, Abel, Architectural Issues in CUSeeMe, Bell Communications Research, Minutes of the Multiparty Multimedia Session Control Networking Group, 4 pages, Jan. 19, 1995.
Monheim, Thomas A., Personal Communications Servies: The Wireless Future of Telecommunications, 44 Fed., Comm. L.J. 335, Mar. 1992.
Unknown, Newton Users Now Can Surf the Net with Pocket Call 2.0; Ex Machina Answers Customer Demand with First VT100 Terminal Emulator for Newton, Business Wire, Aug. 8, 1995.
Ratcliffe, Mitch, Magic Happens: Motorola's Envoy Communicator: Motorola's Personal Digital Assistant; General Magic's Magic Cap Operating System; Evaluation, Digital Media, 1995.
Exhibit 15 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-11, filed Apr. 20, 2011, McGraw Hill Computer Desktop Encyclopedia, 9th Edition, 2001, pp. 1-20.
Exhibit 16 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-12, filed Apr. 20, 2011, Microsoft Computer Dictionary, Fifth Edition, 2002, pp. 141, 376 and 392 definition of terms, pp. 1-7.
Exhibit 17 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-13, filed Apr. 20, 2011, Webster's New World Computer Dictionary, Tenth Edition, 2003, pp. 64, 68, 274 and 305, definition of terms, pp. 1-8.
Exhibit 18 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-14, filed Apr. 20, 2011, Dictionary of Computing & Communications, Sixth Edition, 2003, pp. 65, 86, 96 and 340, definition of terms, pp. 1-8.
Exhibit 19 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-15, filed Apr. 20, 2011, Wiley Electrical and Electronics Engineering Dictionary, 2004, pp. 128, 165, 312, 380, 386, 501, 502 and 554, pp. 1-11.
Exhibit 20 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-16, filed Apr. 20, 2011, The American Heritage Dictionary, Third Edition, 1994, pp. 1-5.
Exhibit 21 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-17, filed Apr. 20, 2011, Random House Webster's Dictionary, Fourth Edition, 2001, pp. 1-5.
Exhibit 22 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-18, filed Apr. 20, 2011, Channel Definition Format (CDF) Submission 970309, pp. 1-10.
Exhibit 23 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-19, filed Apr. 20, 2011, Dr. James M. Knox resume, pp. 1-3.
Exhibit 24 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-20, filed Apr. 20, 2011, 5,959,621 patent, pp. 1-33.

Exhibit 25 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-21, filed Apr. 20, 2011, 5,987,454 patent, pp. 1-38.
Exhibit 26 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-22, filed Apr. 20, 2011, A Component and Communication Model for Push Systems, article by Hauswirth, et al., dated Jun. 15, 1999, pp. 1-19.
Exhibit 27 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-23, filed Apr. 20, 2011, Towards an Accessible Web by Applying PUSH Technology, article by Kapyla et al., published in 1998, pp. 1-16.
Exhibit 28 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-24, filed Apr. 20, 2011, 5,758,088 patent, pp. 1-35.
Defendant Apple, Inc.'s Notice of Submission of Technology Tutorial, submitted to the court by AWS Convergence Technologies, Inc., et al. and SimpleAir, Inc., dated Jun. 10, 2010, document 207, filed Jun. 8, 2011, p. 1-2.
Joint Claim Construction Chart, Civil Action No. 2:09-cv-289 (CE), dated Jun. 8, 2011, document 208, pp. 1-19.
Exhibit 1, Claim Construction Comparison, Civil Action No. 2:09-cv-289 (CE), dated Jun. 16, 2011, document 216-1, filed Jun. 20, 2011, pp. 1-3.
Plaintiff SimpleAir's Markman Presentation, Civil Action No. 2:09-cv-289 (CE), dated Jun. 20, 2011, document 215, pp. 1-3.
Plaintiff SimpleAir's Markman Presentation, Exhibit 1, A Central Broadcast Server, document 215-1, filed Jun. 20, 2011, pp. 1-51.
Plaintiff SimpleAir's Markman Presentation, Exhibit 2, Transmitting Preprocessed Data to Receivers, document 215-2, filed Jun. 20, 2011, pp. 1-6.
Plaintiff SimpleAir's Markman Presentation, Exhibit 3, A Data Channel, document 215-3, filed Jun. 20, 2011, pp. 1-36.
Plaintiff SimpleAir's Markman Presentation, Exhibit 4, On or Off, document 215-4, filed Jun. 20, 2011, pp. 1-8.
Plaintiff SimpleAir's Markman Presentation, Exhibit 6, Interactive Activity, document 215-6, filed Jun. 20, 2011, pp. 1-8.
Plaintiff SimpleAir's Markman Presentation, Exhibit 7, Designating a Name Registered on the Address Service, document 215-7, filed Jun. 20, 2011, pp. 1-8.
Plaintiff SimpleAir's Markman Presentation, Exhibit 8, First Communication Network / Second Communication Network, document 215-8, filed Jun. 20, 2011, pp. 1-9.
Plaintiff SimpleAir's Markman Presentation, Exhibit 9, Receiving Device / Interactive Device, document 215-9, filed Jun. 20, 2011, pp. 1-14.
Plaintiff SimpleAir's Markman Presentation, Exhibit 5, Preamble, document 215-5, filed Jun. 20, 2011, pp. 1-17.
Plaintiff SimpleAir's Markman Presentation, Exhibit 10, Rebuttal, document 215-10, filed Jun. 20, 2011, pp. 1-19.
SimpleAir: Markman Tutorial, submitted Jun. 8, 2011, pp. 1-51.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 1A: U.S. Patent No. 5,714,943 (Rasor), issued Feb. 3, 1998, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 1B: U.S. Patent No. 5,714,943 (Rasor), issued Feb. 3, 1998 Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 2A: U.S. Patent No. 5,905,865 (Palmer), issued on May 18, 1999, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 2B: U.S. Patent No. 5,905,865 (Palmer), issued on May 18, 1999, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 3A: European Patent No. EP 0872128 B1 (Winbladh), published Jan. 1, 2005, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 3B: European Patent Spec. 0872128 B1 (Winbladh), published Jan. 1, 2005, Claim Chart.

US 8,601,154 B2

Page 5

(56)    **References Cited**

OTHER PUBLICATIONS

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 4A: U.S. Patent No. 5,933,478 (Ozaki), issued Aug. 3, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 26A: U.S. Patent No. 5,657,345 to Lazaridis, issued Aug. 12, 1997, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 26B: U.S. Patent No. 5,657,345 to Lazaridis, issued Aug. 12, 1997, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 27A: U.S. Patent No. 5,555,241 to Lazaridis, issued, Sep. 10, 1996, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 27B: U.S. Patent No. 5,555,241 to Lazaridis, issued, Sep. 10, 1996, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 28A: U.S. Patent No. 5,802,312 to Lazaridis, issued Sep. 1, 1998, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 28B: U.S. Patent No. 5,802,312 to Lazaridis, issued Sep. 1, 1998, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 57A: AirBoss/SCOUT System (WO 97/10558), published Mar. 20, 1997, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 57B: AirBoss/SCOUT System (WO 97/10558), published Mar. 20, 1997, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 127A: U.S. Patent No. 5,742,905 (Pepe et al.), issued Apr. 21, 1998, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 127B: U.S. Patent No. 5,742,905 (Pepe et al.), issued Apr. 21, 1998, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3 Invalidity Contentions, submitted Aug. 26, 2010.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 4B: U.S. Patent No. 5,933,478 (Ozaki) issued Aug. 3, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 5A: U.S. Patent No. 5,509,000 (Oberlander), issued Apr. 16, 1996, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 5B: U.S. Patent No. 5,509,000 (Oberlander), issued Apr. 16, 1996, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 6A: U.S. Patent No. 5,987,321 (Miyake), issued Nov. 16, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 6B: U.S. Patent No. 5,987,321 (Miyake), issued Nov. 16, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 7A: U.S. Patent No. 5,907,811 (Foladare), issued May 25, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 7B: U.S. Patent No. 5,907,811 (Foladare), issued May 25, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 9A: U.S. Patent No. 5,581,594 (McAfee), issued Dec. 3, 1996, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 9B: U.S. Patent No. 5,581,594 (McAfee), issued Dec. 3, 1996, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 10A: U.S. Patent No. 5,138,653 (Le Clercq), issued Aug. 11, 1992, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 10B: U.S. Patent No. 5,138,653 (Le Clercq), issued Aug. 11, 1992, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 11A: U.S. Patent No. 5,905,944 (Goldman), issued May 18, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 11B: U.S. Patent No. 5,905,944 (Goldman), issued May 18, 1999, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 12A: U.S. Patent No. 5,742,906 (Foladare), issued Apr. 21, 1998, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 12B: U.S. Patent No. 5,742,906 (Foladare), issued Apr. 21, 1998, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 15A: U.S. Patent No. 6,035,104 (Zahariev), issued Mar. 7, 2000, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 15B: U.S. Patent No. 6,035,104 (Zahariev), issued Mar. 7, 2000, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 16A: U.S. Patent No. 5,416,473 (Dulaney), issued May 16, 1005, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 16B: U.S. Patent No. 5,416,473 (Dulaney), issued May 16, 2005, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 60A: Boston Community Information System, May 1985, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 60B: Boston Community Information System, May 1985, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 64A: RIM Freedom PCS Network Adapter for Mobitex: Installation & User's Guide, 1995, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 64B: RIM Freedom PCS Network Adapter for Mobitex: Installation & User's Guide, 1995, Claim Chart.

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 72A: RIM Mobitex User's Handbook for the Mobidem AT, Apr. 1993, Claim Chart.

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 5 of 64

(56)        **References Cited**

OTHER PUBLICATIONS

Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 72B: RIM Mobitex User's Handbook for the Mobidem AT, Apr. 1993, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 73A: The Hewlett Packard Palmtop System, Dec. 1991, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 73B: The Hewlett Packard Palmtop System, Dec. 1991, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 73C: The Hewlett Packard Palmtop System, Dec. 1991, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 73D: The Hewlett Packard Palmtop System, Dec. 1991, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 76A: RIMGate System, Jun. 1993, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 76B: RIMGate System, Jun. 1993, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3, Exhibit 77A: Notable Technologies AirNote Messaging System, Aug. 1994, Claim Chart.
Civil Action No. 2:09-CV-289-CE,Defendants Apple Inc., Facebook, Inc., American Broadcasting,Companies, Inc., AWS Convergence Technologies, Inc., Disney,Oniine, ESPN Enterpris.
Exhibit 2C: U.S. Patent No. 5,905,865 (Palmer), issued on May 18, 1999, Claim Chart.
Exhibit 2D: U.S. Patent No. 5,905,865 (Palmer), issued on May 18, 1999, Claim Chart.
Exhibit 8A: U.S. Patent No. 6,278,862 (Henderson), issued Aug. 21, 2001, Claim Chart.
Exhibit 8B: U.S. Patent No. 6,278,862 (Henderson), Issued Aug. 21, 2001, Claim Chart.
Exhibit 13A: United States Patent No. 5,043,721 (May)1, issued on Aug. 27, 1991, Claim Chart.
Exhibit 13B: United States Patent No. 5,043,721 (May), issued on Aug. 27, 1991, Claim Chart.
Exhibit 13C: U.S. Patent No. 5,043,721 (May), issued on Aug. 27, 1991, Claim Chart.
Exhibit 13D: U.S. Patent No. 5,043,721 (May), issued on Aug. 27, 1991, Claim Chart.
Exhibit 14A: U.S. Patent No. 5,588,009 (Will), issued on Dec. 24, 1996, Claim Chart.
Exhibit 14B: U.S. Patent No. 5,588,009 (Will), issued on Dec. 24, 1996, Claim Chart.
Exhibit 17A: U.S. Patent No. 6,343,115 (Foladare), issued on Jan. 29, 2002, Claim Chart.
Exhibit 17B: U.S. Patent No. 6,343,115 (Foladare), issued on Jan. 29, 2002, Claim Chart.
Exhibit 18A: U.S. Patent No. 5,327,486 (Wolff), issued on Jul. 5, 1994, Claim Chart.
Exhibit 18B: U.S. Patent No. 5,327,486 (Wolff), issued on Jul. 5, 1994, Claim Chart.
Exhibit 18C: U.S. Patent No. 5,327,486 (Wolff), issued on Jul. 5, 1994, Claim Chart.
Exhibit 18D: U.S. Patent No. 5,327,486 (Wolff), issued on Jul. 5, 1994, Claim Chart.
Exhibit 19A: U.S. Patent No. 5,140,419 (Galumbeck, et al.), issued Aug. 18, 1992, Claim Chart.
Exhibit 19B: U.S. Patent No. 5,140,419 (Galumbeck, et al.), issued Aug. 18, 1992, Claim Chart.
Exhibit 19C: U.S. Patent No. 5,140,419 (Galumbeck et al.), issued Aug. 18, 1992, Claim Chart.
Exhibit 19D: U.S. Patent No. 5,140,419 (Galumbeck et al.), issued Aug. 18, 1992, Claim Chart.

Exhibit 20A: US Patent No. 5,761,662 (Dasan issued on Jun. 2, 1998), Claim Chart.
Exhibit 20B: US Patent No. 5,761,662 (Dasan issued on Jun. 2, 1998), Claim Chart.
Exhibit 21A: U PCT Patent Application No. WO97/17682 (Laflin et al.), issued May 15, 1997, Claim Chart.
Exhibit 21B: PCT Patent Application No. WO97/17682 (Laflin, et al.), Published May 15, 1997, Claim Chart.
Exhibit 22A: U.S. Patent No. 5,737,595 (Cohen), § 102(e) date Jul. 18, 1995, PCT publication Jun. 9, 1994, Claim Chart.
Exhibit 22B: U.S. Patent No. 5,737,595 (Cohen), § 102(e) date Jul. 18, 1995, PCT publication Jun. 9, 1994, Claim Chart.
Exhibit 23A: U.S. Patent No. 5,701,580 (Yamane et al.), issued on Dec. 23, 1997 (filed on Dec. 1, 1995), Claim Chart.
Exhibit 23B: US Patent No. 5,701,580 (Yamane et al.), issued on Dec. 23, 1997 (filed on Dec, 1, 1995), Claim Chart.
Exhibit 24A: US Patent No. 5,418,908 (Keller et al.), issued on May 23, 1995 (filed on Oct. 15, 1992), Claim Chart.
Exhibit 24B: US Patent No. 5,418,908 (Keller et al.), issued on May 23, 1995 (filed on Oct. 15, 1992), Claim Chart.
Exhibit 25A: US Patent No. 5,426,422 (Vanden Heuvel et al)1, issued on Jul. 20, 1995, Claim Chart.
Exhibit 25B: US Patent No. 5,426,422 (Vanden Heuvel et al)1, issued on Jul. 20, 1995, Claim Chart.
Exhibit 29A: United States Patent No. 6,047,327 (Tso)1, issued on Apr. 4, 2000, Claim Chart.
Exhibit 29B: United States Patent No. 6,047,327 (Tso)1, issued on Apr. 4, 2000, Claim Chart.
Exhibit 30A: U.S. Patent No. 5,907,793 (Reams), issued May 25, 1999, Claim Chart.
Exhibit 30B: U.S. Patent No. 5,907,793 (Reams), issued May 25, 1999, Claim Chart,.
Exhibit 31A: US Patent No. 5,909,651 (Chander et al.), issued on Jun. 1, 1999, Claim Chart.
Exhibit 31B: US Patent No. 5,909,651 (Chander et al.), issued on Jun. 1, 1999, Claim Chart.
Exhibit 32A: U.S. Patent No. 5,954,793 (Strutman et al.), issued Sep. 21, 1999, Claim Chart.
Exhibit 32B: U.S. Patent No. 5,954,793 (Stutman, et al.), Issued Sep. 21, 1999, Claim Chart.
Exhibit 32C: U.S. Patent No. 5,954,793 (Stutman et al.), issued Sep. 21, 1999, Claim Chart.
Exhibit 32D: U.S. Patent No. 5,954,793 (Stutman, Miller), issued Sep. 21, 1999, Claim Chart.
Exhibit3A: U.S. Patent No. 5,754,939 (Herz), issued on May 19, 1998, Claim Chart.
Exhibit 33B: U.S. Patent No. 5,754,939 (Herz), issued on May 19, 1998, Claim Chart.
Exhibit 34A: US Patent No. 7,483,871 (Herz), issued on Jan. 27, 2009 (claims priority to application filed Nov. 29, 1994), Claim Chart.
Exhibit 34B: US Patent No. 7,483,871 (Herz), issued on Jan. 27, 2009 (claims priority to application filed Nov. 29, 1994), Claim Chart.
Exhibit 35A: U.S. Patent No. 5,555,446 (Jasinski), earliest effective filing date Oct. 1, 1992, issued Sep. 10, 1996, Claim Chart.
Exhibit 35B: U.S. Patent No. 5,555,446 (Jasinski), earnest effective filing date Oct. 1, 1992, issued Sep. 10, 1996, Claim Chart.
Exhibit 36A: U.S. Patent No. EP0212761 (Sharpe), issued on Mar. 4, 1987, Claim Chart.
Exhibit 36B: U.S. Patent No. EP0212761 (Sharpe), issued on Mar. 4, 1987, Claim Chart.
Exhibit 37A: U.S. Patent No. 5,398,280 (MacConnell), issued Mar. 14, 1995, Claim Chart.
Exhibit 37B: U.S. Patent No. 5,398,280 (MacConnell), issued Mar. 14, 1995, Claim Chart.
Exhibit 38A: European Patent Application EPO 0514360 (Ghisler), issued Nov. 19, 1992, Claim Chart.
Exhibit 38B: European Patent Application EPO 0514360 (Ghisler), issued Nov. 19, 1992, Claim Chart.
Exhibit 39A: U.S. Patent No. 5,575,507 (Bobo), published on Oct. 7, 1997, Claim Chart.
Exhibit 39B: U.S. Patent No. 5,575,507 (Bobo), published on Oct. 7, 1997, Claim Chart.

**US 8,601,154 B2**

Page 7

(56)         **References Cited**

OTHER PUBLICATIONS

Exhibit 40A: PCT Patent Application No. WO 94/20916 (Strutman et al.), issued Sep. 15, 1994, Claim Chart.
Exhibit 40B: PCT Patent Application No. WW 94/20916 (Strutman et al.), issued Sep. 15, 1994, Claim Chart.
Exhibit 40C: PCT Patent Application No. WO 94/20916 (Strutman et al.), issued Sep. 15, 1994, Claim Chart.
Exhibit 40D: PCT Patent Application No. WO 94/20916 (Strutman et al.), issued Sep. 15, 1994, Claim Chart.
Exhibit 41A: U.S. Patent No. 6,108,704 (Hutton, et al.), issued Aug. 22, 2000, Claim Chart.
Exhibit 41B: U.S. Patent No. 6,108,704 (Hutton, et al.), issued Aug. 22, 2000, Claim Chart.
Exhibit 42A: U.S. Patent No. 4,829,558 (Welsh), issued May 9, 1989, Claim Chart.
Exhibit 42B: U.S. Patent No. 4,829,558 (Welsh), issued May 9, 1989, Claim Chart.
Exhibit 43A: Published EP Application 0 503 813 A2 (Miska), published Sep. 16, 1992, Claim Chart.
Exhibit 43B: Published EP Application 0 503 813 A2 (Miska), published Sep. 16, 1992, Claim Chart.
Exhibit 43C: U.S. Patent No. EPO503,813 (Miska, Wilcock) issued Sep. 16, 1992, Claim Chart.
Exhibit 43D: U.S. Patent No. EPO503,813 (Miska, Willcock), issued Sep. 16, 1992, Claim Chart.
Exhibit 44A: U.S. Patent No. 5,761,606 (Wolzien), issued Jun. 2, 1998.
Exhibit 44B: U.S. Patent No. 5,761,606 (Wolzien), issued Jun. 2, 1998, Claim Chart.
Claim Chart.Exhibit 45A: US Patent No. 5,307,399 (Dai), issued on Apr. 26, 1994.
Exhibit 45B: US Patent No. 5,307,399 (Dai), issued on Apr. 26, 1994, Claim Chart.
Exhibit 46A: U.S. Patent No. 5,978,837 (Foiadare), issued Nov. 2, 1999, Claim Chart.
Exhibit 46B: U.S. Patent No. 5,978,837 (Foladare, et al.), issued Nov. 2, 1999, Claim Chart.
Exhibit 47A: US Patent No. 6,104,912 (Fuller), issued on Aug. 15, 2000, Claim Chart.
Exhibit 47B: US Patent No. 6,104,912 (Fuller), issued on Aug. 15, 2000, Claim Chart,.
Exhibit 48A: US Patent No. 5,752,191 (Fuller), issued on May 12, 1998, Claim Chart.
Exhibit 48B: US Patent No. 5,752,191 (Fuller), issued on May 12, 1998, Claim Chart.
Exhibit 49A: US Patent No. 5,608,786 (Gordon), issued on Mar. 4, 1997 (filed on Feb. 13, 1995, claiming priority to Canadian application 2139081 filed Dec. 23, 1994, Claim Cha.
Exhibit 49B: US Patent No. 5,608,786 (Gordon), issued on Mar. 4, 1997 (filed on Feb. 13, 1995, claiming priority to Canadian application 2139081 filed Dec. 23, 1994), Claim Ch.
Exhibit 50A: US Patent No. 4,642,425 (Guinn), issued on Feb. 10, 1987, Claim Chart.
Exhibit 50B: US Patent No. 4,642,425 (Guinn), issued on Feb. 10, 1987, Claim Chart.
Exhibit 51A: International Patent Application Publication No. WO 93/23930 (Vanden Heuvei, Halley), issued Nov. 25, 1993, Claim Chart.
Exhibit 51B: International Patent Application Publication No. WO 93/23930 (Vanden Heuvel, Halley), issued Nov. 25, 1993, Claim Chart.
Exhibit 52A: US Patent No. 5,487,100 (Kane), issued on Jan. 23, 1996, Claim Chart.
Exhibit 52B: US Patent No. 5,487,100 (Kane), issued on Jan. 23, 1996, Claim Chart.
Exhibit 53A: WO 95/26113 (Hays), published on Sep. 28, 1995, Claim Chart.
Exhibit 53B: WO 95/26113 (Hays), published on Sep. 28, 1995, Claim Chart.
Exhibit 54A: US Patent No. 5,809,128 (McMullin), issued on Sep. 15, 1998, Claim Chart.
Exhibit 54B: US Patent No. 5,809,128 (McMullin), issued on Sep. 15, 1998, Claim Chart.
Exhibit 55A: US Patent No. 5,652,789 (Miner), issued on Jul. 29, 1997, Claim Chart.
Exhibit 55B: US Patent No. 5,652,789 (Miner), issued on Jul. 29, 1997, Claim Chart.
Exhibit 56A: US Patent No. 5,151 929 (Wolf) issued on Sep. 29, 1992, Claim Chart.
Exhibit 56B: US Patent No. 5,151,929 (Wolf), issued on Sep. 29, 1992, Claim Chart.
Exhibit 58A: PCT Patent Application WO 96/36142 (Bezaire at al.), issued Nov. 14, 1996, Claim Chart.
Exhibit 58B: PCT Patent Application WO 96/36142 (Bezaire et al.), issued Nov. 14, 1996, Claim Chart.
Exhibit 58C: PCT Patent Application WO 96/36142 (Bezaire et al.), issued Nov. 14, 1996, Claim Chart.
Exhibit 58D: PCT Patent Application WO 96/36142 (Bezaire et al.), issued Nov. 14, 1996, Claim Chart.
Exhibit 59A:S. Shekhar and D. Liu, Genesis and Advanced Traveler Information Systems (ATIS): Killer Applications for Mobile Computing?, published Nov. 1994, Claim Chart.
Exhibit 59B: S. Shekhar and D. Liu, Genesis and Advanced Traveler Information Systems (ATIS): Killer Applications for Mobile Computing?, published Nov. 1994, Claim Chart.
Exhibit 61A: News On-Demand for Multimedia Networks, publication date Aug. 1993, Claim Chart.
Exhibit 61B: News On-Demand for Multimedia Networks, publication date Aug. 1993, Claim Chart.
Exhibit 62A: U.S. Patent No. 4,473,824 (Claytor), published on Sep. 25, 1984, Claim Chart.
Exhibit 62B: U.S. Patent No. 4,473,824 (Claytor), published on Sep. 25, 1984, Claim Chart.
Exhibit 63A: U.S. Patent No. 6,411,684 (Cohn), published on Jun. 25, 2002, Claim Chart.
Exhibit 63B: U.S. Patent No. 6,411,684 (Cohn), published on Jun. 25, 2002, Claim Chart.
Exhibit 64A: RIM Freedom PCS Network Adapter for Mobitex: Installation & User's Guide, Claim Chart.
Exhibit 64B: RIM Freedom PCS Network Adapter for Mobitex: Installation & User's Guide, Claim Chart.
Exhibit 65A: US Patent No. 5,245,656 (Loeb et al.), issued on Sep. 14, 1993, Claim Chart.
Exhibit 65B: US Patent No. 5,245,656 (Loeb et al.), issued on Sep. 14, 1993, Claim Chart,.
Exhibit 66A: US Patent No. 5,781,614 (Brunson), issued on Jul. 14, 1998 (filed on Jan. 19, 1996), Claim Chart.
Exhibit 66B: US Patent No. 5,781,614 (Brunson), issued on Jul. 14, 1998 (filed on Jan. 19, 1996), Claim Chart.
Exhibit 67A: US Patent No. 5,327,558 (Burke et al.), issued on Jul. 5, 1994, Claim Chart.
Exhibit 67B: US Patent No. 5,327,558 (Burke et al.), issued on Jul. 5, 1994, Claim Chart.
Exhibit 68A: US Patent No. 5,465,401 (Thompson), issued on Nov. 7, 1995 (filed on Dec. 15, 1992), Claim Chart.
Exhibit 68B: US Patent No. 5,465,401 (Thompson), issued on Nov. 7, 1995 (filed on Dec, 15, 1992), Claim Chart.
Exhibit 69A: US Patent No. 6,430,607 (Kavner), issued on Aug. 6, 2002 (divisional of application filed on Aug. 18, 1995), Claim Chart.
Exhibit 69B: US Patent No. 6,430,607 (Kavner), issued on Aug. 6, 2002 (divisional of application filed on Aug. 18, 1995), Claim Chart.
Exhibit 70A: RIM User's Handbook for Wireless Computing, Jun. 1993 ("Handbook for Wireless Computing"), Claim Chart.
Exhibit 70B: RIM User's Handbook for Wireless Computing, Jun. 1993 ("Handbook for Wireless Computing"), Claim Chart.
Exhibit 71A: RIM Mobitex Made Easy: A Guide to Wireless Computing (1994), Claim Chart.
Exhibit 71B: Rim Mobitex Made Easy: A Guide to Wireless Computing (1994), Claim Chart.
Exhibit 74A: pACT System (1995), Claim Chart.
Exhibit 74B: pACT System (1995), Claim Chart.

US 8,601,154 B2

Page 8

(56)    **References Cited**

OTHER PUBLICATIONS

Exhibit 75A: U.S. Patent No. 7,577,745 (Mason et al.), issued Aug. 18, 2009, Claim Chart.
Exhibit 75B: U.S. Patent No. 7,577,745 (Mason et al.), issued Aug. 18, 2009, Claim Chart.
Exhibit 83B: The AirMedia Live! System: Air Media Jan. 29, 1996 Press Release, Claim Chart.
Exhibit 84A: The AirMedia Live! System: Air Media Jun. 3, 1996 The AirMedia Live! System, Claim Chart.
Exhibit 84B: The AirMedia Live! System: Air Media Jun. 3, 1996 The AirMedia Live! System, Claim Chart.
Exhibit 86A: U.S. Patent No. 5,410,343 (Coddington, et al.), issued Apr. 25, 1995, Claim Chart.
Exhibit 86B: U.S. Patent No. 5,410,343 (Coddington, et al.), issued Apr. 25, 1995, Claim Chart.
Exhibit 90A: The SkyTel System: SkyTel Feb. 1996 Article and SkyTel MailScout Product Description Exemplar Teachings, Claim Chart.
Exhibit 90B: The SkyTel System: SkyTel Feb. 1996 Article and SkyTel MailScout Product Description Exemplar Teachings, Claim Chart.
Exhibit 95A: U.S. Patent No. 5,600,573 (Hendricks et al.), filed Dec. 2, 1994, issued Feb. 4, 1997, Claim Chart.
Exhibit 95B: U.S. Patent No. 5,600,573 (Hendricks et al.), filed Dec. 2, 1994, issued Feb. 4, 1997, Claim Chart.
Exhibit 96A: U.S. Patent No. 4,644,351 (Zabarsky, at al.), issued Feb. 17, 1987, Claim Chart.
Exhibit 96B: U.S. Patent No. 4,644,351 (Zabarsky, et al.), issued Feb. 17, 1987, Claim Chart.
Exhibit 96C: U.S. Patent No. 4,644,351 (Zabarsky, et al.), issued Feb. 17, 1987, Claim Chart.
Exhibit 96D: U.S. Patent No. 4,644,351 (Zabarsky, et al.), issued Feb. 17, 1987, Claim Chart.
Exhibit 97A: U.S. Patent No. 5,311,570 (Grimes), issued May 10, 1994, Claim Chart.
Exhibit 97B: U.S. Patent No. 5,311,570 (Grimes), issued May 10, 1994, Claim Chart.
Exhibit 98A: U.S. Patent No. 4,531,184 (Wigan), issued Jul. 23, 1985, Claim Chart.
Exhibit 98B: U.S. Patent No. 4,531,184 (Wigan), issued Jul. 23, 1985, Claim Chart.
Exhibit 99A: United States Patent No. 5,913,040 (Rakavy), issued Jun. 15, 1999, Claim Chart.
Exhibit 99B: United States Patent No. 5,913,040 (Rakavy), issued Jun. 15, 1999, Claim Chart.
Exhibit 100A: U.S. Patent No. 5,289,497 (Jacobson), issued Feb. 22, 1994, Claim Chart.
Exhibit 100B: U.S. Patent No. 5,289,497 (Jacobson), issued Feb. 22, 1994, Claim Chart.
Exhibit 101A: U.S. Patent No. 5,090,051 (Muppidi), issued Feb. 18, 1992, Claim Chart.
Exhibit 101B: U.S. Patent No. 5,090,051 (Muppidi), issued Feb. 18, 1992, Claim Chart.
Exhibit 102A: U.S. Patent No. 5,175,7581 (Levanto), issued Dec. 29, 1992, Claim Chart.
Exhibit 102B: U.S. Patent No. 5,175,7581 (Levanto), issued Dec. 29, 1992, Claim Chart.
Exhibit 103A: US Patent No. 5,247,347 (Litteral), issued on Sep. 21, 1993, Claim Chart.
Exhibit 103B: US Patent No. 5,247,347 (Litteral), issued on Sep. 21, 1993, Claim Chart.
Exhibit 104A: US Patent No. 5,689,641 (Ludwig). issued on Nov. 18, 1997, Claim Chart.
Exhibit 104B: US Patent No. 5,689,641 (Ludwig), issued on Nov. 18, 1997, Claim Chart.
Exhibit 105A: US Patent No. 5,045,850 (Andros et al.), issued on Sep. 3, 1991, Claim Chart.
Exhibit 105B: US Patent No. 5,045,850 (Andros et al.), issued on Sep. 3, 1991, Claim Chart.

Exhibit 106A: US Patent No. 6,243,398 (Kahane), issued on Jun. 5, 2001, Claim Chart.
Exhibit 106B: US Patent No. 6,243,398 (Kahane), issued on Jun. 5, 2001, Claim Chart.
Exhibit 107A: U.S. Patent No. 5,559,800 to Mousseau, Claim Chart.
Exhibit 107B: U.S. Patent No. 5,559,800 to Mousseau, Claim Chart.
Exhibit 108A: U.S. Patent No. RE 33,417 (Bhagat, Hays), issued Oct. 30, 1990, Claim Chart.
Exhibit 108B: U.S. Patent No. RE 33,417 (Bhagat, Hays), issued Oct. 30, 1990, Claim Chart.
Exhibit 109A: U.S. Patent No. 5,699,053 (Jonsson), issued Dec. 16, 1997, Claim Chart.
Exhibit 109B: U.S. Patent No. 5,699,053 (Jonsson), issued Dec. 16, 1997, Claim Chart.
Exhibit 110A: U.S. Patent No. 5,559,859 (Dai, et al.) issued Sep. 24, 1996, Claim Chart.
Exhibit 110B: U.S. Patent No. 5,559,859 (Dai, at ai.), issued Sep. 24, 1996, Claim Chart.
Exhibit 111A: U.S. Patent No. 6,571,296 (Dillon), issued May 27, 2003, Claim Chart.
Exhibit 111B: U.S. Patent No. 6,571,296 (Dillon), issued May 27, 2003, Claim Chart.
Exhibit 112A: U.S. Patent No. 5,423,086 (Cannon, et al.), issued Jun. 6, 1995, Claim Chart.
Exhibit 112B: U.S. Patent No. 5,423,086 (Cannon, et al.), issued Jun. 6, 1995, Claim Chart.
Exhibit 113A: U.S. Patent No. 5,392,452 (Davis), issued Feb. 21, 1995, Claim Chart.
Exhibit 113B: U.S. Patent No. 5,392,452 (Days), issued Feb. 21, 1995, Claim Chart.
Exhibit 114A: U.S. Patent No. 5,663,717 (DeLuca), issued Sep. 2, 1997, Claim Chart.
Exhibit 114B: U.S. Patent No. 5,663,717 (DeLuca), issued Sep. 2, 1997, Claim Chart,.
Exhibit 115A: U.S. Patent No. 5,548,814 (Lorang, Lindquist), issued Aug. 20, 1996, Claim Chart.
Exhibit 115B: U.S. Patent No. 5,548,814 (Lorang, Lindquist), issued Aug. 20, 1996, Claim Chart.
Exhibit 115C: U.S. Patent No. 5,548,814 (Lorang, Lindquist), issued Aug. 20, 1996, Claim Chart.
Exhibit 115D: U.S. Patent No. 5,548,814 (Lorang, Lindquist), issued Aug. 20, 1996, Claim Chart.
Exhibit 116A: U.S. Patent No. 5,414,750 (Bhagat, et al.), issued May 9, 1995, Claim Chart.
Exhibit 116B: U.S. Patent No. 5,414,750 (Bhagat, et al.), issued May 9, 1995, Claim Chart.
Exhibit 116C: U.S. Patent No. 5,414,750 (Bhagat, et al.), issued May 9, 1995, Claim Chart.
Exhibit 116D: U.S. Patent No. 5,414,750 (Bhagat, et al.), issued May 9, 1995, Claim Chart.
Exhibit 117A: U.S. Patent No. 5,559,862 (Bhagat, et al.), issued Sep. 24, 1996, Claim Chart.
Exhibit 117B: U.S. Patent No. 5,559,862 (Bhagat, et al.), issued Sep. 24, 1996, Claim Chart.
Exhibit 118A: U.S. Patent No. 4,554,418 (Toy), issued Nov. 19, 1985, Claim Chart.
Exhibit 118B: U.S. Patent No. 4,554,418 (Toy), issued Nov. 19, 1985, Claim Chart.
Exhibit 119A: U.S. Patent No. 5,493,692 (Theimer, et al.), issued Feb. 20, 1996, Claim Chart.
Exhibit 119B: U.S. Patent No. 5,493,692 (Theimer, et al.), issued Feb. 20, 1996, Claim Chart.
Exhibit 119C: U.S. Patent No. 5,493,692 (Theimer, et al.), issued Feb. 20, 1996, Claim Chart.
Exhibit 119D: U.S. Patent No. 5,493,692 (Theimer, et al.), issued Feb. 20, 1996, Claim Chart.
Exhibit 120A: U.S. Patent No. 5,946,322 (Moura et al.), issued Aug. 31, 1999, Claim Chart.
Exhibit 120B: U.S. Patent No. 5,946,322 (Moura et al.), issued Aug. 31, 1999, Claim Chart.
Exhibit 120C: U.S. Patent No. 5,946,322 (Moura et al.), issued Aug. 31, 1999, Claim Chart.

US 8,601,154 B2

Page 9

(56)　　　　　　References Cited

OTHER PUBLICATIONS

Exhibit 120D: U.S. Patent No. 5,946,322 (Moura et al.), issued Aug. 31, 1999, Claim Chart.
Exhibit 121A: U.S. Patent No. 5,570,084 (Ritter, et al.), issued Oct. 29, 1996, Claim Chart.
Exhibit 121B: U.S. Patent No. 5,570,084 (Ritter, et al.), issued Oct. 29, 1996, Claim Chart.
Exhibit 122A: U.S. Patent No. 5,396,537 (Schwendeman), issued Mar. 7, 1995, Claim Chart.
Exhibit 122B: U.S. Patent No. 5,396,537 (Schwendeman), issued Mar. 7, 1995, Claim Chart.
Exhibit 122C: U.S. Patent No. 5,396,537 (Schwendeman), issued Mar. 7, 1995, Claim Chart.
Exhibit 122D: U.S. Patent No. 5,396,537 (Schwendeman), issued Mar. 7, 1995, Claim Chart.
Exhibit 123A: U.S. Patent No. 4,525,779 (Davids), issued on Jun. 25, 1985, Claim Chart.
Exhibit 123B: U.S. Patent No. 4,525,779 (Davids), issued on Jun. 25, 1985, Claim Chart.
Exhibit 124A: U.S. Patent No. 5,862,325 (Reed, et al.), issued Jan. 19, 1999, Claim Chart.
Exhibit 124B: U.S. Patent No. 5,862,325 (Reed, et al.), issued Jan. 19, 1999, Claim Chart.
Exhibit 124C: U.S. Patent No. 5,862,325 (Reed, et al.), issued Jan. 19, 1999, Claim Chart.
Exhibit 124D: U.S. Patent No. 5,862,325 (Reed, et al.), issued Jan. 19, 1999, Claim Chart.
Exhibit 125A: U.S. Patent No. 5,673,299 (Fuller et al.), issued Sep. 30, 1997, Claim Chart.
Exhibit 125B: U.S. Patent No. 5,673,299 (Fuller et al.), issued Sep. 30, 1997, Claim Chart.
Exhibit 126A U.S. Patent No. 5,541,976 (Ghisler), issued Jul. 30, 1996, Claim Chart.
Exhibit 126B U.S. Patent No. 5,541,976 (Ghisler), issued Jul. 30, 1996, Claim Chart.
Exhibit 127C: U.S. Patent No. 5,742,905 (Pepe), issued on Apr. 21, 1998, Claim Chart.
Exhibit 127D: U.S. Patent No. 5,742,905 (Pepe), issued on Apr. 21, 1998, Claim Chart.
Civil Action No. 2:09-CV-289-CE, Defendants Research in Motion Corporation and Research in Motion Limited's P.R. 3-3 Invalidity Contentions.
U.S. District Court of Texas; SimpleAir Holdings, Inc. Defendants Responsive Claim Construction Brief, p. 1-36, Jul. 31, 2008.
U.S. District Court of Texas; SimpleAir Holdings, Inc. Defendants Motion for Summary Judgement, p. 1-23, Jul. 31, 2008.
Exhibit 8; Modern Dictionary of Electronics, Seventh Edition; p. 1-7; Jul. 17, 2008.
Exhibit 7; Webster's New World Computer Dictionary, Tenth Edition, p. 1-8. Jul. 17, 2008.
Exhibit 6; The American Heritage Dictionary . . . Fourth Edition, p. 1-8, Jul. 17, 2008.
Exhibit 5; Random House Webster's Dictionary, Fourth Edition, p. 1-6. Jul. 17, 2008.
Exhibit 4; Webster's Third New International Dictionary, Unbridged, p. 1-6, Jul. 7, 2008.
Exhibit 3; Published PCT Application WO 97/27546, p. 1-101, Jul. 17, 2008.
Exhibit 2; Applicant Response to Office action, p. 1-6, Jul. 17, 2008.
Exhibit 1; U.S. Patent 6,735,614, p. 1-12, Jul. 17, 2008.
Exhibit 10; Newton's Telecom Dictionary, 12th Edition, p. 1-10, Jul. 17, 2008.
Exhibit 9; Microsoft Dictionary Eith Edition, p. 1-7, Jul. 17, 2008.
Exhibit A; Document 83-2, p. 1-17, Jun. 13, 2008.
U.S. District Court of Texas; SimpleAir Holfings, Inc., V M-Qube, Inc., et al., p. 1-2, Jun. 11, 2008.
U.S. District Court of Texas; SimpleAir Holfings, Inc., V M-Qube, Inc., et al., Defendant MySpace, Inc.'s Amended Answer, p. 1-16, Jun. 9, 2008.

U.S. District Court of Texas; SimpleAir Holfings, Inc., V M-Qube. Inc., et al., DefendantYahoo! Inc.'s, Inc.'s Amended Answer, p. 1-16, Jun. 9, 2008.
Exhibit 2; U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al., Docket Control Order, p. 2-5. Nov. 15, 2007.
Exhibit 1; U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al., Discovery Order, p. 2-8. Nov. 15, 2007.
Exhibit B; Defendants' Proposed Constructions and References, p. 1-7, Jun. 13, 2008.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Plaintiff and Counterdefendant . . . Document 41, p. 1-4, Feb. 20, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Plaintiff and Counterdefendant . . . Document 40, p. 1-4, Feb. 20, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Plaintiff and Counteniefendant . . . Document 39, p. 1-4, Feb. 20, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Plaintiff and Counterdefendant . . . Document 34, p. 1-6, Feb. 5, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Plaintiff and Counterdefendant . . . Document 33, p. 1-6, Feb. 5, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Defendant Yahoo! inc.'s Answer . . . Document 27, p. 1-9, Jan. 31, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Defendant MySpace inc.'s Answer . . . Document 25, p. 1-9, Jan. 31, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Defendant Ebay inc.'s Answer . . . Document 23, p. 1-9, Jan. 31, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., et al.; Defendant M-Qube, Inc.s Answer . . . Document 19, p. 1-11, Jan. 16, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., MySpace, Inc. Responses to SimpleAir Holdings, Inc., Second Set of Interogatories . . . , p. 1-3.
U.S. District Court Eastern District of Texas; SimpleAir Holding,Inc., V M-Qube, Inc., et al.; Complaint for Patent Infringement . . . Document 1, p. 1-6, Exhibit A; Oct. 26, 2006.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc., V M-Qube, Inc., at al.; Defendant CBS Broadcasting Inc.'s Answer . . . Document 18,Jan. 16, 2007.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc.,V M-Qube, Inc., et al.; Joint Claim Construction and PreHearing Statement; Document 83, Jun. 13, 2008.
U.S. District Court Eastern District of Texas; SimpleAir Holding, Inc.,V M-Qube, Inc., et al.; PlaintiffSimpleAir's Claim Construction Brief, Document 88, 34 pages. Jul. 17, 2008.
Kramer, Matt, AirNote offers all-in-one solution for paging needs, PCWeek Then National Newspaper of Corporate Computing, Oct. 3, 1994, vol. 11, No. 93.95, p. 85.
Unknown, AirNote ships with software to filter and forward e-mail messages to text pager . . . , Business Wire, inc., Aug. 15, 1994, pp. 1-3.
Wireless Services Corporation, AirNote Wireless E-Mail, pp. 1-76, Copyright 1995-8 Wireless Services, Corporation.
Corporate News, SkyTel Launches New Service for Email, Voice Mail and Faxes, Corporate News, Aug. 11, 1999, pp. 1-3.
Corporate News, XYPOINT Corp. and Wireless Service Corp. Announce Partnership to Link, Corporate News, Jul. 12, 1999, pp. 1-2.
Corporate News, Wireless Services Announces Nextel Delivered More Than One Million Wireless Internet Messages in February, Corporate News, Apr. 27, 1999, pp. 1-2.
Corporate News, Wireless Services Delivers Over Nine Million Data Messages in 1998, Corporate News, Feb. 8, 1999, pp. 1-2.
Corporate News, Land Mobile Radio News, Oct. 23, 1998.

US 8,601,154 B2

Page 10

(56)    **References Cited**

OTHER PUBLICATIONS

Corporate News, Wireless Services Offers GotSports Personalized Sports information Serivce Via Pagers, PCS Phones and Email, Corporate News, Oct. 21, 1998, pp. 1-2.

Corporate News,Nextel Announces On-Line Paging Serice Provided by Wireless Services, Corporate News, Aug. 12, 1998, pp. 1-2.

Albright, Peggy, Wireless Services Offers E-mail, Corporate News, Aug. 3, 1998, pp. 1-2.

Jones, Jeanne L, Keep Data Coming, Corporate News, Jun. 19, 1998, pp. 1-2.

Corporate News, Telescan Launchs Telescan Direct Wireless Service for Market Quotes and News, Corporate News, Oct. 14, 1997.

Corporate News, With @Stream, Receiving E-mail on the Road Now As Easy As Picking up the Phone, Corporate News, Oct. 6, 1997, pp. 1-2.

The News Tribune Tocoma, Billions Riding on Thin Air / Seattle Has Become the Center of an Exponentially Expanding . . . , Corporate News, Oct. 15, 1997, pp. 1-4.

Macworld, Apple Mobile Message System, Macworld, Sep. 1995, vol. 12, No. 9, p. 74.

PR Newswire Association, inc., Apple Mobile Message System Makes it Easy to Receive Wireless Messages in the Road, Financial News, Jan. 3, 1995, pp. 1-3.

Business Wire, Inc., Apple Mobile System will Incorporate Ex Machine's Notify! and Update! Software, Business Wire, Inc., Jan. 3, 1995, pp. 1-2.

Apple, Inc., Apple Mobile Messaging System: Description (Jul. 1995), http://docs.info.apple.com/article/html?artnum=17014&coll=ap ; accessed Jul. 6, 1995.

PR Newswire Association, Inc., Apple Outlines Plethora of Newton Wireless Communications Solutions at MessagePad 120 Launch, Financial News, Jan. 30, 1995, pp. 1-4.

Unknown, Apple Wireless-Messaging Bundle Targets PowerBooks, PCWeek, Dec. 26, 1994/Jan. 2, 1995, vol. 11, No. 51, pp. 45 and 47.

M2 Communications Ltd., AU-System Radio, M2 Communications Ltd., Oct. 11, 1995, pp. 1-2.

Crain Communications, Inc., Business Brief, Crain Communications, Inc., Mar. 13, 1995.

Windows, CompuServe Navigator, Windows User Giude, Dec. 1994, pp. 1-33.

Unknown, CompuServe Teams with Socket to Deliver Wireless E-Mail,News Release, Nov. 14, 1995, pp. 1-2.

CompuServe, Information Manager for Windows, User's Guide, CompuServe, Feb. 1995, 179 pages.

CompuServe, Information Service, User's Guide, CompuServe, May 1995, 37 pages.

Wellington Newspapers Limited, E-Mail to GSM Digital Phone System Unveiled.

Wellington Newspapers Limited, Sep. 25, 1995.

Information Access Company, a Thompson Corporation Company, Editor's Picks 1995; 61 Hottest Products for 1995; Cover Story; Directory, Jan. 1995, pp. 1-12.

Rooney, Paula, Ex Machine's Update Completes Wireless Circle, PCWeek, The National Newspaper of Corporate Computing; May 17, 1993, vol. 10, No. 19, 3 pages.

Betheney, Herb, Ex Machina's Update Eases Wireless data Transfer, PCWeek, The National Newspaper of Corporate Computing; Mar. 14, 1993, vol. 10, No. 10, 3 pages.

Dias, et al,, Extending the Reach of the Internet Through Paging, INET'95, Annual Meeting of the Internet Society, Honolullu, Hawaii, Jun. 27-30, 1995, 6 pages.

Wexier, Joane, First PCS Offerings Arrive from SkyTel, NetworkWorld, vol. 12, No. 38, Sep. 18, 1995, 3 pages.

Monroy, Jesus, Jr., FYI: Wireless Data, WCO Issue # 21, Nov. 1994, http://www.markshapiro.com/issue21.p13-p22.html.

Socket Communications Services, Getting Started with SWiMS, Socket Wireless Messaging Services, how to Activate your SWiMS Account, Sep. 1995, 15 pages.

Gibbs, Mark, Hot LAN Tools, Network World, Inc., Sep. 12, 1994, pp. 1-4.

Hewlett Packard, HP 100LX User's Guide, Hewlett Packard, 1993, 106 pages.

Hewlett Packard, HP 200LX User's Guide, Hewlett Packard, 1994, 122 pages.

Lefkowitz, Larry, How to Get Battery-Powerd Portable Moderns to Work With the HP 95LX, The HP Plamtop Paper, Jan./Feb. 1993, 5 pages.

Unknown. Moderns that Work with the HP 95LX, The HP Plamtop Paper, Jan./Feb. 1993, 5 pages.

Dickens, Ted, CompuServe Opens New HP Handhelds Forum, The HP Plamtop Paper, Jul./Aug. 1992, 3 pages.

Lefkowitz, Larry, Accessing Compuserve with the HP 95LX, The HP Plamtop Paper, Mar./Apr. 1992, 6 pages.

Shaddock, Rick, EMBARC Messaging Services, The HP Plamtop Paper, Mar./Apr. 1993, 3 pages.

Dickens, Ted, Getting Help for Your HP Plamtop on CompuServe, The HP Plamtop Paper, Nov./Dec. 1992,pp. 47-50.

Shaddock, Rick, SkyStream Wireless Receiver, The HP Plamtop Paper, Nov./Dec. 1992,pp. 20-24.

Nutter, Ronald, The HP Plamtop as Tech Support Tool, The HP Plamtop Paper, Nov./Dec. 1993,pp. 32-34.

Hall, et al., Third Party Prodicts of Interest to HP Plamtop Users, The HP Plamtop Paper, Nov./Dec. 1993,pp. 6-13.

Arancio, Alex, Access CompuServe with acCIS, The HP Plamtop Paper, Nov./Dec. 1994,vol. 3, No. 6, pp. 27-28 and 32.

Scardina, Mark, CIS: CompuServe Information Service, The HP Plamtop Paper, Nov./Dec. 1994,vol. 3, No. 6, pp. 23-26.

Chernow, Bob, Crusing The Internet with the HP Plamtop, The HP Plamtop Paper, Nov./Dec. 1994,vol. 3, No. 6, pp. 16-20.

Roberts, Victor, The HP Plamtop: The Ideal Portable Terminal with Versatile PIMs, The HP Plamtop Paper, Nov./Dec. 1994,vol. 3, No. 6, pp. 36-39.

Goldstein, Hal, RAM Cards and RAM Card Drives, The HP Plamtop Paper, Jan./Feb. 1992 pp. 16-17.

Unknown, Lotus Ships Lotus Notes Pages Gateway for SkyTel, Lotus Press Release, Feb. 8, 1994, pp. 1-3.

Mobile Telecommunication Technologies Corporation, Securities and Exchange Commission, Form 10-K, Apr. 3, 1995, 113 pages.

Goldstein, Hal, News From HP: The HP 95LX and the Motorola Newsstream Receiver, 1991, pp. 1-5.

Paul, et al., Newton Gets New Network links, NetWorld, The NewsWeekly of Enterprise Network Corporations; Aug. 12, 1993, 2 pages.

Business Wire, Inc., Notable Technologies Brings Wireless Communications to the World Wide Web, Business Wire, Inc., Feb. 21, 1995, 2 pages.

Krohn, Novell Outlines NetWare Future, PC Week, Oct. 19, 1992, vol. 9, No. 42, 3 pages.

Farbar, Apple's PowerPC Success Hinges on Apps Delivery, PC Week, Mar. 15, 1993, vol. 10, No. 10, 2 pages.

Kramer, Matt, Wireless Comm Begins Fulfilling Promise, First Looks, PC Week, Mar. 15, 1993, vol. 10, No. 10, pp. 91-94 and 101-102.

Unknown, Notify!: The Mac Pager, MacUser, Apr. 1992, p. 49.

Unknown, TidBITS # 103, TidBITS, Jan. 27, 1992, 10 pages.

Emigh, Jacqueline, PageCard to Double as PCMCIA Card / Standalone Pager, LookSmart, Dec. 21, 1993, http://findarticles.com/p/articles/mi_1993_Dec_21/ai_15052712/print.

Socket Communications, PageCard Wireless Messaging System: Users Guide for Manual Operation, Socket Communications: Maual, Feb. 1995, 30 pages.

Unknown, MacWeek, vol. 9, No. 36, Sep. 11, 1995, p. 1, 3-4 and 55-57.

Andrews, Dean, Video Conferencing Product Trims Phone Costs, PC World, May 1995, p. 110.

Socket Wireless Messaging Services, Getting Started with SWiMS, How to Activate Your SWiMS Account, Sep. 1995, 15 pages.

Sony, Magic Link, PIC-1000, Sony, Jun. 1994, 8 pages.

SkyTel, GO Wireless, SkyTel, Brochure, 1994, 6 pages.

AT&T, Smart Messaging, Instant Information, Electronic Shopping and More, AT&T, PersonaLink Services, Jun. 1994, 36 pages.

Stahl, Stephanie, Creating 'Virtual' Call Centers, InformationWeek for Business and Technology Managers, Sep. 5, 1994, 4 pages.

**US 8,601,154 B2**

Page 11

(56)                **References Cited**

OTHER PUBLICATIONS

Beam, Miles, A Summary of Data Broadcasting Technologies and Potential Applications in Today's Market, RDS/RBDS, Milestone Technologies, Inc., last modified on Aug. 23, 1995.

Storm, David, AirNote Technologies, Inc., 1994, 6 pages, http://storm.com/pubwork/cw51294.html.

Business Wire, Inc., SkyTel Announces SkyCard, Business Wire, Inc., Sep. 19, 1994, 3 pages.

PR Newswire Association, Inc., SkyTel Corporation to Offer and Display Motorola NewsCard, PR Newswire Association, inc., Oct. 20, 1992.

SkyTel Communications, Inc., Form 10-K, SkyTel Communications, Inc., Apr. 1, 1996, 6 pages.

Socket Communications, The Office, Mobile Professionals Need Connections, Socket Communications, 1996, 8 pages.

Socket Communications, PageCard Wireless Messaging System, Socket Communications, 1996, 2 pages.

Unknown, Socket Enhances Wireless Messaging Services, Press Release, Socket Communications, Sep. 13, 1995, 2 pages.

ProQuest, Socket introduces PageCard Wireless Messaging System for Apple PowerBooks and MessagePads, Oct. 11, 1995, 2 pages.

Stephens, Sara G., Socket to You Anywhere, Anytime, Windows Magazine, Aug. 1995, pp. 1-3 and 176.

Case, Howard, Socket Releases Wireless E-Mail Forwarding Software for Microsoft Mail, Socket Communications, Oct. 4, 1995, 2 pages.

Socket Communications, SWiMS Socket Wireless Massaging Services User's Guide, Socket Communications, Sep. 1995, 44 pages.

ProQuest, TekNow Announces Messaging Software Bundle with Socket Communications, Business Wire, Mar. 22, 1995, pp. 1-2.

Information Access Company, Text Paper Offers Travellers an Easy Way to Touch Base, Aug. 29, 1994.

The Internet Informer, The Internet Informer, Oct. 1994, 51 pages, http://www.textfiles.com/magazines/ONESHOTS/october.txt.

DeRose, James F., The Wireless Data Handbook, Third Edition, Apr. 1996, pp. 277-289.

Unknown, Mac III: The Next Generation, MacWeek, vol. 7, No. 6, Feb. 8, 1993, 2 pages.

Unknown, SkyTel and CompuServer Team to Provide Wireless Messaging Services in Countries Worldwide, Business Wire, Inc., May 1, 1995, pp. 3 and 4.

Que Corporation, Using CompuServe, Get the Most From CompuServe's Services and Resources!, Second Edition, 1994, 90 pages.

Socket Communications, Using the PageCard with your Apple Power Book, Sep. 1995, 27 pages.

Socket Communications, Using the PageCard with Your Newton MessagePad, Sep. 1995, 21 pages.

PR Newswire Association, Inc., Wireless data Services Announced for Portable Computers; New Spftware From SkyTel, Ex Machina to Update Mobile ApplicationsFeb. 2, 1993.

Miastkowski, Stan, Omnifax G5: Five Peripherals in a Compact Package, PC World, Aug. 1994, 2 pages.

T. Berners-Lee et al., Uniform Resource Locators, Network Working Group, University of Minnesota Editors, Dec. 1994, 25 pages.

Gareiss, Robin, A Value-Added Service with Brains, Data Communications, Jan. 1995, pp. 66, 68 and 70.

Wayner, Peter, Agent-Enhanced Communicator, BYTE, The Magazine of Technology Integration, Feb. 1995, 4 pages.

Silver, Gail, AT&T Introduces AT&T PersonaLink(SM) Services, ProQuest, Business Wire, New York, Sep. 28, 1994, Section 1, p. 1-3.

Unknown, Roaming with Data, IEEE Colloquium, Mar. 6, 1995, 6 pages.

Farber, David, Interesting-People Message, First Reactions—The Sony Magic Link, Oct. 9, 1994, pp. 1-2, http://www.interesting-people.org/archives/.

Lellimo, Albert, Jr., The Next Generation, Network World, Mar. 13, 1995, vol. 12, No. 11, pp. 63-66.

Messmer et al.,PDAs to Spin Magic, Network World, Jan. 10, 1994, vol. 11, No. 2, 2 pages.

Fisher, Lawrence M., Personal Digital Assistant, part III, The New York Times, Sep. 28, 1994, 4 pages.

Rodrigues, Karen, PersonaLink Aims to Put PDAs On-Line, infoWorld, AT&T PersonaLink On-Line Services, Oct. 3, 1994, 16, 40; ABI/INFORM Golbal, p. 43.

Hogan, Mike, Prime Time for PDAs-Finally, Home Office Computing, Jun. 1995, 6 pages.

Sony,PIC-1000 Personal Intelligent Communicator Peripherals, Sony, Magic Link, 1994, 8 pages.

O'Mahony, Jennifer, SkyTel Announces Availability of Wireless Messaging for Sony Magic Link Personal Communicators, ProQuest, Business Wire, New York, Sep. 28, 1994,Sec. 1.

Reinhardt, Andy, Sony Releases Magic Cap Device, BYTE, The Magazine of Technology Integration, Dec. 1994, 3 pages.

Jacqueline, Emigh, Sony's New Magic Link Personal Communicator, Information Access Company, Newsbytes, Sep. 29, 1994, 3 pages.

Reinhardt, Andy, The Network with Smarts, BYTE, The Magazine of Technology Integration, Oct. 1994.

Kramer, Matt, Paging-Software Programs Show Broader Messaging Capabilities, PC Week, vol. 11, No. 25, Jun. 27, 1994, 5 pages.

Unknown, SkyTel and Ex Machina Announce Joint Marketing Agreement; Notify! Wireless Messaging Software to Work with Skyword and Skystream, Aug. 10, 1992, pp. 5 and 6.

Unknown, Advanced Communications Software Introduced for Newton; Ex Machina Debuts Pocketcall Terminai Program and Notify! Wireless Messaging to Newton, Aug. 2, 1993.

Unknown, Ex Machina Introduces Wireless Receiving Software for Windows, Business Wire, Inc., Nov. 19, 1993, pp. 1-2.

U.S. District Court Eastern District of Texas; SimpleAir Holding, inc. V M-Qube, Inc. et al.,Invalidity Contentions Pursuant to Patent . . . document 41, Feb. 20, 2007.

Unknown, A New Chapter in Wireless Communication and E-Mail, Electronic Messaging News, vol. 3, No. 24, Nov. 27, 1991, 3 pages.

Acharya et al., Delivering Multicast Messages in Networks with Mobile Hosts, Department of Computer Science Rutgers University, IEEE 1993.

Schulman et al., Traveler Information: Tailored to Meet the Needs of the Traveler, TIntelligent Transportation: Realizing the Benefits, vol. 1, Apr. 15-18, 1996.

Parola, Bryan, irMedia Live! Premiers at Semo '96 First Wireless Cyberspace Network Connections Internet to Off-Line PC's, Press Release, Jan. 29, 1996, pp. 1-4.

Unknown, AirMedia Live! Wireless Cyberspace Network Goes Online; Ex Machina Announces Launch of Nationwide Wireless . . . Business Wire, Jun. 3, 1996, 3 pages.

Motorola Wireless Data Group, AirMobile Wireless Comm Client for cc:Mail User Guyde Version 1.0, Motorola, Inc. 1995, 45 pages.

Unknown, America Online Expands Lead in Mobile Computing Market, Provides Customized Service Pre-Loaded on the Motorola Envoy DevicePR Newswire, Mar. 7, 1994.

Unknown, Apple Computer Launches eWorld, Its New Online Commnity, PR Newswire, Jun. 20, 1994.

Apple Mobile Message System, Apple Computer, Inc. 1994.

Unknown, Apple's Starcore Group Announces New Software for Newton Messagepad and Compatibles, PR News, Jan. 5, 1994.

Gillford et al., An Architecture for Large Scale Information Systems, MIT Laboratory for Computer Sciences, Association for Computer Machinery, 1985.

Unknown, Ericsson Adapts pACT Narrowband PCS Protocol; New Digital Two-Way Open Air Protocol Co-Developed with AT&T Wireless Services, Business Wire, Feb. 6, 1996.

Barbara, Daniel, Sleepers and Workaholics: Caching Strategies in Mobile Environments (Extended Version), Journal, Aug. 29, 1994.

Vittore, Vince, Bellcore's Airboss Brings Single Number To Data, Emerging Technologies, America's Network, Jun. 1, 1993.

Belsie, Laurent, Here Comes New Wave of Personal Digital Assistants, The Christian Science Monitor, An International Daily Newspaper, Apr. 24, 1994.

Unknown, On-Ramp to the Information Highway, Earl G. Graves Publishing Company, Inc., Black Enterprise, Apr. 1994.

Unknown, Electronic Mail & Messaging Systems, BRP Publications, Apr. 1, 1996, vol. 20 Issue 6, Newsletter.

**US 8,601,154 B2**

Page 12

(56)        **References Cited**

OTHER PUBLICATIONS

Unknown, CompuServe Announces Wireless Partnership; New Services Helps Mobile Professionals Stay in Charge SM, Business Wire, May 1, 1995.
Unknown, CompuServe: Exclusive Wireless Technology Enabling Communication to all Pagers in the U.S. Announced, M2 PressWire, Oct. 11, 1995.
CompuServe, CompuServe Information Manager for Macintosh, User's Guide, 1995, 179 pages.
Beatty et al., Cruising America Online, Prima Publishing, 1994, 319 pages.
Dack et al., Key Lessons in Mobile Applications, Networks & Communications Laboratory, HP Laboratories Bristol, HPL-93-108, Dec. 1993, 17 pages.
Motorola, Introduction to Application Developers, DataTAC Networks, Jan. 1996.
DeRose, James F., The Wireless Data Handbook, Third Edition, Apr. 1996, 156 pages.
Milligan et al., eWorld; The Official Guide for Macintosh Users, Hyden Books, 1994.
Unknown, Ex Machina Announces PocketCall Intelligent Terminal Program for General Magic Platform, Business Wire, Jan. 6, 1994.
Unknown, Ex Machina Introduces PocketCall for Motorola's Envoy Personal Wireless Communicator, Business Wire, Mar. 7, 1994.
Rooney, Paula, Ex Machine's Update Completes Wireless Cycle, PC Week, vol. 10, No. 19, 3 pgs., May 17, 1993.
Motorola, FLEX; Flexible High Speed Paging Protocol, Motorola, Inc., Apr. 26, 1994, 16 pages.
Gadol et al., Nomadic Tenets—A User's Perspective, Sun Microsystems Laboratories, Inc., Jun. 1994, 16 pages.
Burch, Ben, Motorola Envoy Press Clippings, USENET, Comp.sys.pen, (via Google Groups), Mar. 7, 1994.
Unknown, Hewlett-Packard Delivers Instant Voice, Data Messages to PalmTop Via PageNet, Land Mobile Radio News, vol. 48, No. 12, Mar. 25, 1994.
Apple, Inc., How to Activate the Apple Notification Service, Apple Mobile Massage System, 1994.
Hewlett Packard Co., HP 95LX User's Guide, Nov. 1991.
Schmuhl et al., HP PalmVue: A New Healthcare Information Product, Hewlett-Packard Journal, Jun. 1996.
Unknown, Proceedings of the Twenty-Seventh Internet Engineering Task Force, SURFnet and RARE Amsterdam, The Netherlands, Corporation for National Recearch Initiatives, Jul. 12, 1993.
Unknown, Individual Delivers Headsup, a Personal, Interactive Newspaper for the Fax and Mobile Computing Environments, PR Newswire Association, Inc., May 10, 1993.
Unknown, How SMART Works, Individual, Inc., White Paper, on Information and Belief, Pre 1995.
Doug Van Kirk, StarLink to unite HP 100LX users with paging Services, InfoWorld, Mar. 14, 1994.
Matzkin, Jonathan K., Intelligent Assistance, Computer Shopper, The Computer Magazine for Direct Buyers, vol. 15, No. 11, Issue 188, Nov. 1995.
Unknown, Internet Protocol DARPA Internet Program Protocol Specification,Information Sciences Institute University of Southern California, Sep. 1981.
Ioannidis, John, Protocols for Mobile Internetworking, Columbia University, 1993.
Unknown, Standard Codes and Formats for International Radio Paging, Recommendation 584-1, Question 12-8, Study Programme 12 A/8, ITU, 1982-1986.
Kador, John, Letting Computers Choose Your News; Individual, Inc's HeadsUp Customized Electronic News Service, Gale Group, Inc., Jun. 30, 1994.
Nilsson, B.A., Let's Get Small; PCMCIA cards; Includes Related Article on the Top PCMCIA Card Vendors, ZD Net, Computer Shopper, Jun. 1, 1993.
Jones, Stephen, Lotus and SkyTel Announce Strategic Affiance to Develop Wireless Messaging Technologies, Business Wire, New York, May 5, 1993, Section 1 p. 1.

Emigh, Jacqueline, Lotus Releases cc:Mail Gateway for Pager Messaging, Post-Newsweek Business Information, Inc., NewsBytes, Aug. 30, 1994.
MASC/MPAK Protocol Description, Ericsson, reprinted 2002.
McIntyre, Angus, Games: The MOO Frontier, The Guardian, Nov. 24, 1994.
Unknown, Mobidem Radio Data Modem Criticized by Newsletter Report, NewsBytes News Network, Feb. 20, 1992.
Khan et al., MobiTex and Mobile Data Standards, IEEE, Mar. 1995.
Mobitex Interface Specification, General Binder Overview, 1992-1993, 910 pages.
Mobitex Made Easy: A guide to Wireless Computing, RIM, 1994, 143 pages.
MIS Mobitex Interface Specification—Open Version, Ericsson AB, 2002, 690 pages.
Parsa, Kourosh, The Mobitex Packet-Switched Radio Data System, RAM Mobile Data, IEEE, 1992.
Monheim, Thomas A., Personal Communications Servies: The Wireless Future of Telecommunications, 44 Fed., Comm. L.J. 335, 191-192.
Motorola Adds Completely Mobile to Sales Force for Embarc Wireless Network, Canada Newswire, Sep. 2, 1993.
Motorola Announces Commercial Availability of Envoy Wireless Communicator, PR Newswire, Feb. 14, 1995.
Unknown, Motorola's EMBARC and Individual, Inc. Launch HeadsUp Wireless Service, Business Wire, Inc., Jun. 1, 1993.
Motorola, User's Guide for Motorola's Envoy and Envoy 150 Wireless Communicators, Motorola, Inc. Nov. 1994.
Unknown, Motorola FLEX on Schedule, Newsbytes News Network, Mar. 7, 1994.
Unknown, Motorola Unveils Envoy Hand-Held Device: First Fully integrated Two-Way Personal Wireless Communicator . . . , Business Wire, Mar. 7, 1994.
Unknown, Motorola's Newsstream Demonstrates Strength of One-Way Wireless Communications, PR Newswire, Feb. 16, 1993.
Unknown, Motorola's Wireless Data Group Targets End of Year for Envoy Shipment, PR Newswire, Jul. 18, 1994.
Fraser, Robert J., The MobiTex Terminal Specification, Evolution, Administration and Guided Tour, Reprinted from Communications, Jul. 1991 and Aug. 1991.
Sandomir, Richard, N.B.A. Sues to Keep Scores in its Court; The New York Times, Mar. 21, 1996.
Tatters, Wes, Navigating the Internet with CompuServe, Sams.net Publishing, 1995.
Jain at al., Network Support for Personal Information Services to PCS Users, Bell Communications Research, IEEE 1994.
Unknown, New Sharp Personal Information Assistant Will Offer EMBARC Wireless Messaging Capabilities, PR Newswire Association, Inc., Nov. 15, 1993.
Miller et al., News On-Demand for Multimedia Networks, International Multimedia Conference, Anaheim, CA, Aug. 2-6, 1993.
Unknown, News Serice for Computer-Phones, Editor & Publisher Co., Inc., Nov. 6, 1993.
Unknown, pACT, Personal Air Communications Technology, Brochure No. 32596, Mar. 1996.
Unknown, pACT Specification, Personal Air Communications Technology, Release 1.1, Oct. 1, 1995.
Unknown, Page Descriptor Footer (PDF) Draft Specification Revision 2.01, Socket Communications, Inc., Mar. 7, 1996.
PageCard Wireless Messaging System for Mobile Professionals for Newton Message Pads, Socket Communications, Inc. 1995.
PageCard Wireless Messaging System Users Guide for Manual Operation, Socket Communications, Inc., Feb. 1995.
PageNet Boosts Network Speed, Efficiency with Deployment of FLEX Pagers on Nationwide and Local Systems, Business Wire, Jul. 31, 1995.
Unknown, PageNet to Provide Paging for HP Palm Vue Systems, Communications Today, May 25, 1995.
Poultney, John, Pagers are more than a beeper, less than a computer, MacWeek, Sep. 11, 1995.
Unknown, PCSI Awarded Multimillion Collar Contract for pACT Narrowband Pcs Base Stations, Business Wire, Oct. 27, 1995.

US 8,601,154 B2

Page 13

(56)        **References Cited**

OTHER PUBLICATIONS

The HP OminGO 100 and the Sony PIC-200; Magic Cap Animation; SkyTel's 2-Way Paging System; Magic Cap Serial Communications . . . , PDS Developers vol. 3.6, Nov./Dec. 95.

Porter, Patrick L., Individual's Interactive Newspaper Hits Stride, UMI, Inc., Jan. 24, 1994.

Unknown, Mobitex User's Handbook for the Mobidem AT, RIM Apr. 1993.

Unknown, RIMGate, Installation and User's Guide, Aug. 1994.

Unknown, User's Handbook for Wireless Computing, RIM Research in Motion.

Unknown, River Run Software Group Announces its Wireless and Wireline Communications Products for Motorola's Personal Wireless Communicator, Business Wire, Mar. 7, 1994.

Unknown; Send and Receive Messages from Almost Anywhere; RadioMail bundled on Motorola Envoy Personal Wireless Communicator, Business Wire, Mar. 7, 1994.

Seybold, Andrew M., Using Wireless Communications in Business, Van Nostrand Reinhold, An International Thompson Publishing Company, May 1996.

Snekhar et al., Genesis and Advanced Traveler Information System (ATIS): Killer Applications for Mobile Computing?, Nov. 1994.

Unknown, Product Review: SkyTel 2-Way Messaging Service, Virtual Publishing Co., Ham Radio Online, Feb. 1996.

Unknown, SkyTel Announces Availability of Wireless Messaging for Sony Magic Link Personal Communicators; SkyTel Announces Agreement with Sony, Business Wire, Sep. 28, 1994.

SkyTel Announces SkyCard; Intelligent Wireless Message Management for Mobile Computing, Business Wire, Sep. 19, 1994.

Unknown, Sony's New Magic Link Personal Communicator, NewsBytes News Network, Sep. 29, 1994.

Unknown, Telocator Alphanumeric Protocol Version 1.3, The Personal Communications Industry Association, Sep. 24, 1993.

Unknown, Telocator Alphanumeric Protocol Version 1.8, Feb. 4, 1997.

USPTO, Cyberspace Doorbell, AirMedia, Inc. Registered Trademark No. 2,185,824, Registered on Sep. 1, 1998.

USPTO, Airmedia Live, AirMedia, Inc. Registered Trademark No. 2,253,920 Registered on Jun. 15, 1999.

Sony, Magic Link, User's Guide PIC-1000, 1994, 103 pages.

Que Corporation, Using CompuServe, Get the Most From CompuServe's Services and Resources!, Second Edition, 1994, 495 pages.

Vaughan-Nichols, Steven J., Online Serives Going Full Speed Ahead with Internet Access and Wireless Users, pp. 1, 3, 6 and 609. vol. 14, No. 7, Issue 172, Jul. 1994.

Storm, David, Mail on the Viking Express, Network Computing, p. 48, Nov. 15, 1992.

Pahlavan et al., Wireless Data Communications, Proceedings of the IEEE. vol. 82, No. 9, Sep. 1994.

RIM, Freedom PCS Network Adapter for Mobitex Version 1.0, Installation and User's Guide, Last Revised Oct. 13, 1995, 45 pages.

Unknown, Wireless World: HP's First Wireless Service Delivers Instant Voice & Data Messages to the HP 100LX PalmTop PC, EDGE, On & About AT&T, vol. 9, No. 294, Mar. 14, 1994.

Unknown, McAfee Virus Update Notigy 1.1, Innovations by InterSystem, p. 1-3, Aug. 15, 2007.

Unknown, Details, Instyler Software, Instyler SmartSetup, p. 1-2, Aug. 15, 2007.

Unknown, Order, Instyler Software, Instyler SmartSetup, p. 1-2, Aug. 15, 2007.

Unknown, Lifeinstyler Update-Notify by Sebastian Brand; Email without Boundaries, 1 page, Aug. 15, 2007.

About Us, Instyler Software, 1 page, Aug. 15, 2007.

Instyler Update-Notify; Download, 1 page, Aug. 15, 2007.

Instyler Update-Notify; An Overview, 1 page, Aug. 15, 2007.

PR Newswire Association, Inc., Wireless data Services Announced for Portable Computers; New Spftware From SkyTel, Ex Machina . . . , Wireless Data Services, pp. 8-10, Feb. 2, 1993.

Information Access Company, Ex Machine's Update Eases Wireless data Transfer: Update 1.0 Communications Program for Macintosh Powerbooks, p. 6-7, Mar. 15, 1993.

Unknown, Socket Unveils the PageCard, The First PCMCIA Alphanumeric Pager with LCD Display, PR Newswire Association, p. 3-5, Nov. 15, 1993.

High Beam—Encyclopedia, Apple Mobile Message System will Incorporate Ex Machina's Notify! and Update! Software, Business Wire, p. 1-2, Jan. 16, 1995.

Barney, Doug, Apple Taps into Paging Technology with Mobile, Wireless Suite, InfoWorld Group; p. 1-2, Jan. 16, 1995.

Issacson, Portia, Integrated PCMCIA Peripherals Enjoy Rapid Growth in Popularity, UMI, Inc., p. 21-23, Aug. 1, 1994.

Socket PC Cards FQA, Synchrotech, p. 1-3, Jan. 17, 2007.

Brown, Bruce, Page your Socket Communications PageCard: Socket Communications: Hardware Review; Brief Article; Evaluation, information Access Company; p. 1-2, Apr. 1997.

Unknown, Wireless Messaging System Adds Support for Microsoft Exchange New Version of Socket's PageCard Offers Windows 95 Spport, Business Wire, p. 1-3, Nov. 6, 1995.

Unknown, Socket PageCard Chosen by Apple Computer for First of a Kind Wireless Message System, Business Wire, p. 1-3, Jan. 3, 1995.

Unknown, Socket Releases Wireless E-Mail Forwarding Software for Microsoft Mail, Business Wire, p. 1-4, Oct. 4, 1995.

Unknown, PageCard Wireless Messaging System, Socket Communications, p. 1-13, Copyright 1995.

Scardina, Mark, The PageCard SDK, Handheld Systems, XP-002106346, Nov. / Dec. 1997.

PR Newswire Association, Inc., Socket Unveils the PageCard, The First PCMCIA Alphanumeric Pager with LCD Display, PR Newswire, p. 19-21 Nov. 15, 1993.

Emigh, Jacqueline, PageCard to Double as PCMCIA Card / Standalone Pager . . . Product Announcement, Newsbytes News Network, 1 pag, Dec. 21, 1993.

Unknown, Socket Association, Inc., Socket Unveils the PageCard, The First PCMCIA Alphanumeric Pager with LCD Display, PR Newswire. p. 53-55, Nov. 15, 1993.

Enterprise Networking, New Products, Computerworld, p. 52, Nov. 29, 1993.

Unknown, Infoworld; Pipeline; Announcement, Infoworld Media Group, p. 51, Dec. 13, 1993.

Unknown, ABI/Inform; High Growth Forecast for Wireless Moderns, UMI, Inc. Jul. 1994.

Unknown, The PageCard Built by Mitsubishi Corp., Information Access Company, p. 49-50, Jun. 20, 1994.

Unknown, ABI/Inform; High Growth Forecast for Wireless Moderns, UMI, Inc. , p. 24-25, Jul. 1994.

Unknown, Apple Mobile Message System will Incorporate Ex Machina's Notify! and Update! Software, High Beam Research, p. 1-2, Jan. 3, 1995.

Unknown, Apple Mobile Message System Makes it Easy to Receive Wireless Messages in the Road, High Beam Research, p. 1-3. Jan. 16, 2007.

Unknown, Socket PageCard Chosen by Apple Computer for First of a Kind Wireless Message System, Business Wire, p. 1-2. Jan. 17, 2007.

Unknown, PageCard Transmits LAN-Based Email to remote notebooks, Information Access Company, p. 19, Feb. 6, 1995.

Unknown, Wireless Messaging Kit Forwards Mail to Pagers . . . , Information Access Company, p. 18, Mar. 13, 1995.

Unknown, TekNow Announces Messaging Software Bundle . . . , High Beam Research, p. 1-3. Jan. 16, 2007.

Unknown, Wireless Technology Gives Paying a Face-Lift, CMP Publications, Inc., p. 15-16, May 1, 1995.

Unknown, Wireless Massaging System for Windows, BYTE.com, p. 1-3, Jan. 17, 2007.

Unknown, ABI/Inform; Talk & Backtalk, UMI, Inc., p. 6-12, Jun. 1995.

Unknown, Socket Introduces Software Developers Kit for data Paging . . . , High Beam Research, p. 1-3, Jan. 16, 2007.

Unknown, Socket SDK to advance paging applications, Information Access Company, p. 7, Aug. 14, 1995.

US 8,601,154 B2

Page 14

(56)          **References Cited**

OTHER PUBLICATIONS

Unknown, PCMCIA Pager Downloads data, Information Access Company, p. 6, Sep. 1995.
Unknown, Wireless Messaging System Adds Support for Microsoft . . . , High Beam Research, p. 1-2, Jan. 16, 2007.
Unknown, London Pafer Pffers data Paging to UK . . . , Business Wire, p. 1-2, Jan. 16, 2007.
Unknown, Socket Enables International Wireless Massaging, High Beam Research, p. 1-2, Jan. 16, 2007.
Unknown, Stratus TRM Offers Advanced Messaging Services for PageCard,High Beam Research, p. 1-2, Jan. 16, 2007.
Unknown, Socket Announces Advanced Data Paging Software . . . , High Beam Research, p. 1-3, Jan. 16, 2007.
Unknown, Socket Communications Announces Plans to Develop . . . , High Beam Research, p. 1-3, Jan. 16, 2007.
Unknown, Socket Expands Servia I/O Card Family for Mobile Computers, High Beam Research, p. 1-4, Jan. 16, 2007.
Unknown, AT&T and SkyTel Offer Wireless Mailbox Service, The New York Times Company, p. 25, Oct. 15, 1991.
Unknown, Trade Briefs, The Journal of Commerce, Inc., p. 23-24, Feb. 10, 1992.
Unknown, Abstracts; SkyTel to Develop a Removable Card for Apple's Newton, The New York Times Company, p. 22, Jun. 15, 1992.
Unknown, 2-Way Pager Works Well, But Pricing is Sky-High, P.G. Publishing Co., p. 9-10. Feb. 15, 1998.
Unknown, Ebay to Go Wireless with SkyTel, San Jose Mercury News, p. 8, May 14, 1999.
Unknown, Wireless E-Mail Works with Pager, Sun-Sentinel Company, p. 7, May 18, 1999.
Unknown, MCI Takes First Step into Wireless Internet, Gannett Company, p. 4-5, Jun. 1, 1999.
Unknown, Wireless and Raising its Profile; Reason's Motient Undergoing a Transformation to Data Network Firm, The Washington Post, p. 2-3, Nov. 2, 2000.
Unknown, Getting Messages on a Wrist, The Dallas Morning News, p. 1, Oct. 7, 2001.
Johnson, Alyssa, Wireless Service Tracks Teen Drivers; SkyTel's New Sky Guard Vehicle Tracking Service Allows Parents to Keep an Eye . . . , Ziff Davis Media, Inc., p. 11-12.
Heilman, Wayne, Download, Chapel Hills Get Wireless Internet Service,ProQuest Information & Learning, Co., p. 9-1O, Feb. 1, 2006.
Unknown, ParkMagic and SkyTel to Roll Out Mobile Parking Service in U.S., M2 Communications Ltd., Dec. 9, 2006, pp. 7-8.
Unknown, When Vehicles Become Mobile Offices, ProQuest Information & Learning, Co., p. 5-6, Apr. 2007.
Unknown, SkyTel Partners with VMS to Expand U.S. Distribution of SkyGuard Vehicle Saftey Technology, Associated Press, p. 3-4, Jun. 12, 2007.
Unknown, Satellite Notes, Warren Publishing, Inc., p. 2, Jun. 25, 2007.
SkyTel, SkyTel to End Wireless Net Test, The Dever Post, p. 1, Jul. 9, 2007.
SkyTel, Products & Services; Service Comparrison, kyTel, p. 1-2, 2007.
SkyTel, Customer Service; SkyTel Instructions . . . , SkyTel, p. 1-3, 2007.
SkyTel, NightWalk Systemsand SkyTel Join Forces, SkyTel, p. 1-3. Jul. 18, 2007.
SkyTel, Customer Q&A, SkyTel, 1 page, 2007.
SkyTel, Bell Industries Companies Acquisition of SkyTel, SkyTel, p. 1-3, Feb. 1, 2007.
SkyTel, Telemetry; Machine to Machine . . . , SkyTel, p. 1-2, 2007.
SkyTel, Service Options, SkyTel, p. 1-3, 2007.
SkyTel, SkyPaper Numeric Paging, SkyTel, p. 1-2, 2007.
SkyTel, SkyWord Text Paging, SkyTel, p. 1-2, 2007.
SkyTel, 1Way Paging, SkyTel, p. 1-2, 2007.
SkyTel, SkyWriter SkyTel 2Way Messaging, SkyTel, p. 1-4, 2007.

SkyTel, SkyGuard—The Ultimate Vehicle Reassurance System, SkyTel, p. 1-2, 2007.
SkyTel, FleetHawk, SkyTel, 1 page, 2007.
SkyTel, SkyTel Management Team, SkyTel, p. 1-2, 2007.
SkyTel, SkyTel Company History, SkyTel, p. 1-2, 2007.
Unknown, AirNote 1.0 Remote Messaging Services, UMI, Inc., p. 23-24, Dec. 1994.
Unknown, Going Global or Staying Closer to Home?, UMI, Inc., p. 19-22, Oct. 1995.
Unknown, Carriers Win with Narrowband PCS Communications, p. 17-18, Nov. 1995.
Unknown, Size is Everything, Bell & Howell Information & Learning, p. 14, Nov. 2001.
Lewis, Pete H., The Executive Computer, The New York Times Company, p. 63-65, Apr. 28, 1991.
Riley, James, Motorola, HP Tir up for PlamTop Pagers, South China Morning Post, Ltd., p. 61-62. Aug. 4, 1992.
Goldstein, Hal, The HP 95LX and the Motorola Newsstream Receiver, http://palmtoppaper.com/ptp00028.htm, p. 1-5, Aug. 22, 2007.
Unknown, Most Frequently Asked HP 95LX Questions to HP Technical Support, The HP PalmTop Paper; Fall 1991 Premier Issue; p. 1-2, fall 1991, http://palmtoppaper.com.
Unknown, The HP PalmTop Paper; Online Index to Issues 0-51, SourceForge Net, Efone, p. 1-2, Jul. 24, 2000.
eFone.com, eFone Documentation Tree, efone.com, p. 1-4, May 12, 2002.
eFone.com, Admin—pages eFone Administration Interface, efone. com, pp. 1-24, Mar. 25, 2002.
eFone.com, Installing efone, p. 1-6, Mar. 25, 2002.
eFone.com, The Home Page, p. 1-2, Aug. 15, 2007.
Unknown, CompuServe Testing Wireless Credit Check, The Columbus Dispatch, pp. 15-16, Sep. 12, 1994.
Unknown, CompuServe to Unveil Service Linked to Pagers, The Columbus Dispatch, pp. 13-14, Mar. 25, 1996.
Unknown, AT&T Internet Offers CompuServe Access, Plain Dealer Co., p. 11-12, Apr. 8, 1996.
Van, Jon, CompuServe is Web-Bound, Chicago Tribune Company, p. 9-10, May 22, 1996.
Unknown, H&R Block Seeks to Boost Value of CompuServe, The Times Mirror Company, p. 7-8, Aug. 29, 1996.
Scott, Jennifer, CompuServe Logs Off After 28-Year Run, The Columbus Dispatch, p. 5-6, Feb. 1, 1998.
Katz, Frances, Partnered with CompuServe, MCI Back in Net Access Business, The Atlanta Constitution, p. 3-4, Feb. 5, 1999.
R. Sivanithy, Sky Telecom Starts HK Wireless Mesaging Service, Times Business Publications, p. 21, Apr. 24, 1993.
Williams, Elisa, New Device Enables Portable PC to Get E-Mail, other data, Orange County Register, p. 19-20. May 5, 1994.
Kehoe, Louise, SkyTel Launches Two-Way Pager, The Financial Time Limited, p. 17-18, Sep. 27, 1995.
Burgess, John, Paging Takes a New Direction, The Washington Post, p. 14-15, Oct. 2, 1995.
Langberg, Mike, SkyTel Quietly Introduces a Paper that Answers Back, Saint Paul Pioneer Press, p. 11-13, Feb. 17, 1997.
Davis, Mark S., ABI/Uniform Using CompuServe for Practical Economic Development, UMI, Inc., p. 16-18, 1996.
Lynch, David J., ABI/Inform; End of the Line for On-Line Services, UMI, Inc., p. 8-15, May 1996.
Poynder, Richard, ABI/Inform; Europe is Choosing its Online Routes, UMI, Inc., p. 5-7, May 1996.
Liebmann, Lenny, ABI/Inform; Increasing Net Value, UMI, Inc., p. 1-4, Sep. 1996.
Kahney, Leander, Appie's Newton Just Wont Drop, Wired.com; 1 page, Aug. 22, 2007.
Unknown, Apple Newton, Wikipedia.org, p. 1-10. Aug. 22, 2007.
Unknown, Organize Integrate Communicate, Newton Solutions Guide, p. 1-72, 1993.
Unknown, Mobile Computing, World Cat Record, p. 1-2, Jan. 16, 2007.
Unknown, Pager FAQ, Chris De Herra's Wndons CE Website, p. 1-2, Jan. 16, 2007.

US 8,601,154 B2

Page 15

(56)         References Cited

OTHER PUBLICATIONS

Unknown, The First PowerBook Paging Solution to be Offered by Apple, Information Access Company, p. 45-46, Nov. 14, 1994.
Moeller, Michael, Apple Wireless-Messaging Bundle Targets PowerBooks, Information Access Company, p. 43-44, Dec. 26, 1994.
Halper, Mark, Power Macs to Star at Exposition, UMI, Inc. p. 15-16, Dec. 26, 1994.
Unknown, Pagenet to provide Wireless Network Services for . . . , PR Newswire Association, Inc., p. 40-41. Jan. 3, 1995.
Unknown, Pagenet to provide Wireless Network Services for Apple Product, PR Newswire Association, Inc., p. 17-18, Jan. 3, 1995.
Unknown, Apple Offers Wireless Mobile Message System, Post-Newsweek Business Information, Inc., p. 38-39. Jan. 3, 1995.
Unknown, Apple Announces Licensees, Strengthens Product Offerings, Drops Price, and Gains New Suporters, PR Newswire Accocia-tion, p. 35-37, Jan. 4, 1995.
Wexler, Joanie, Apple Assumes Role of Mobile Integrator, Network World, Inc., p. 33-34, Jan. 9, 1995.
Barney, Doug, Apple Taps into Paging Technology with Mobile, Wireless Suite, InWorld Media Group, p. 31-32, Jan. 16, 1995.
Unknown, Apple Rolls Out Wireless Solution, CMP Publications, Inc., p. 29-30, Jan. 16, 1995.
Unknown, Apple Announces Licensees, Strengthens Product Offerings, Drops Price, and Gains New Suporters, PR Newswire Association, Inc., p. 14-16, Jan. 4, 1995.
Mohan et al., ABI/Inform; Expo Focuses on Wireless, Newton, UMI, Inc., p. 13-14. Jan. 9, 1995.
Wexler, Joanie, ABI/Inform; Apple Assumes Role of Mobile Integra-tor, UMI, Inc., p. 19-20, Jan. 9, 1995.
Unknown, Incoming, Message System from Apple Computer and Emergency Phone Dialer From Radio Shack, High Beam Research, The Weekly Newspaper, p. 1-2. Jan. 16, 1995.
Schwartz, Jeffery, ABI/Inform, Paging Services Take Spotlight, UMI, Inc., p. 12, Jan. 16, 1995.
Barney, Doug, ABI/Inform; Apple Taps into Paging Technology Which Mobile, Wireless Suite, UMI, Inc., p. 17-18. Jan. 16, 1995.
Unknown, ABI/Inform; Apple Rolls Out Wireless Solution, UMI, Inc., p. 15-16, Jan. 16, 1995.
Unknown, Apple Outlines Plethora of Newton Wireiess Communi-cations Solutions Messagepad 120 Launch, PR Newswire Associa-tion, Inc., p. 10-13, Jan. 30, 1995.
Unknown, Pagenet to provide Wireless Network Services for Socket Messaging System, PR Newswire Association, Inc., p. 8-9, Jan. 30, 1995.
Fitzgerald, Michael, Pagers Boost Mobile Arsenal, Computerworld, p. 23-24, Jan. 30, 1995.
Unknown, Pagenet to provide Wireless Network Services for Socket Messaging System, PR Newswire Association, p. 27-28. Jan. 30, 1995.
Unknown, Apple Upgrades the Wireless Newton, Business Commu-nications, Co., p. 22, Feb. 1995.
Unknown, Apple Mobile Message System, High Beam Research, p. 1, Mar. 1, 1995.
Rizzo, John, Apple Goes Wireless, Information Access Company, vol. 11, No. 4, p. 17, Apr. 1995.
Unknown, ABI/Inform; Apple's Power Play, UMI, Inc., p. 7-8, May 1, 1995.
Kitchen, Jay, ABI/Inform; Wirelessand the Infromation Superhigh-way; the Road to the Future, UMI, Inc., p. 8-13, Jun. 1995.
Beckman, Mel, ABI/Inform; Apple Mobile Message System, UMI, Inc., p. 4-5, Sep. 1995.
Unknown, Socket Serial Card is First to Earn Windows 95 Logo, High Beam Research, Business Wire, p. 1-2, Aug. 30, 1995.
Unknown, Apple Mobile Message System, High Beam Research, p. 1-2, Sep. 1, 1995.
AirNote, Inc., AirNote FAQ, AirNote, p. 1-4, Aug. 15, 2007.
AirNote, Inc., Wireless E-Mail Services Corporation . . . , AirNote, p. 1-2, Aug. 15, 2007.
AirNote, Inc., AirNote Wireless E-Mail, Communication trhough the AirNote Website, AirNote, p. 1-3. Aug. 15, 2007.

AirNote, Inc., AirNote Wireless Email, AirNote, p. 1-2, Aug. 15, 2007.
Beckman, Mel, ABI/Inform; AirNote 1.0, UMI, Inc., p. 1-4, Dec. 1994.
Unknown, Links Airmail Downloads, Home, p. 1-3, Aug. 15, 2007. www.Airmail2000.com.
Unknown, Links Airmail Home Page, p. 1-2. Aug. 15, 2007. www. Airmail2000.com.
Unknown, CompuServe Called Key by AOL Exec., The Columbus Dispatch, p. 1-2, Jan. 19, 2001.
Mundy, Jane, AOL and ConpuServe Telephone Cramming, Online Legal Marketing, p. 1-2, Feb. 21, 2006.
Lieberator, Mark, CompuServe or CompuScam, AN ISP Plagued by Incompetence, p. 1-5, Apr. 24, 2005.
Hu, Jim, CompuServe 7.0 Sends MS a Message, 2 pages, Apr. 16, 2002.
CompuServe, Frequently Asked Questions, CompuServe Interactive Services, Inc., p. 1-2, 2004.
Unknown, CompuServe Prepares for Hong Kong Wireless Users, Washington Post NewsWeek Interactive, 1 page, Oct. 26, 1994.
Unknown, CompuServe, Wikipedia p. 1-8, 2007.
Unknown, Welcome to CompuServe, CompuServe Interactive Ser-vices, Inc., p. 1-10, 2002.
Unknown, Brand: CompuServe, AOL LLC, 1 page, Apr. 26, 2007.
Unknown, CompuServe Company and Contact Infromation, Com-puter Hope, p. 1-2, 2007.
Unknown, CompuServe: The Value Leader in Cyberspace, NetScape Communications Corporation, 1 page, 2007.
Unknown, CompuServe Interactive Services Inc. Information, Hoovers, Inc., 1 page 2007.
Unknown, CompuServe Interactive Services Inc. Overview, Hoovers, Inc., p. 1-2, 2007.
Richarson, Kelly A., CompuServe Teams With SkyTel, PageNet, UMI, Inc., p. 20-21, Aug. 1995.
Moody, T., AT&T PersonalLink—A Public Network for Smart Agent PICS, IEEE , Mar. 6, 1995.
Unknown, Annual Report (Form 10-K), Mobile Telecommunication Technologies Corporation: Mar. 31, 1995.
Unknown, Notable Introduces "all-in-one" AirNote, UMI, Inc, Oct. 1994.
RadioMail Corporation to Bundle Wireless Messaging Software with Megahertz Allpoints Wireless PC Card, Business Wire, Nov. 1, 1995.
Erickson, Pam, Extensive Software Applications Available to Sup-port Motorola NewsCard, PR Newswire.
PageNet Announces First Non-Paging Service on New Nationwide Network, PR Newswire, Mar. 7, 1994.
Inter Partes Reexamination request 95/000,631, filed May 3, 2011 for US Patent 6,735,614.
Reexamination request 95/009,904, filed May 3, 2011 for US Patent 6,021,433.
Reexamination request 95/009,905, filed May 3, 2011 for US Patent 6,167,426.
Reexamination request 95/009,906, filed May 3, 2011 for US Patent 7,035,914.
Defendants Responsive Claim Construction Brief, SimpleAir, Inc. v. AWS Convergence Technologies, Inc., et al., Case 2:09-cv-00289-CS, Document 198, Filed May 18, 2011, pp. 1-52.
Exhibit A, Case 2:09-cv-00289-CS, Document 198-1, Defendants' Proposed Claim Construction, Filed May 18, 2011, pp. 1-4.
Exhibit 1, Case 2:09-cv-00289-CS, Document 198-2, U.S. Patent 6,021,433, Filed May 18, 2011, pp. 1-52.
Exhibit 2, Case 2:09-cv-00289-CS, Document 198-3, U.S. Patent 7,035,914, Filed May 18, 2011, pp. 1-52.
Exhibit 3, Case 2:09-cv-00289-CS, Document 198-4, U.S. Patent 6,167,426, Filed May 18, 2011, pp. 1-12.
Exhibit 4, Case 2:09-cv-00289-CS, Document 198-5, U.S. Patent 6,735,614, Filed May 18, 2011, pp. 1-12.
Exhibit 5, Case 2:09-cv-00289-CS, Document 198-6, Filed May 18, 2011, Marked up amendment in U.S. Appl. No. 09/350,467, dated Dec. 12, 2002, pp. 1-7.
Exhibit 6, Case 2:09-cv-00289-CS, Document 198-7, Filed May 18, 2011, Marked up amendment in U.S. Appl. No. 08/788,613, dated Feb. 8, 1999, pp. 1-5.

(56)          **References Cited**

OTHER PUBLICATIONS

Exhibit 7, Case 2:09-cv-00289-CS, Document 198-8, Filed May 18, 2011, marked up Office Action for U.S. Appl. No. 08/488,613, mail date May 19, 1999, pp. 1-7.
Exhibit 8, Case 2:09-cv-00289-CS, Document 198-9, Filed May 18, 2011, Marked up amendment in U.S. Appl. No. 08/788,613, dated Jul. 9, 1999, pp. 1-4.
Exhibit 9, Case 2:09-cv-00289-CS, Document 198-10, Filed May 18, 2011, fee record sheet and marked up claims in U.S. Appl. No. 09/350,467, dated Jul. 21, 1999, pp. 1-5.
Exhibit 10, Case 2:09-cv-00289-CS, Document 198-11, Filed May, 18, 2011, marked up office action for U.S. Appl. No. 09/350,467, mail date Apr. 24, 2002, pp. 1-8.
Exhibit 11, Case 2:09-cv-00289-CS, Document 198-12, Filed May, 18, 2011, Transcript of deposition of James Knox, taken on May 12, 2011, pp. 1-19.
Exhibit 12, Case 2:09-cv-00289-CS, Document 198-13, Filed May 18, 2011, marked up U.S. Appl. No. 60/060,839, mail date Nov. 15, 1996, pp. 1-14.
Exhibit 13, Case 2:09-cv-00289-CS, Document 198-14, Filed May, 18, 2011, marked up pages from International Application No. PCT/US97/01165, filed Jan. 24, 1997, total of 7 pages.
Exhibit 14, Case 2:09-cv-00289-CS, Document 198-15, Filed May, 18, 2011, Webster's II New College Dictionary, copyright 1995 by Houghton Mifflin Company, definition of "Specify", p. 1060.
Exhibit 15, Case 2:09-cv-00289-CS, Document 198-16, Filed May, 18, 2011, Letter from Dovel & Luner LLP, mail date May 13, 2011, pp. 1-4.
Declaration of Dr. Harry Bims in Support of Deffendants' Responsive Claim Construction Brief, Case 2:09-cv-00289- CS, Document 198-17, Filed May, 18, 2011, pp. 1-28.
Transcript of Deposition of Harry Bims, dated May 24, 2011, Veritext National Deposition & Litigation Services, pp. 1-226.
Transcript of Deposition of James Knox, dated May 12, 2011, Veritext National Deposition & Litigation Services, pp. 1-270.
Appendix A, SimpleAir's Infringement Contentions under Patent Rule 3-1 for Apple, Inc. and 7,035,914 patent, Jun. 21, 2010, pp. 1-172.
Appendix B, SimpleAir's Infringement Contentions under Patent Rule 3-1 for Research in Motion and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-93.
Appendix C, SimpleAir's Infringement Contentions under Patent Rule 3-1 for Facebook and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-83.
Appendix D, SimpleAir's Infringement Contentions under Patent Rule 3-1 for ABC and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-46.
Appendix E, SimpleAir's Infringement Contentions under Patent Rule 3-1 for AWS and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-35.
Appendix G, SimpleAir's Infringement Contentions under Patent Rule 3-1 for ESPN and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-57.
Appendix H, SimpleAir's Infringement Contentions under Patent Rule 3-1 for Handmark and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-40.
Appendix I, SimpleAir's Infringement Contentions under Patent Rule 3-1 for The Weather Channel and 7,035,914 patent, dated Jun. 21, 2010, pp. 1-49.
Plaintiff SimpleAir's Disclosure of Asserted Claims and Infringement Contentions under Patent Rule 3-1, Jun. 21, 2010, pp. 1-14.
Plaintiff SimpleAir's Identification of Documents Pursuant to Patent Rule 3-2, Jun. 21, 2010, pp. 1-2.
Plaintiff's Reply Brief in Support of Its Proposed Claim Constructions, May 27, 2011, pp. 1-24.
Exhibit 29, Case 2:09-cv-00289-CE, document 201-1, filed May 27, 2011, transcript of videotaped deposition of Harry Bims, Ph.D., taken on May 24, 2011, pp. 1-97.
Exhibit 30, Case 2:09-cv-00289-CE, document 201-2, filed May 27, 2011, marked up amendment in U.S. Appl. No. 08/788,613, dated Jul. 9, 1999, pp. 1-4.

Exhibit 31, Case 2:09-cv-00289-CE, document 201-2, filed May 27, 2011, Office Action for U.S. Appl. No. 09/350,467, mail date Nov. 17, 2003, pp. 1-42.
Plaintiff SimpleAir's Opening Brief in Support of Its Proposed Claim Constructions, Document 191, dated Apr. 20, 2011, pp. 1-49.
Declaration of James Knox, Ph.D., document 191-1, dated Apr. 19, 2011, pp. 1-52.
Exhibit 1 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-1, filed Apr. 20, 2011, 6,021,433 patent, pp. 1-52.
Exhibit 2 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-2, filed Apr. 20, 2011, 7,035,914 patent, pp. 1-52.
Exhibit 3 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-3, filed Apr. 20, 2011, 6,167,426 patent, pp. 1-7.
Exhibit 4 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-4, filed Apr. 20, 2011, 6,735,614 patent, pp. 1-12.
Exhibit 5 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 193-1, filed Apr. 21, 2011, AirMedia Live Internet Broadcast Network, Infrastructure and Services for CASIO Information Technology, and AirMedia Live! premieres at Demo '96; First wireless cyberspace network connects Internet off-line PC's, article dated Jan. 29, 1996, pp. 1-73.
Exhibit 6 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 193-2, filed Apr. 21, 2011, Marked up amendment of U.S. Appl. No. 08/788,613, dated Feb. 8, 1999, and Office action, Mail date May 17, 1999, pp. 1-36.
Exhibit 7 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 193-3, filed Apr. 21, 2011, marked up preliminary amendment, dated Feb. 2, 2000, pp. 1-5.
Exhibit 8 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 193-4, filed Apr. 21, 2011, Office Action for U.S. Appl. No. 08/970,655, mail date May 25, 1999, and response to office action, filed Oct. 22, 1999, pp. 1-14.
Exhibit 9 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-5, filed Apr. 20, 2011, McGraw-Hill Dictionary of Scientific and Technical Terms, Fifth Edition, 1994, p. 271, definition of "broadcast", pp. 1-6.
Exhibit 10 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-6, filed Apr. 20, 2011, The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition, 1996, p. 110, 146, 182, 183, 252, 279, 449, 524, 539, 670, 683, 747 and1137, definition of terms, pp. 1-15.
Exhibit 11 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-7, filed Apr. 20, 2011, Microsoft Computer Dictionary, Fourth Edition, 1999, pp. 62, 81, 109, 126, 240, 242, 308, 333, and 365, definition of terms, pp. 1-13.
Exhibit 12 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-8, filed Apr. 20, 2011, Random House Websters Computer & Internet Dictionary, Third Edition, 1999, pp. 64, 79, 148-149, 374, 415, 416 and 605, definition of terms, pp. 1-13.
Exhibit 13 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-9, filed Apr. 20, 2011, Modern Dictionary of Electronics, Seventh Edition, 1999, pp. 383, 384, 390, 501, 518, and 683, definition of terms, pp. 1-9.
Exhibit 14 to Plaintiff SimpleAir's Opening Claim Construction Brief, document 192-10, filed Apr. 20, 2011, IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, Seventh Edition, 2000, pp. 121 and 795, definition of terms, pp. 1-5.
Defendants' Invalidity Contentions, dated Sep. 14, 2012, pp. 1-169 in *SimpleAir v. Microsoft, et al.*, No. 2:11-CV-416 (E.D. Tex.).
Defendants' Invalidity Contentions Charts, Part 1 of 4, Exhibits 1-42, served Sep. 15, 2012, pp. 1-1617 in *SimpleAir v. Microsoft, et al.*, No. 2:11-CV-416 (E.D. Tex.).
Defendants' Invalidity Contentions Charts, Part 2 of 4, Exhibits 43-75, served Sep. 15, 2012, pp. 1-1184 in *SimpleAir v. Microsoft, et al.*, No. 2:11-CV-416 (E.D. Tex.).
Defendants' Invalidity Contentions Charts, Part 3 of 4, Exhibits 76-118, served Sep. 15, 2012, pp. 1-1211 in *SimpleAir v. Microsoft, et al.*, No. 2:11-CV-416 (E.D. Tex.).
Defendants' Invalidity Contentions Charts, Part 4 of 4, Exhibits 132-150, served Sep. 15, 2012, pp. 1-883 in *SimpleAir v. Microsoft, et al.*, No. 2:11-CV-416 (E.D. Tex.).

US 8,601,154 B2

Page 17

(56)         **References Cited**

OTHER PUBLICATIONS

Defendants Responsive Claim Construction Brief, *SimpleAir, Inc.* v. *AWS Convergence Technologies, Inc., et al.*, Case 2:09-cv-00289-CE, Document 198, Filed May 18, 2011, pp. 1-52.

Exhibit A, Case 2:09-cv-00289-CE, Document 198-1, Defendants' Proposed Claim Construction, Filed May 18, 2011.

Exhibit 1, Case 2:09-cv-00289-CE, Document 198-2, U.S. Patent 6,021,433, Filed May 18, 2011, pp. 1-52.

Exhibit 2, Case 2:09-cv-00289-CE, Document 198-3, U.S. Patent 7,035,914, Filed May 18, 2011, pp. 1-52.

Exhibit 3, Case 2:09-cv-00289-CE, Document 198-4, U.S. Patent 6,167,426, Filed May 18, 2011, pp. 1-12.

Exhibit 4, Case 2:09-cv-00289-CE, Document 198-5, U.S. Patent 6,735,614, Filed May 18, 2011, pp. 1-12.

Exhibit 5, Case 2:09-cv-00289-CE, Document 198-6, Filed May 18, 2011, Marked up amendment in U.S. Appl. No. 09/350,467, dated Dec. 12, 2002, pp. 1-7.

Exhibit 6, Case 2:09-cv-00289-CE, Document 198-7, Filed May 18, 2011, Marked up amendment in U.S. Appl. No. 08/788,613, dated Feb. 8, 1999, pp. 1-5.

Exhibit 7, Case 2:09-cv-00289-CE, Document 198-8, Filed May 18, 2011, marked up Office Action for U.S. Appl. No. 08/488,613, mail date May 19, 1999, pp. 1-7.

Exhibit 8, Case 2:09-cv-00289-CE, Document 198-9, Filed May 18, 2011, Marked up amendment in U.S. Appl. No. 08/788,613, dated Jul. 9, 1999, pp. 1-4.

Exhibit 9, Case 2:09-cv-00289-CE, Document 198-10, Filed May 18, 2011, fee record sheet and marked up claims in U.S. Appl. No. 09/350,467, dated Jul. 21, 1999, pp. 1-5.

Exhibit 10, Case 2:09-cv-00289-CE, Document 198-11, Filed May 18, 2011, marked up office action for U.S. Appl. No. 09/350,467, mail date Apr. 24, 2002, pp. 1-8.

Exhibit 11, Case 2:09-cv-00289-CE, Document 198-12, Filed May 18, 2011, Transcript of deposition of James Knox, Ph.D., taken on May 12, 2011, pp. 1-19.

Exhibit 12, Case 2:09-cv-00289-CE, Document 198-13, Filed May 18, 2011, marked up U.S. Appl. No. 60/060,839, mail date Nov. 15, 1996, pp. 1-14.

Exhibit 13, Case 2:09-cv-00289-CE, Document 198-14, Filed May 18, 2011, marked up pages from International Application No. PCT/US97/01165, filed Jan. 24, 1997, total of 7 pages.

Exhibit 14, Case 2:09-cv-00289-CE, Document 198-15, Filed May 18, 2011, Webster's II New College Dictionary, copyright 1995 by Houghton Mifflin Company, definition of "Specify", p. 1060.

Exhibit 15, Case 2:09-cv-00289-CE, Document 198-16, Filed May 18, 2011, Letter from Dovel & Luner LLP, mail date May 13, 2011, pp. 1-4.

Declaration of Dr. Harry Bims in Support of Deffendants' Responsive Claim Construction Brief, Case 2:09-cv-00289-CE, Document 198-17, Filed May 18, 2011, pp. 1-28.

Fraser, Robert J., The MTS—Part II, The second half of a series on the Mobitex Terminal Specification looks at the Modules which compose four terminal products, Reprinted from Communications, Aug. 1991.

Bourassa, Barbara, HP and Lotus' 10-Ounce Has 1-2-3 2.2, PC Week, vol. 8, No. 17, p. 19, Apr. 29, 1991.

Jones, Jeanne L., Keep Data Wave Coming, Corporate News, Jun. 19, 1998, pp. 1-2.

Parola, Bryan, AirMedia Live! Premiers at Demo '96 First Wireless Cyberspace Network Connections Internet to Off-Line PC's, Press Release, Jan. 29, 1996, pp. 1-4, http://web.archive.org/web/20000118211521/airmedia.com/sidebar/corprofile/pubrelations/ . . .

Strom, David, AirNote, AirNote Technologies, Inc., 1994, 6 pages, http://storm.com/pubwork/cw51294.html, Published in 1994.

Gifford et al.,The Application of Digital Broadcast Communication to Large Scale Information Systems, IEEE Journal on Selected Areas in Communications, vol. SAC-3, No. 3, May 1985.

Roberts, Victor, The HP Palmtop: The Ideal Portable Terminal with Versatile PIMs, The HP Palmtop Paper, Nov./Dec. 1994,vol. 3, No. 6, pp. 36-39.

Riley, James, Motorola, HP Tir up for PalmTop Pagers, South China Morning Post, Ltd., p. 61-62, May 4, 1992.

Dickens, Ted, Getting Help for Your HP Palmtop on CompuServe, The HP Palmtop Paper, Nov./Dec. 1992, pp. 47-50.

Nutter, Ronald, The HP Palmtop as Tech Support Tool, The HP Palmtop Paper, Nov./Dec. 1993,pp. 32-34.

Hall, et al., Third Party Prodicts of Interest to HP Palmtop Users, The HP Palmtop Paper, Nov./Dec. 1993, pp. 6-13.

Chernow, Bob, Cruising the Internet with the HP Palmtop, The HP Palmtop Paper, Nov./Dec. 1994, vol. 3, No. 6, pp. 16-20.

Dickens, Ted, CompuServe's HPSYS Forum and the Files You Can Find There, The HP Palmtop Paper, Jan./Feb. 1992, 3 pages.

Unknown, Socket Links Mobile Users to PCs; Socket Communications' Pagecard Wireless Messaging System for Windows; Product Announcement; Brief Article Information Access Company, p. 14, Jun. 1995.

AT&T Corporation, AT&T PersonaLink Services, Jun. 1, 1994, 36 pages.

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 17 of 64

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 18 of 64



FIG. 1



FIG. 2

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 19 of 64



*FIG. 3(a)*

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 20 of 64



FIG. 3(b)

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 21 of 64



FIG. 3(c)

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 22 of 64



FIG. 4

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 23 of 64

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 24 of 64

## FIG. 5-1

| Item | Size | Description |
|---|---|---|
| **Header:** | | |
| CRC | 2 bytes | Standard Cyclical Redundancy Code to verify data block integrity. |
| Header Type | 1 bit | If bit clear, then this is a message header. If bit set, then this is the data block header. |
| Custom Header Flag | 1 bit | If bit clear, no custom header. If bit set, then a custom header is included in the data block. |
| Version Number | 4 bits | Protocol version used. |
| Private Data Block Flag | 1 bit | If bit clear, then this data block will be passed on to the Alert Panel for processing and display. If bit set, then this is a private data block to be processed internally by the Communications Server. |
| Virtual Capcode Flag | 1 bit | If bit clear, then this data block is not targeted for a specific virtual capcode and no virtual capcode is included in the data block. If bit set, then this data block contains a virtual capcode. |
| Data Block Type | 1 byte | The value of this byte specifies the type of data contained in the data block. If Private Data Block Flag is clear: 1 = plain text, 2 = AirMedia Live data feed format. If Private Data Block Flag is set: 1 = Capcode reprogramming message, 2 = Binary file transfer. |
| Data Block Version | 4 bits | The version number of this data block's format. |

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 25 of 64

## FIG. 5-2

| | | |
|---|---|---|
| Use Compression Flag | 1 bit | If bit clear, then this data block is not compressed. If bit set, then compression is used and the compression type is specified in the Compression ID item. |
| Use Encryption Flag | 1 bit | If bit clear, then this data block is not encrypted. If bit set, then this data block is encrypted. |
| Spare | 2 bits | Reserved for future use. |
| Compression ID (optional) | 1 byte | Included only if Use Compression Flag is set. Indicates the type of compression used. |
| Virtual Capcode (optional) | 1 byte | Included only if Virtual Capcode flag is set. Contains the virtual capcode to which this data block is targeted. |
| Size of Custom Header (optional) | 1 byte | Included only if Custom Header Flag is set. Contains the size in bytes of the custom header. |
| Custom Header (optional) | variable | Reserved for future enhancements to data block protocol. Size determined from previous item. |
| Contents: | | |
| Data Block Contents | variable | Information notification data from the information source to be processed by AirMedia Live software. |

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 26 of 64

*FIG. 6*

| Item | Size | Description |
|---|---|---|
| Header: | | |
| Alert Length | 1 byte | The size of the alert data in bytes. |
| Alert Type | 1 byte | The value of this item defines the alert type (e.g. new e-mail arrival alert). Up to 256 predefined alert types are allowed. |
| Contents: | | |
| Alert Data | variable | Personal alert notification data. Size of data is determined by the Alert Length item. |

*FIG. 9*

| Item | Size | Description |
|---|---|---|
| Header: | | |
| Packet Type | 4 bits | The value of this item indicates the packet type: 0 = Standard AirMedia Live Packet; 1 = Single Packet Data Block; if the left most bit (high bit) is set, then this is a Binary Alert Packet. |
| Data Block ID | 12 bits | The ID of the data block contained in this packet. |
| Contents: | | |
| Packet Contents | variable | The header and contents of the data block contained in this packet. |

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 27 of 64

## FIG. 7

| Item | Size | Description |
|------|------|-------------|
| Header: | | |
| CRC | 2 bytes | Standard Cyclical Redundancy Code to verify message integrity. |
| Header Type | 1 bit | If bit clear, then this is a message header. If bit set, then this is the data block header. |
| Custom Header Flag | 1 bit | If bit clear, no custom header. If bit set, then a custom header is included in the message. |
| Data Block ID | 14 bits | ID of the data block to which this message belongs. |
| Message Number | 1 byte | The position of this message in the data block (i.e. message sequence number). |
| Total Messages | 1 byte | Total number of messages in the data block. |
| Size of Custom Header (optional) | 1 byte | Included only if Custom Header Flag is set. Contains the size in bytes of the custom header. |
| Custom Header (optional) | variable | Reserved for future enhancements to message protocol. Size determined from previous item. |
| Contents: | | |
| Message Contents | variable | The data portion of the message. |

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 28 of 64

*FIG. 8*

| Item | Size | Description |
|---|---|---|
| Header: | | |
| Packet Type | 4 bits | The value of this item indicates the packet type: 0 = Standard AirMedia Live Packet; 1 = Single Packet Data Block; if the left most bit (high bit) is set, then this is a Binary Alert Packet. |
| Total Packets Flag | 1 bit | If bit is clear, then the Total Data Packets and Total Error Correction Packets items are not present. If bit is set, then the Total Data Packets and Total Error Correction Packets items are present. |
| Message ID | 11 bits | The number of the message to which this packet belongs. |
| Packet Number | 1 byte | The position of this packet in the message (packet sequence number). |
| Total Data Packets | 1 byte | Total number of data packets in the message (does not include error correction packets). |
| Total Error Correction Packets | 1 byte | Total number of Reed-Solomon forward error correction packets in the message. |
| Contents: | | |
| Packet Contents | variable | The data portion of the packet. |



FIG. 10

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 29 of 64



FIG. 11

54

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 30 of 64



USER'S PC
INTERNET
EXTRACT TAGS
262
U TAG
S TAG
AIRMEDIA LIVE WIRELESS GATEWAY
136
(4) MESSAGE TRANSMITTED TO USER'S PC VIA THE WIRELESS BROADCAST NETWORK
(3) INFORMATION GATEWAY ATTACHES URL TAG TO THE MESSAGE
272
EXTRACT SOURCE URL FROM MESSAGE
EXTRACT SOURCE ID FROM MESSAGE
264
AIRMEDIA LIVE INFORMATION GATEWAY
134
(5) URL EXTRACTED FROM MESSAGE AND DISPLAYED IN VIEWER
266
GET URL FROM DATABASE USING SOURCE ID AS INDEX
(2) CONTENT MANAGER DETERMINES URL FROM INFORMATION SOURCE
DISPLAY SOURCE URL
270
THE DEFAULT URL DATABASE IS CHANGEABLE THROUGH STAR FEEDS VIA THE AIRMEDIA LIVE BROADCAST NETWORK
AIRMEDIA LIVE CONTENT MANAGER
(6) USER CLICKS URL TO GET ADDITIONAL INFORMATION FROM SOURCE
USER CLICKS SOURCE URL
272
DEFAULT URL DATABASE
268
(1) CONTENT PROVIDER SENDS INFORMATION TO AIRMEDIA CONTENT MANAGER
USER'S STANDARD INTERNET BROWSER LAUNCHED
CONTENT PROVIDER
(8) CONNECTION MADE TO THE INFORMATION SOURCE ON THE INTERNET VIA THE USER'S STANDARD INTERNET SERVICE PROVIDER
(7) AIRMEDIA SOFTWARE LAUNCHES USER'S INTERNET BROWSER AND PASSES SOURCE URL TO BROWSER

FIG. 12



FIG. 13

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 32 of 64



FIG. 14

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 33 of 64



INFORMATION FROM CONTENT MANAGER

INFORMATION GATEWAY BUILDS DATA BLOCK AND ASSIGNS REAL AND VIRTUAL CAPCODES TO A DATA BLOCK AS REQUIRED BASED ON INFORMATION IN THE SUBSCRIBER DATABASE

WIRELESS GATEWAY PERFORMS PACKETIZATION, COMPRESSION, ENCRYPTION, ETC. TO PREPARE DATA BLOCK FOR TRANSMISSION OVER THE PAGING NETWORK

DATA BLOCK TRANSMITTED OVER PAGING NETWORK BY COMMERCIAL CARRIER

SUBSCRIBER DATABASE

WIRELESS RECEIVER PASSES DATA BLOCK TO COMMUNICATIONS SERVER ONLY IF REAL CAPCODE IN DATA FRAME MATCHES STORED REAL CAPCODE

COMMUNICATIONS SERVER CHECKS VIRTUAL CAPCODE FLAG IN DATABLOCK AND EXTRACTS VIRTUAL CAPCODE IF ONE IS PRESENT

CAPCODE DATABASE

IS VIRTUAL CAPCODE PRESENT ?

NO

YES

FIG. 15

DOES VIRTUAL CAPCODE MATCH ONE IN DATABASE ?

NO

DATA BLOCK DISCARDED

YES

DATA BLOCK CONTENTS PASSED TO ALERT PANEL

ALERT PANEL

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 34 of 64

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 35 of 64

*FIG. 16*

| Whole Packets | Packet Header | Packet column 1 | column 2 | column 3 | ⋯ | column s |
|---|---|---|---|---|---|---|
| packet 1: | header 1 | x | x | x | ⋮ | x |
| packet 2: | header 2 | x | x | x | ⋮ | x |
| . | . | . | . | . | ⋮ | . |
| . | . | . | . | . | ⋮ | . |
| . | . | . | . | . | ⋮ | . |
| packet p: | header p | x | x | x | ⋮ | x |
| packet p + 1 | header p + 1 | x | x | x | ⋮ | x |
| packet p + 2 | header p + 2 | x | x | x | ⋮ | x |
| packet p + 3 | header p + 3 | x | x | x | ⋮ | x |
| . | . | . | . | . | ⋮ | . |
| . | . | . | . | . | ⋮ | . |
| . | . | . | . | . | ⋮ | . |
| packet p + x | header p + x | x | x | x | ⋮ | x |

Reed Solomon Parity- Check Packets — 152

Information Packets — 154

150



FIG. 17

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 36 of 64



FIG. 18(a)

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 37 of 64



LOAD HUFFMAN DICTIONARY FROM DISK STORAGE, GET ADDRESS POINTER TO START OF COMPRESSED INPUT DATA IN MEMORY AND ALLOCATE A MEMORY BUFFER FOR STORING THE DECOMPRESSED OUTPUT DATA.
222
READ ONE BIT FROM INPUT DATA AND SAVE IT IN b
224
234
DONE
226
b = 0 ?
YES
NO
232
IS NEXT TOKEN THE HUFFMAN END-OF-DATA TOKEN ?
YES
NO
DECOMPRESS USING PREVIOUSLY SEEN TEXT. GET THE NEXT TOKEN (T,L) AND GET L BYTES OF DECOMPRESSED DATA FROM THE OUTPUT BUFFER AT LOCATION DENOTED BY T. LET THESE BYTES BE DENOTED BY txt.
228
236
DECOMPRESS USING HUFFMAN DICTIONARY. GET THE NEXT TOKEN (T,L) AND GET L BYTES OF DECOMPRESSED DATA FROM THE HUFFMAN DICTIONARY USING T AS AN ENTRY INTO THE DICTIONARY. LET THESE BYTES BE DENOTED BY txt.
WRITE txt TO THE OUTPUT BUFFER AND ADVANCE THE INPUT DATA POINTER BY THE LENGTH OF THE TOKEN (T,L) IN BITS.
230
220

FIG. 18(b)



LOAD THE PRECOMPUTED STANDARD HASH TABLE HT FOR FILE 1, THE
DICTIONARY FILE, FROM MASS STORAGE. SET THE MINIMUM MATCH
LENGTH L FROM THE LENGTH USED IN CREATING HT. SET THE MAXIMUM
MATCH LENGTH U FROM THE LIMITS ON CONTIGUOUS DATA BLOCK
TRANSMISSION SIZE. GET THE MEMORY ADDRESS POINTER TO THE STREAM
OF INPUT DATA (FILE 2) TO BE COMPRESSED BY DIFFERENCING WITH FILE
1, AND ALLOCATE A MEMORY BUFFER FOR THE COMPRESSED OUTPUT DATA.

242        246

END OF
INPUT DATA
?        YES        DONE        248

NO

CALCULATE THE HASH VALUE H OF THE NEXT INPUT DATA SUBSTRING
OF LENGTH L BYTES WITH THE SAME HASHING ALGORITHM USED TO
COMPUTE HT.        250

SET THE OPTIMAL MATCH LENGTH ML TO 0.
SET THE OPTIMAL POSITION MP TO -1.        252

254

FOR EACH POSITION P IN HT CORRESPONDING TO H:
FIND THE BEST MATCH LENGTH PML AT POSITION P IN FILE 1 SUCH THAT
L <= PML <= U
IF PML IS GREATER THAN ML, THEN SET ML = PML AND MP = P.
REPEAT UNTIL ALL POSITIONS ARE CONSIDERED.

256

YES        ML = 0
?        NO        260

WRITE BIT VALUE 0 TO THE
OUTPUT BUFFER. WRITE THE
BYTE AT THE CURRENT INPUT
BUFFER POINTER TO THE
OUTPUT BUFFER. ADVANCE
THE INPUT BUFFER POINTER
BY ONE BYTE.        258

WRITE BIT VALUE 1 TO THE
OUTPUT BUFFER. WRITE THE
OPTIMAL MATCH LENGTH ML
AND THE OPTIMAL MATCH
POSITION MP TO THE
OUTPUT BUFFER.
ADVANCE THE INPUT
BUFFER POINTER BY
ML BYTES.

*FIG. 19(a)*

240

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 39 of 64



FIG. 19(b)

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 40 of 64



*FIG. 20*

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 41 of 64

Case: 16-1901    Document: 13    Page: 118    Filed: 06/24/2016



FIG. 21

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 42 of 64

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 43 of 64



*FIG. 22*



FIG. 23

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 44 of 64

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 45 of 64

*FIG. 24(a)*



FIG. 24(b)



FIG. 24(c)



FIG. 24(d)

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 46 of 64



*FIG. 25*

Appx00073

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 47 of 64

US 8,601,154 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEM AND METHOD FOR TRANSMISSION OF DATA

## RELATED APPLICATION INFORMATION

This application is a continuation of Ser. No. 11/409,396, filed Apr. 21, 2006, which is a continuation of U.S. Ser. No. 09/350,467, filed Jul. 9, 1999 and issued as U.S. Pat. No. 7,035,914, which is a continuation of U.S. Ser. No. 08/788, 613, filed Jan. 24, 1997, which issued as U.S. Pat. No. 6,021, 433, and which claims the benefit of U.S. Provisional Application Ser. No. 60/010,651, filed Jan. 26, 1996; U.S. Provisional Application Ser. No. 60/014,341, filed Mar. 29, 1996; U.S. Provisional Application Ser. No. 60/014,735, filed Apr. 1, 1996; and U.S. Provisional Application Ser. No. 60/026,471, filed Sep. 23, 1996.

## NOTICE OF COPYRIGHTS AND TRADE DRESS

A portion of the disclosure of this patent document contains material which is subject to copyright protection. This patent document may show and/or describe matter which is or may become trade dress of the owner. The copyright and trade dress owner has no objection to the facsimile reproduction by anyone of the patent disclosure as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright and trade dress rights whatsoever.

## FIELD OF THE INVENTION

The present invention relates generally to communication systems, and more particularly to both wired and non-wired data transmission communication systems.

## BACKGROUND

Undoubtedly, computers, communications and information are driving forces in society today. The most significant advances in computers, communications and information services, respectively. Each of these technologies have produced significant benefits and have effected nearly everyone's life in one way or another.

In particular, more than 100 million personal computers are equipped with multimedia hardware and software and nearly every new personal computer manufactured today is shipped with some form of multimedia. Multimedia has made the computer much more than a number crunching, word processing tool. Rather, multimedia has turned the computer into an indispensable educational, entertainment and information tool. By combining the realism of sound, graphics and video, multimedia applications have revolutionized the way individuals work, entertain and stay informed. Multimedia has also helped drive the computer industry to provide tools which can be used by the most novice computer user making computers almost as prevalent in our society as television or radios. Also, multimedia has driven manufacturers to build smaller and more powerful and mobile systems—leading a technological revolution not matched in our history.

Moreover, wireless communication technology has allowed individuals to be notified anywhere and anytime of information. Wherever an individual is, i.e. whether away from the office or in the car, he or she can be informed of information, such as new meeting schedules, dinner plans or even life or death emergencies.

Additionally, on-line services have revolutionized the distribution of information in our society by making available, to individuals throughout the world, endless amounts of information on every subject imaginable. The Internet and on-line services have brought together the world through a linkage of interconnected computer systems which can share information almost instantaneously.

These technologies suffer from numerous disadvantages, however. The benefits of wireless technology have only been utilized for personal messaging offering limited message lengths and have never been utilized as a computer peripheral, limiting the benefit of instant anytime anywhere to personal messages of limited length and value. Consequently, information which is sent is typically old and historic.

Moreover, while popular in education and business markets, multimedia has yet to find widespread application in the consumer market. While valuable in education and business circles, the average home user has little use for sound and full motion video. As the number of information providers continue to expand throughout the world, the amount of time and effort required to find information becomes exponentially longer.

In particular, the interface to on-line services is often difficult and intimidating to novice computer users. As a result, the benefit of this valuable source of information is thus not available to them. For example, despite the wealth of information available, users are required to search through the myriad of information, rather than having the information come to them. Consequently, information is often missed.

Furthermore, immediate notification of information is not available. For example, users who use computer related services, such as electronic mail (E-mail), do not receive instant notification when new mail is received. As a result, urgent E-mail will sit unnoticed in an electronic mailbox.

Another major problem is that data transmitted over existing wireless broadcast networks suffer from inevitable degradation. Traditional paging, being a one-way transmission, can use only forward error correction (FEC) on data packets. Many existing paging networks use Motorola's FLEX™, POCSAG or other wireless protocol's error correction/detection capabilities. Although these industry standard protocols provide error detection capabilities, many of them are not able to deal with burst errors or errors due to loss of synchronization. Since these protocols cannot correct all possible errors, some of the data packets will arrive with errors or simply get lost. In most cases, truncated packets and lost packets account for the vast majority of errors after decoding.

Similar problems exist with other forms of wireless communication systems as well.

What is needed therefore is a system and method for data transmission, which combines the benefits of multimedia, wireless and wired on-line services while addressing and overcoming their limitations.

## SUMMARY OF THE INVENTION

The preceding and other shortcomings of prior art methods and systems are overcome by the present invention which provides a system and method for data communication connecting on-line networks with on-line and off-line computers. In particular, the present system provides for broadcast of up to the minute notification centric information thereby providing an instant call to action for users who are provided with the ability to instantaneously retrieve further detailed information. Throughout the day, various pieces of information happening around the world are currently available in a sender initiated paradigm where individuals have to seek out the information. In accordance with the present invention, the notification centric portions of that information that lives in

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 48 of 64

US 8,601,154 B2

**3**

an electronic medium is wirelessly broadcast on a nationwide basis to wireless receiving devices which are attached to personal computers or other computing devices. Upon receipt of the information at the personal computer, the user is notified through different multimedia alerts that there is an incoming message. Wirelessly broadcasted URL's, associated with the data, are embedded in data packets and provide an automated wired or wireless connection back to the information source for obtaining detailed data.

The present invention unlike other wireless systems provides for a combination of broadcast, narrowcast and pointcast transmission. That is, information can be transmitted wirelessly to everyone (broadcast), to a subset of users (narrow cast) or to one user (pointcast). The present invention furthermore provides multiple viewers which listen to the airwaves and have the ability to filter against the broadcast with specific action. A message server provides different types of filters with the ability to parse data. Additionally, the message server is designed such that third party developers can write different types of multimedia viewers which can easily be downloaded to the user system and automatically registered with the message server. The viewers can thus be controlled through the interface of the present invention and multiple viewers and multiple controllers of such viewers can dynamically be added and controlled. Moreover, since the messages are encoded for multimedia events, the viewers of the present invention have capability to do different things for multimedia, such as sound, video, animation and so forth.

In operation, data parsed from a plurality of incoming data feeds from existing information sources is prepared for optimized wireless transmission and then transmitted nationwide to connected and non-connected computing devices thereby extending the reach of existing information sources, such as Internet and on-line services. On the user end, once data is received, a global communications server recombines, decodes, decrypts and decompresses the incoming data. When a complete data message is formed, the communications server sends a message to the user interface alert panel causing an animated icon to fly to the alert panel notifying a user that a new message has arrived. Upon clicking the icon, the appropriate viewer is launched. Users can then display the context of the data on their computers. Based on preferences set by the user with respect to sound, video and animation, users can be alerted to incoming messages. Wirelessly broadcasted URL's and on-line addresses, associated with the data, are embedded in multimedia viewers and provide an automated wired connection/link back to the information sources to obtain detailed information. Information, such as advertisements and promotional broadcasts, can be consolidated in a multimedia viewer as well as automatically activated on a scheduled or triggered basis. Information is thus modified and updated instantaneously and wirelessly. Additional information services can be activated wirelessly through broadcast activation codes which can enable or disable services.

The present invention also provides a method based on Reed-Solomon code which is used to derive redundant data packets thereby minimizing redundancy, and maximizing flexibility and packet recovery ability.

In accordance with another embodiment of the invention, the information provided from the information sources and transmitted to the central broadcast server to be consolidated in accordance with the present invention and then transmitted wirelessly nationwide to personal computers and other computing devices can also be sent simultaneously via a wired connection to the same personal computers and computing

**4**

devices having Internet/World Wide Web (WWW) access (direct or via on-line service providing Internet and Web access).

The foregoing and additional features and advantages of this invention will become apparent from the detailed description and accompanying drawing figures that follow. In the figures and written description, numerals indicate the various features of the invention, like numerals referring to like features throughout for both the drawing figures and the written description.

### DESCRIPTION OF THE DRAWINGS

FIG. **1** is schematic diagram of a wireless communication network including information mirroring, selection addressing, bandwidth optimization, message server design and URL broadcast and hotlinks in accordance with the present invention;

FIG. **2** is a block diagram of the wireless communication network illustrated in FIG. **1**;

FIG. **3**(*a*) is a block diagram of the head-end high-level software architecture for communication over a paging network in accordance with the present invention;

FIG. **3**(*b*) is a block diagram of the head-end high-level software architecture for communication over a Vertical Blanking Interval (VBI) in accordance with the present invention;

FIG. **3**(*c*) is a block diagram of the head-end high-level software architecture for communication via satellite in accordance with the present invention;

FIG. **4** is a flow chart illustrating the transfer of data from the content manager to the wireless broadcast network;

FIG. **5** is a table illustrating the 8-bit binary format for information notification data blocks;

FIG. **6** is a table illustrating the 8-bit binary format for personal alert notification data blocks;

FIG. **7** is a table illustrating the 8-bit binary format for messages;

FIG. **8** is a table illustrating the 8-bit binary format for packets;

FIG. **9** is a table illustrating the 8-bit binary format for single packet data blocks;

FIG. **10** is a detailed schematic diagram of the message server design illustrated in FIG. **1**;

FIG. **11** is an illustration of a user remote interface for controlling the computer interface in accordance with the present invention;

FIG. **12** is a flow chart of an algorithm for extracting and processing the Internet source URL for messages broadcast over the wireless communication network illustrated in FIG. **1**;

FIG. **13** is a flow chart of an algorithm for generating and processing E-mail alerts in accordance with the present invention;

FIG. **14** is a flow chart of an algorithm for address and message filtering in accordance with the present invention;

FIG. **15** is a detailed flow chart of the algorithm illustrated in FIG. **14** for targeting data to a user utilizing physical and virtual addresses;

FIG. **16** is an illustration of the columns of a data group encoded by an encoder using a modified Reed-Solomon code for deriving parity-check packets;

FIG. **17** is a flow chart of an algorithm for deriving parity-check packets as illustrated in FIG. **16**;

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 49 of 64

5

FIG. **18**(*a*) is a flow chart of an algorithm for data compression which combines-Huffman compression and dictionary-based compression in accordance with the present invention;

FIG. **18**(*b*) is a flow chart of an algorithm for data decompression of the compression algorithm illustrated in FIG. **18**(*a*);

FIG. **19**(*a*) is a flow chart of an algorithm for data compression using differencing in accordance with the present invention;

FIG. **19**(*b*) is a flow chart of an algorithm for data decompression of the compression algorithm illustrated in FIG. **19**(*a*);

FIG. **20** is an illustration of a user interface alert panel as seen by a user;

FIG. **21** is a flow chart of an algorithm for implementing the initialization procedure for the user interface alert panel illustrated in FIG. **20**;

FIG. **22** is a flow chart of the algorithm for implementing process EMIT messages procedure for the user interface alert panel;

FIG. **23** is a block diagram illustrating how star feed messages are processed in accordance with the present invention; and

FIG. **24**(*a*) is a depiction of a market scoreboard viewer;

FIG. **24**(*b*) is a depiction of a football viewer;

FIG. **24**(*c*) is a depiction of a newspaper viewer;

FIG. **24**(*d*) is a depiction of a stock ticker viewer; and

FIG. **25** is a flow chart of the algorithm for multiplexing a data message.

DETAILED DESCRIPTION

In the description that follows, like parts are marked throughout the specification and drawings with the same reference numerals, respectively. The drawing figures might not be to scale, and certain components can be shown in generalized or schematic form and identified by commercial designations in the interest of clarity and conciseness.

Referring to FIG. **1**, a wireless communication system **10** including selection addressing **28**, connecting on-line information sources **12** with on- and off-line computers, such as personal computer **14**, is illustrated. In accordance with the present invention, the wireless communication system **10** turns a personal computer **14** or other computing device into a personal wireless information and messaging center. Although the present invention may be used to interact wirelessly with any computing device, for illustrative purposes, the present invention will be described and illustrated utilizing a personal computer **14**. One skilled in the art will recognize that computing devices may include consumer electronic devices including computing capabilities. The data/information which is transmitted in accordance with the present invention may be in the form of voice (audio), video, data or a combination thereof.

In particular, the present system provides for broadcast of up to the minute notification centric information thereby providing an instant call to action for users who are provided with the ability to instantaneously retrieve further detailed information. Throughout the day, various pieces of information happening around the world are currently available from information sources **12** in a sender initiated paradigm where users have to seek out the information. In accordance with the present invention, the notification centric portions of that information that lives in an electronic medium is wirelessly broadcast on a nationwide basis to wireless receiving devices **32** which are connected to personal computers **14** or other

6

computing devices. Upon receipt of the information at the personal computer **14**, the user is notified through different multimedia viewers **20** that there is an incoming message. The message can be of something that is happening at the present moment anywhere around the world. Included with the broadcast that is wirelessly sent to the user is the Internet address and location of the detail of that message. By clicking on a button within the multimedia viewer **20** that notified the user that a message came in, the present invention will automatically make a wired connection to the information source **12** utilizing the user's preferred on-line browser which will direct the user to the particular location on the Internet service provider where the user can receive detailed information.

The information source **12** may be a private Internet provider such as Quotecom, corporate Internet provider or an on-line service provider such as America On-Line, Compuserve, Prodigy, the Microsoft Network, and the like. A browser is a known software tool used to access the information source **12** via the providers. Known browser software includes Netscape, Netscape Navigator, Microsoft Explorer, Mosaic and the like. The present invention is designed to operate with any of these known or developing web browsers.

Additionally, the present invention unlike other wireless systems provides for a combination of broadcast, narrowcast and pointcast transmission. That is, information can be transmitted from a central broadcast server **34** wirelessly to everyone (broadcast), to a subset of users (narrow cast) or to one user (pointcast). One skilled in the art will recognize that the central broadcast server **34** operates effectively as a network operations center. The present invention furthermore provides multiple viewers **20** which listen to the airwaves and have the ability to filter against the broadcast with specific action. A message server provides different types of filters with the ability to parse data. The filters control which messages are handled by a particular viewer **20**. Additionally, the message server is designed such that third party developers can write different types of multimedia viewers **20** which can easily be downloaded to the user system and automatically registered with the message server. The viewers can thus be controlled through the interface of the present invention and multiple viewers **20** and multiple controllers of such viewers can dynamically be added and controlled. Moreover, since the signals are encoded for multimedia events, the viewers **20** of the present invention have capability to utilize multimedia capability.

As will be described in detail below, data parsed from a plurality of incoming data feeds **16** from existing information sources **12** is wirelessly transmitted by the central broadcast server **34** nationwide through a commercial wireless carrier **36** to connected and non-connected computing devices **14** thereby extending the reach of existing information sources **12**, such as Internet and on-line services. On the user end, once data is received, the message server design **18** recombines, decodes, and decompresses the incoming data. When a complete data message is formed, a communications server **38** in the message server design **18** notifies a user interface alert panel **50** which presents an icon, which when clicked, notifies appropriate viewers **20** which are registered to display particular data. Users can then display the context of the data on their computers **14**. Based on preferences set by the user with respect to sound, video and animation, users can be alerted to incoming messages. Wirelessly broadcasted Uniform Resource Locator's (URL's) **22**, associated with the data, are embedded in multimedia data packets and provide an automated wired or wireless connection or link **22** back to the information source **12** for obtaining detailed data. A network path to an information source **12** is identified by the

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 50 of 64

URL having a known syntax for defining a network. Data, such as advertisements and promotional broadcasts, can thus be embedded in a multimedia viewer as well as automatically activated on a scheduled or triggered event. Moreover, an advantage of the present invention is that data can be modified and updated instantaneously and wirelessly. Additional services can be activated wirelessly and existing services disabled through broadcast activation codes which can enable or disable addresses thus turning services on and off.

Another advantage of the present invention is that a remote computer **14** can receive information instantly—even while it is off-line (i.e. not connected to the Internet or some other on-line service). Thus, a user has the ability to receive "on-line" information even when the user is "off-line". In accordance with another advantage of the present invention, a user can simultaneously, using the same computer **14**, work on a conventional application, such as a spreadsheet or word processing program, and monitor information which is being transmitted wirelessly.

The user computer **14** of the present invention includes a microprocessor connected to a system bus and supported by read only memory (ROM) and random access memory (RAM) which are also coupled to the system bus. The RAM is the main memory into which the operating system and application programs are loaded. The RAM may also support Internet services, including but not limited to the file transfer protocol (FTP) and simple mail transfer protocol (SMTP) or E-mail. A CD ROM, which is optional, is connected to the system bus and is used to store a large amount of data. Various I/O controllers, including but not limited to the video controller, audio controller and mouse controller may also be connected to the system bus. A modem enables communication over a network to other information sources or computers. The operating system of the computer may be Windows '95™, WINDOWS NT™ or any other known and available operating system.

In the preferred embodiment of the invention, the user computer has a 486 PC or higher processor, 16 MB of RAM, Windows 95 operating system, at least 20 MB available on hard disk for storing the executable programs, support files and databases, sound and video cards, monitor, mouse or other equivalent pointing device, an ISA slot for receiving an internal 16 Bit ISA receiver card, or serial port. The receiver card installed in the ISA slot in the user computer **14** interacts with the wireless receiver **32**. The wireless receiver may also be accessed via the serial port. One skilled in the art will recognize that the present invention is not limited to the particular configuration discussed above. Rather, the present invention may be implemented on other computer systems and configurations, including but not limited to Macintosh or Unix computers, televisions, telephones, appliances and so forth.

The wireless communication system **10** of the present invention includes information mirroring **26**, selection addressing **28**, bandwidth optimization **30**, receiving means **32**, message server design **18** and URL broadcast and hot links **22**.

Information Mirroring

As is illustrated in FIG. **1**, information sources **12**, such as the Internet, on-line services and other information sources, provide data feeds, including real time data feeds, to a network of servers **33** in the central broadcast server **34**. These data feeds, once they have been parsed, compressed, encrypted and packetized based on feed and data type, provide the basis for outgoing broadcast sent immediately or on a scheduled basis. The data feeds include but are not limited to, electronic mail (E-mail) and other personal alert notifica-

tions, news, sports, and financial stories, premium and special event feeds, advertisements/promotions, graphics, sounds, and scheduled updates. The data feeds generated by the information sources **12** are in digital form and divided into one or more data packets.

Referring to FIG. **2**, a block diagram **100** of the software architecture for communications between the information sources **12** and central broadcast server **34** prior to transmission to users is illustrated. Referring to FIGS. **1** and **2**, information sources **12** provide data feeds to the central broadcast server **34** which performs selection, scheduling and addressing **28**. In particular, real time data feeds from the Internet **13** in the information source **12** are provided to a network of servers **33** in the central broadcast server **34**, such as the FTP server **102** and the SMTP server **104** illustrated in FIG. **2**. The data, which can include but is not limited to stock quotes, weather, lotto, E-mail, etc. is then respectively parsed by parsers, such as the stock quote parser **106**, weather parser **108**, lotto parser **110** and mail parser **112**, and then transmitted to the content manager **114** located in the central broadcast server **34**. Data is also provided to the central broadcast server **34** by sources **116** which provide software and hardware for a mainstream connection, via FM radio, with the source **118**. This kind of data is also parsed by various parsers, such as Reuters **120**, COMDEX **122** and TSN **126**. The present invention is not limited to the information sources or parsers described herein. Rather, any type of information source and corresponding parser may be used. The parsed data is then transmitted to the content manager **114**.

The central broadcast server **34** also provides a registration/subscription processor **128** via the World Wide Web (WWW) database or alternatively, other means. The WWW is a collection of servers of the Internet that utilizes the Hypertext Transfer Protocol (HTTP). Through the registration/subscription processor **112**, a user can register and subscribe to receive broadcasts provided by the present invention via the user computer **14**. The information provided by the user is transmitted to a subscriber database **130** which is utilized by the central broadcast server to determine which subscribers receive which types of content.

Referring to FIG. **2**, the content manager **114** determines how different types of information are handled. In particular, it specifies priorities for different types of information, and decides which pieces of information will be transmitted and which will be rejected. It also applies scheduling rules **132** to determine when messages should be scheduled to be transmitted to the user. In addition, the content manager **114** is responsible for determining what format the information should be sent in, what compression method to use, and who information should be sent to. The compression method and format are determined by the type of information. When and if the information should be sent, who it should be sent to, and the priority of the information are determined based on the type of information, the time of day, the day of the week, and the specific date. So, for example, these rules could be used to specify that certain news feeds go to premium subscribers only except during certain hours of the day. Or it could be used to say that stock quotes are a low priority during hours the stock exchanges are closed, on Saturday and Sunday, and on market holidays. The content manager **114** also has the ability to detect and remove duplicate messages.

The content manager **114** communicates with the information gateway **134** which is responsible for resolving logical information inside the system to physical information needed for the wireless gateway **136**. In particular, the information gateway's **114** duties include, but are not limited to: resolving service identifications (ids) and addresses from a logical

US 8,601,154 B2

9

address and managing the content budget rules **138** to ensure that the total content quota is not exceeded. The content budget is based on the number of bytes which may be transmitted in an hour. The algorithm used manages the budget by evaluating the total bytes allowed in the hour, the priority of the information, the total bytes sent so far in the hour and the maximum instantaneous rate at which information may be sent to determine whether to send a message. The goal being to ensure that sending low priority information early in the hour will not prevent high priority information from being sent late in the hour. Since the input to the information gateway **134** is primarily logical, it could be exchanged for an information gateway **134** which could send the information to be transmitted over another medium, such as the Internet. In addition, the information gateway **134** enforces priorities to ensure that higher priority information is sent before lower priority information.

In accordance with the present invention, the wireless gateway **136** prepares data blocks for transmission over a wireless broadcast network, including but not limited to transmission via a paging network (FIG. 3(*a*)), Vertical Blanking Interval (VBI) (FIG. 3(*b*)) or satellite (FIG. 3(*c*)), narrow and broadband PCS, GSM, VSB television, cellular and other developing wireless technologies. One skilled in the art will recognize that the data blocks can be transmitted by a digital, analog or FM subcarrier. The present invention is designed to operate with any of the above known or developing transmission networks.

In particular, referring to FIG. 3(*a*), a block diagram of the head-end high-level software architecture for transmission over a paging network **37** in accordance with the present invention is illustrated. The paging network **37** allows information to be transmitted over paging frequencies to paging receivers **32** which are connected to a user computer **14**. The wireless gateway **136** transmits information to a plurality of paging terminals **39** which transmit the information to paging transmitters **41**. In turn, the paging transmitters **41** transmit the information to receivers **32**, which only receive information having specific addresses as noted in detail below. The paging terminals **39** and transmitters **41** are preferably located nationwide to provide information access to all users. Paging terminals communicate with one another via the Inter and Intra System Protocol (TNPP). Information is typically received at a paging terminal **39** and eventually transmitted to a separate paging transmitter **41** through a radio control link. One skilled in the art will recognize that the link between the paging terminal **39** and the radio controlled link to the paging transmitters **41** can be a satellite link. In particular, information from the paging terminal **39** is transmitted to a satellite via an uplink. The information is then modulated onto the carrier of the radio control link for transmission to the paging transmitters **41**. One skilled in the art will recognize that any commercial paging carrier which can transmit information wirelessly can be utilized in accordance with the present invention.

Referring to FIG. **25**, in accordance with an advantage of the present invention, to overcome the paging network limitation on the amount of data that may be sent to a single address, or capcode in paging terminology, messages are sent on groups of pooled addresses and received at the user end on corresponding pools of addresses. Thus, information is multiplexed over multiple addresses but is reassembled at the user end as if sent to a single address. This allows utilization of available network bandwidth that could not be utilized with a single address.

In particular, the data to be transmitted over a paging network **37**, such as that illustrated in FIG. 3(*a*), first goes

10

through a process of packetization, encryption, compression and forward error correction methods, as described in detail below. The output of this process is 1 to n number of data packets, depending on the level of error correction, and type of compression/encryption applied to the data. The paging network addresses an individual or group by broadcasting on a particular address or capcode. By programming a paging device to listen to the individual capcode, the device is then capable of receiving the particular message. The inherent problem with the FLEX protocol which is used by major paging carriers is that there is a limit to the number of messages which can be sent to any one particular capcode at a time. In accordance with FLEX encoding rules, only 2 messages per capcode can exist at any one time in a particular FLEX frame, which is approximately 1.875 seconds. A typical data message sent over a paging carrier is broken down into 16 individual data packets. If only one capcode is transmitted, it would take (16 packets/message)*(½ frame/packet)*(1.875 sec/frame)=15 seconds/message. This is a relatively slow rate and only utilizes a small fraction of the FLEX frame. A FLEX frame is capable of transmitting on four different phases or channels at a particular time, hosting several messages per frame. The FLEX encoding rules only specify the maximum messages per capcode frame, but there is no limit set to the number of capcodes.

Referring to FIG. **25**, in accordance with an advantage of the present invention, the data message is multiplexed over a number of capcodes (i.e. uses multiple capcodes to send one message). Using the previous example, the present invention would send the 16 packets of the data message to 8 different capcodes. Thus, it would take (16 packets/message) (½ capcodes/message)*(⅛ frame/capcode)*(1.875 sec/frame)= 1.875 sec/message. The data rate is approximately 8 times faster and fully utilizes the FLEX frame. Although the relationship between the capcode and the packet id number is arbitrary, the server software assigns the packets in a "round-robin" fashion, assigning packets 1-8 to capcodes 1-8, respectively, and packets 9-16 to capcodes 1-8, respectively.

At the user end, the software decodes the messages in a similar manner. A user would subscribe to a particular service, which essentially translates into a set of capcodes which are programmed into the receiving device **32** (FIG. 3(*a*)). The receiving device **32** then receives the packets which are transmitted to that particular set of capcodes. Thus, for example, the user software would initialize the receiving device **32** with the same 8 capcodes as on the transmit side. The packets received with those 8 capcodes would then be combined into the original data message.

Referring to FIG. 3(*b*), a block diagram of the head-end head-level software architecture for transmitting data over a Vertical Blanking Interval (VBI) of a television signal **135** in accordance with the present invention is illustrated. The wireless gateway **136** transmits information through a standard RS232 interface **137** and modem **139**, which through a telephone line **141** communicates with a modem **143** at a television network broadcast transmission site. The information is forwarded from the modem **139** to a VBI encoder **145** which combines the VBI data with a standard television video signal **153**. The encoded data is then forwarded to a satellite uplink transmitter **147** which transmits the television signal **153** to a satellite antenna/receiver **151** via satellite **149**. A VBI decoder **155** then extracts the data from the television video signal and performs physical device addressing. The VBI encoder and decoder may be any commercially available encoder and decoder designed for VBI transmission. The communications

US 8,601,154 B2

11

server **38** is modified to interface with the driver for the VBI decoder **155** which is provided by the manufacturer of the decoder hardware.

Referring to FIG. 3(*c*), a block diagram of the head-end high-level software architecture for transmission via a satellite-based system **157** in accordance with the present invention is illustrated. The wireless gateway **136** transmits information through a standard RS232 interface **159** and modem **161**, which through a telephone line **163** communicates with a satellite modem **165**. The information is forwarded from the satellite modem **165** to an uplink transmitter **167** which transmits the data to a satellite dish or antenna **171** via satellite **169**. In particular, the satellite dish or antenna **171** receives the RF signal from the satellite **169**. A standard satellite receiver PC card **32** converts the RF signal into PC compatible data. The communications server **38** is modified to interface with the receiver card driver provided by the manufacturer of the receiver PC card **32** to receive data from a standard satellite data receiver.

The content manager **114** utilizes a content programming station **140** to control the content of programming. The content programming station **140** allows a programming manager (not shown) to alter the rules used by the content manager **114**. The content programming station **140** will also be used to review and alter content schedules and schedule ad hoc messages. For example, if there are news feeds which must be manually filtered to locate acceptable content, the news feeds would appear at the content programming station **140** for the program manager to review.

A flowchart illustrating the algorithm for implementing the processing of data prior to transmission is illustrated in FIG. **4**. Information from the content manager is initially applied to the information gateway **134** (step **115**) which resolves its logical destination address to a physical wireless address based on information in the subscriber database (step **117**). The data is then applied to the wireless gateway **136** which creates the data block, performs packetization, compression, encryption, and so forth to prepare the data block for transmission over the wireless broadcast network (step **119**). The data block is then transmitted over the wireless broadcast network by the commercial carrier **26**.

Information Mirroring

Data is transmitted from an information source to the central broadcast server **34** as discrete message blocks using E-mail or a well-known high speed protocol such as the Transport Control Protocol/Internet Protocol (TCP/IP). (See Comer, D.E., "Internetworking with TCP/IP, Vol. 1: Principles, Protocols, and Architecture, Second Edition", Prentice Hall, Englewood Cliffs, N.J. (1991).) In particular, each data packet transmitted by the information source **12** includes a header, packet data and information to ensure proper transmission to the central broadcast server **34**. Additionally, an error correction code is typically added to each packet prior to transmission. The data block is broken down into messages and messages are broken into packets. Each packet is accompanied by a message id and a sequence number. All packets belonging to the same message contain the same message id. A sequence number denotes the position of the packet inside the group. Some packets will also carry the total number of packets belonging to the message. Each packet header includes the following: packet type (4 bits), total packets included (1 bit), message identifier (11 bits) and packet sequence number (1 byte).

Although the preferred transmission protocol from information source to the central broadcast server **34** is TCP/IP, it will be appreciated by those skilled in the art that many other

12

standard or application specific protocols, such as the Open Systems Connection (OSI), may be used as well.

The information sources **12** thus provide the information basis for outgoing broadcast transmitted by the central broadcast server **34** through nationwide wireless broadcast network immediately or on a scheduled basis to both on- and off-line computers **14**. When the central broadcast server **34** receives the data packets from the information source **12**, it pre-processes the data packets and wirelessly transmits the data packets to both on- and off-line computers **14**. Consequently, computer users receive real time notifications of information, including but not limited to breaking headlines, sport scores, weather disasters, financial information and even the arrival of new electronic mail. It will be understood by one skilled in the art that the information consolidated at the central broadcast server **34** may additionally be sent via a wired connection to a personal computer or computing device.

Referring to FIG. **1**, information sources **12** also receive requests from remote personal computers **14** or other computing devices for more detailed information. Wirelessly transmitted URL's **22**, associated with incoming information, are embedded in the broadcast message from the central broadcast server **34**, which is displayed in the multimedia viewers **20** and provide an automated direct wired or wireless line connection **22** back to the information source **12** such that detailed data may be automatically downloaded to the user's computer **14**.

As illustrated in FIG. **1**, data generated by the information sources **12** is fed to the central broadcast server **34**, which processes the incoming data packets by parsing the feeds **16** against specific filters, encoding the data and creating desired broadcast feeds for wireless transmission as described in detail below.

Selection Addressing

As illustrated in FIG. **1**, the data packets generated by the information sources **12** are transmitted to the central broadcast server **34**, where they are internally processed before being wirelessly transmitted through a carrier **36** to one or more personal computers **14** or other computing sources via selective receivers **32**. When the packets arrive at a user receiver **32**, they are reassembled by the communications server **38** in the message server design **18** into the original message. One skilled in the art will recognize that the carrier can be a local, regional, nationwide or worldwide carrier.

Information from the content providers is first formatted according to the proprietary EMIT protocol before being prepared for transmission over the wireless broadcast network. In the EMIT format, information feeds include a number of parts, each separated by the tilde (.about.) character. Each part begins with a tag (keyword) followed by an equal sign (=) and the data for that part. The tag determines how to interpret the data in that part. Most tags are single characters to minimize network traffic. Also, tags are case sensitive to allow more single character tags. Tags 1 5 are reserved for information category and sub categories. Other tags generally are derived from the first character in a name, such as, H for headline. An example of an EMIT format information feed is provided below: 1=S~2=B~H=Dodgers Win World Series~D=Nov. 2, 1989 9:30 pm where the primary category (1=) is S (which stands for sports), the first sub category (2=) is B (which stands for baseball), the news headline (H=) associated with this feed is Dodgers Win World Series, and the date/time (D=) is Nov. 2, 1989 9:30 pm.

Data from the information sources is packed into 8-bit binary format data blocks in the central broadcast server **34**. The two basic data block types are illustrated in FIGS. **5** and **6**. In particular, FIG. **5** defines the 8-bit binary format for

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 53 of 64

US 8,601,154 B2

13

"information" notification data blocks while FIG. **6** defines the 8-bit binary format for "personal alert" notification data blocks. Information notification data blocks, illustrated in FIG. **5**, contain general information targeted to all users, including but not limited to news headlines and stories, sports scores, financial market data, and so forth. Personal alert notifications, illustrated in FIG. **6**, contain alert information targeted to specific users, including but not limited to notifications regarding E-mail arrival, stock prices reaching specified values, Internet telephone calls, chats or meeting notices.

Prior to transmission, at the central broadcast server **34**, the data packets are encoded using a protocol suitable for the transmission of information. Data blocks are packetized for transmission over the wireless broadcast network using transmission protocols.

In the preferred embodiment, which uses the paging network as the means of wireless broadcast or transmission, Motorola's FLEX™ protocol is utilized. Alternatively, other protocols, such as traditional Post Office Code Standardization Advisory Group (POCSAG) protocol, Motorola's REFLEX™ and INFLEXION™, AT&T's protocol derived from CDPD or other developing protocols may be used as well. Most wireless transmission protocols, including POC-SAG, provide random error correction as well as error detection capabilities, thereby adding error detection and correction capabilities to the information link.

Depending on the type and amount of information contained, a data block may be enclosed in a single packet, or parceled into messages which in turn are subdivided into one or more packets. The message format protocol is illustrated in FIG. **7**. Large data blocks are divided into messages for efficiency in transmission. The data block header is sent as part of the message. The header type item is used to distinguish between the data block and message headers.

The basic unit of transmission is the packet. Each packet includes a header and contents. The information contained in the header defines the packet's contents. In accordance with the present invention and as illustrated in FIGS. **8** and **9**, two basic types of packets in the 8-bit binary format are utilized. The first 4 bits in the packet define the packet type. Standard packets are used for transmitting data blocks too large for a single packet. In this case, each packet contains the ID of the message to which it belongs, and the packet number denoting the position of the packet inside the message. This allows the software at the user receiving end to rebuild the original messages and data block from the individual packets. Prior to transmitting the packets in a message, forward error correction packets are added as described in detail below. The single packet data block is used where the complete data block can fit into one packet. In this case, the packet header is followed by the data block header and data block contents. Binary alert packets are a special case of the single packet data block and are reserved for the predefined alert notifications described above.

At the receiving end, as described in detail below, the reverse of the data packetization process described above occurs. In the case of multiple packet data blocks, individual packets are combined to form messages based on packet sequence number and message ID included in the packet header. Error correction is performed as required. Individual messages are then combined to form data blocks based on message sequence number and data block ID in the message header.

The central broadcast server **34** performs the following processes on the incoming data: compression, forward error correction, encryption, packetization and wireless broadcast format encoding. After internal processing, the formatted

14

data packets are queued for wireless transmission to their respective destinations which could include one or more remote personal computers **14** or computing devices. In accordance with the present invention, the formatted data packets are either immediately wirelessly transmitted to their respective destinations or stored into available memory for subsequent wireless transmission to their respective destinations. For the latter, i.e. delayed transmission, the central broadcast server **34** includes a non-volatile storage medium for longer term storage of data programmed for subsequent wireless transmission to one or more users.

a. Encryption

To minimize unauthorized use of broadcast data, the data is encrypted prior to wireless transmission so that anyone surreptitiously coming into possession of the data would not be able to convert the data to clear form for use. The user software is designed such that it can properly decrypt the data once it is received on the user end. In the preferred embodiment, data is encrypted using the Data Encryption Standard (DES) algorithm. (See "Data Encryption Standard", Federal Information Processing Standards Publication No. 46, January 1977; "DES Modes of Operation", Federal Information Processing Standards Publication No. 81, December 1980.) Alternatively, other known reversible encryption algorithms may be used for data encryption.

Prior to transmission, the data is also encoded with a data signature. The National Institute of Standards in Technology (NIST) Digital Signature Standard (DSS) algorithm is preferably used for signature verification. Alternatively, other known methods of signature verification may be used. (See "Announcing a Digital Signature Standard", Federal Information Processing Standards Publication, Draft 19 Aug. 1991, front page and pp. 1 4; "Specifications for a Digital Signature Standard (DSS)", Federal Information Processing Standards Publication, Draft 19 Aug. 1991, pp. 1 11.) In operation, DSS is used to authenticate the origin of the data (i.e., establish the identity of the signer) and to check the integrity of the data (i.e., confirm that the data has not been altered after it has been signed).

b. Forward Error Correction

To compensate for transmission errors during wireless broadcast, forward error correction algorithms, such as Fire Codes and various forms of Reed-Solomon Codes, are applied to the outgoing data packets. Reed-Solomon and other coding systems are discussed in, for example, Theory and Practice of Error Control Codes, Richard E. Blahut, Addison Wesley, 1983, at pages 174 and 175. A feature of the forward error correction used here is that the ideal packet size is dynamically computed so as to minimize total over the air size while maximizing error correcting capability.

c. Derivation of Redundant Data Packets

Referring to FIGS. **16** and **17**, as shown in detail below, the columns of a data group **150** are encoded by an encoder using a Reed-Solomon (RS) code for deriving parity-check packets **152** i.e. redundant packets. In accordance with the present invention, the RS code, conventionally used for error detection and correction, is utilized in a novel manner with respect to reconstructing packets that arrived with errors. As described in detail above, the data transmission in the present invention is based on a wireless protocol, such as Motorola's FLEX™ protocol or the POCSAG protocol which provides error detection capabilities. However, these protocols cannot compensate for burst errors or errors due to loss of synchronization, which often results in truncated or lost packets at the receiver. In the present invention, each information packet

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 54 of 64

15

**154** which arrives with an error or errors is considered a lost packet. Therefore, an information packet **154** either arrives without error or is lost.

The present invention is thus directed to compensating for such truncated or lost information packets by sending redundant packets. Instead of sending each packet twice or thrice, the present invention utilizes a modified RS code in a novel manner to transmit packets with redundancy as explained in detail below. For example, for a message which is split into 200 information packets sent over a paging network with a packet loss rate of 1%, the probability of a successful reconstruction of the message is only approximately 13.4%. If every information packet is sent twice, i.e. 400 total packets, the probability of a successful reconstruction of the message increases to approximately 98.2%. In accordance with an advantage of the present invention, by using a modified RS code to derive redundant packets, only 5 extra packets, i.e. 205 total packets, need to be sent to achieve the same approximate 98.2% successful reconstruction probability. Thus, the present invention provides an improvement over conventional methods, which utilize additional error correction and detection capabilities on a per packet basis. In the present invention, Reed Solomon parity check packets **152** effectively compensate for lost information packets. As a result, redundancy and packet loss rate are minimized, and flexibility and packet recovery rate are maximized.

In accordance with the present invention, data received from an information source is encoded into data blocks at the broadcast server. Each data block is then parceled into one or more messages so that each message can be parceled into information packets **154**. Each data packet is accompanied by a message identifier and a sequence number. As described in detail above, all packets which belong to the same message contain the same message identifier. The sequence number denotes the position of the data packet inside the message. Some packets will also be accompanied by information regarding the total number of packets belonging to a message. When enough packets arrive at the user receiver **32**, they will be reassembled into the original message by the communications server **38** in the message server design **18** as explained in detail below.

Referring to FIG. **16**, in accordance with the present invention, a Reed Solomon code is computed down the columns of the block of data packets, thereby creating Reed Solomon parity-check packets. The most general case (n,k) is adopted where

$$1 \le n \le 255 \tag{1}$$

$$1 \le k \le n \tag{2}$$

where k=number of information packets generated by parceling the input message,

n=total number of transmitted packets.

The total number of transmitted packets is determined based on the degree of protection requested. By allowing for the arbitrary combination of n and k, maximal flexibility is achieved. In particular, n and k are chosen during run-time, instead of design-time. For example, (255,223), (255,251), (7,3), (16,1) Reed Solomon codes, used column-wise are all possible combinations for generating Reed Solomon parity-check packets. In a typical operation, by using a (255, 223) Reed Solomon code column-wise, 32 parity-check packets are generated for a group of 200 information packets to be transmitted. Thus, even if 32 arbitrary packets out of 232 total data packets were lost during transmission, a successful reassembling of the information can still be achieved at the receiver end.

16

In accordance with the present invention, to minimize the number of lost messages, the information packets are sent with redundancy using a method based on Reed-Solomon code to derive Reed Solomon parity-check packets. Utilizing an 8-bit Reed-Solomon code, the maximum number of data packets (including both information packets and Reed-Solomon parity-check packets) is 255. There is no limitation on the number of symbols in each data packet as long as they are acceptable by the wireless carrier.

In accordance with the present invention, the modified RS code encodes the data over a Galois Field GF($2^8$) (hereinafter GF(256)) whose field elements are represented by their coordinates with respect to the canonical basis $\{1, a, a^2, \ldots, a^7\}$ where a is a root of the primitive monic polynomial:

$$f(x)=x^8+x^4+x^3+x^2+1 \tag{3}$$

Parity-check packets are generated by encoding k data packets column-wise in accordance with the following generating polynomial g(x) equation:

$$g(x) = \prod_{l=1}^{P} (x + a^l) \tag{4}$$

where g(x)=generating polynomial
a=primitive element of GF(256)
p=number of parity check packets

Multiplication and inversion in GF(256) are implemented by table lookup or by algorithm depending on performance requirements.

In the preferred embodiment, the encoder for encoding k data packets column-wise is a software simulation of polynomial division using linear feedback shift register (LFSR), with n and k being changeable. The coefficients of the generator polynomial g(x) are saved in the order of ascending power. Alternatively, the LFSR may be implemented in hardware, with n and k fixed. (See William Wesley Peterson, "Error Correcting Codes", Edition One, pg. 150.)

A series of data packets including both information packets and parity-check packets are formed. The number of symbols in each data packet is limited only by the wireless broadcast system. In accordance with the present invention, no extra error correction is added to each data packet.

The number of parity-check packets, n-k, must be in the range [1, 254] and the number of erasures, i.e. errors whose locations are known, must be in the range [0, n-k]. The erasure locations must be all distinct and sorted in ascending order. In the present invention, RS error correction is performed on each column. Each error in the column corresponds to a lost packet. Since it is known which packet is lost, the locations of all errors prior to RS decoding are known. Thus, in accordance with an advantage of the present invention, the location of the errors is known before RS decoding, thereby providing for maximal error correction. In contrast, conventional applications of RS attempt to find both the magnitude and location of an error.

As shown in FIG. 16, each data packet (including information packets and RS parity-check packets) is parceled into many codewords. The length of each codeword is 32 bits, where 21 bits are for information and 11 bits are for error correction/detection.

The data packets, i.e. information packets and parity-check packets, are then transmitted to the message server unit via the user receiver. FLEX™ provides information regarding whether the packets were correctly received or not. As a result, any error locations are detected prior to applying RS

**17**

decoding. Decoding is then implemented by syndrome evaluation with known error locations. (See Hasan, Bhargava, and Le-Ngoc, "Reed-Solomon Codes and Their Applications", pg. 79 81.)

In accordance with the present invention, the number of information packets k and the number of Reed-Solomon parity-check packets p can be arbitrarily chosen depending on the transmission condition and the desired accuracy level. The only condition is that the number of information packets k and the number of parity-check packets together total no more than 255. The restriction

$$p+k \approx 255 \tag{5}$$

is imposed by the use of the finite field GF(256). As stated earlier, each data block will thus first be split into several messages so that each message can be split into k packets that satisfy the above restriction. Up to p packets can be lost without compromising successful reconstruction of the message. In accordance with the present invention, even if some data packets are lost, the full message can be recovered using the redundancy data packets generated by the present invention.

Referring to FIG. 17, a flow chart 160 of the algorithm for deriving RS parity-check packets is illustrated. The data block is initially parceled into one or more incoming messages (step 162), and the messages are then parceled into k information packets 154 (step 164). The number of RS parity-checks packets p is then selected (step 166). The information packets are then encoded column-wise with a modified RS code in accordance the generating polynomial:

$$g(x) = \prod_{I=1}^{P} (x + a^i)$$

and parity-check packets are generated (step 168). The data packets, which include information packets and RS parity-check packets, are parceled into codewords (step 170). After the data packets have been parceled into codewords, error correction/detection is performed on the codewords (step 172). The data packets are then transmitted to the users (step 174).

At the user end, the number of codewords which have error(s) is counted (step 176). Then it is determined whether each packet has any errors (step 178). If a packet does not have an error, then it is saved (step 180). However, if a packet has one or more errors, it is discarded (step 182) and the present invention waits for more packets (step 188). When there are enough packets (step 184), a message is assembled (step 186). If not, the present invention waits for more packets (step 188). Finally, when there are enough messages, the data block is assembled (step 192).

d. Compression/Bandwidth Optimization

FIG. 18(a) is a flow chart of an algorithm for data compression which combines Huffman compression and dictionary-based compression. In accordance with the present invention, the data blocks are compressed at the central broadcast server 34 end prior to transmission so that maximum amounts of information in compressed or bandwidth reduced form can be transmitted to the selected user or users. As discussed in detail below, at the user end, the data blocks are correspondingly decompressed (FIG. 18(b)).

In the preferred embodiment, the current compression algorithm for English language articles saved in ASCII text format combines the Huffman compression and the dictionary-based compression, such as LZ77 and LZ78 based algo-

**18**

rithms. In operation, as the compression algorithm scans the input texts, it not only tries to search for the next item in the previously seen text, but also tries to search for the next item in a static Huffman dictionary, and it chooses a method which produces a better result. After the data is received at the user end, it is correspondingly decompressed.

In particular, referring to the algorithm 200 for implementing data compression in FIG. 18(a), the Huffman dictionary is loaded from the disk storage, the address pointer is positioned to the start of the uncompressed input data in memory and a memory buffer for storing the compressed output data is allocated (step 202). Next, it is determined whether the address pointer is moved to the end of the data input (step 204). If so, bit b=1 is written to the output data and the end-of-data token from the Huffman dictionary is written to the output data (step 206) and the compression routine is done (step 208). If in step 204, it is determined that the address pointer is not at the end of the input data, the compression algorithm scans the input texts, searching for the next item in the previously seen text (step 210) and the static Huffman dictionary (step 212), and chooses the method which produces a better result (step 214).

In particular, in step 210, the data is compressed using the previously seen text. A token T1 is generated by comparing the input data at the input pointer to the previous input data. T1 denotes an index to the previously seen data that has the maximum length match with the current data. L1 correspondingly denotes this maximum length.

In step 212, the data is compressed using the Huffman dictionary which was loaded in step 202. A token T2 is generated by looking for the maximum match of the input data at the input pointer to entries in the Huffman dictionary. T2 denotes an index to the dictionary entry for the maximum match. L2 correspondingly denotes the length of the match.

In step 214, the optimum result (T,L) from (T1,L1) or (T2,L2) is chosen depending on which is larger, L1 or L2. If (T1,L1) is chosen, b is set to 0 (b=0), else b is set to 1 (b=1). b is initially written to the output data followed by the optimal result (T,L). The input data pointer is then advanced by L bytes.

After the data is received at the user end, it is correspondingly decompressed in accordance with the algorithm 220 illustrated in FIG. 18(b). The Huffman dictionary is initially loaded from the disk storage, the address pointer is positioned to the start of the compressed input data in memory and a memory buffer for storing the decompressed output data is allocated (step 222). One bit from the input data is read and saved in b (step 224). Next, it is determined whether b=0 (step 226). If so, the data is decompressed using the previously seen text (step 228). The next token (T,L) is initially retrieved, followed by L bytes of decompressed data from the output buffer at a location denoted by T. The retrieved bytes are denoted by txt, which are then written to the output buffer (step 230). The input data pointer is then advanced by the length of the token (T,L) in bits. The program then returns to step 224 and repeats the steps until the Huffman end-of-token is detected (step 232).

If, in step 226, b is not set to 0, it is determined whether the next token is the Huffman end-of-data token. If so, decompression has been completed (step 234). If not, the data is decompressed using the Huffman dictionary (step 236). The next token (T,L) is retrieved, followed by L bytes of decompressed data from the Huffman dictionary using T as an entry into the dictionary. The retrieved bytes of data are denoted by txt, which as noted previously, is written to the output buffer (step 230). The input data pointer is advanced by the length of the token (T,L) in bits and returns to step 224.

**19**

e. Differencing

FIG. **19**(*a*) is a flow chart of an algorithm **240** for data compression utilizing differencing. In accordance with another advantage of the present invention, a differencing algorithm **240** is additionally used to compress the coded data, thereby significantly reducing the number of bytes sent with each transmission. In particular, a dictionary-based compression algorithm, such as LZ77 and LZ78 based compression, can be adapted for this application. File two is described with reference to file one in a minimum number of bytes. In such an algorithm, file one is used as the dictionary.

In particular, the precomputed standard hash table HT for file **1**, the dictionary file, is loaded from mass storage (step **242**). The minimum match length L from the length used in creating the hash table HT and the maximum match length U from the limits on contiguous data block transmission size are set. The memory address pointer to the stream of input data (file **2**) to be compressed by differencing with file **1** is retrieved and a memory buffer for the compressed output data is allocated. The algorithm **240** next determines whether the end of the input data has been detected (step **246**). If so, the compression is complete (step **248**). If not, the hash value H of the next input data substring of length L bytes with the same hashing algorithm used to compute HT is calculated (step **250**). The optimal match length ML is then set to 0 and the optimal position MP is set to −1 (step **252**). For each position P in HT corresponding to H, the best match length PML at position P in file **1** such that L<=PML<=U is determined (step **254**). If PML is greater than ML, then ML is set such that ML=PML and MP is set such that MP=P. If in step **256**, ML=0, the bit value 0 is written to the output buffer (step **258**). The byte at the current input buffer pointer is written to the output buffer and the input buffer is advanced by one byte. The algorithm **240** returns to step **246** and continuously iterates until the end of the input data is detected (step **248**).

If in step **256**, ML is not equal to 0, the bit value 1 is written to the output buffer (step **260**). The optimal match length ML and the optimal match position MP are written to the output buffer. The input buffer pointer is then advanced by ML bytes. The algorithm **240** returns to step **246** and continuously iterates until the end of the input data is detected (step **248**).

As discussed in detail below, at the user end, the data blocks are correspondingly decompressed in accordance with the algorithm **262** illustrated in FIG. **19**(*b*). The dictionary file, file **1**, is initially loaded from mass storage (step **264**). The memory address pointer to the stream of compressed input data and retrieved and the memory buffer for the decompressed output data is allocated. It is next determined, whether the end of the input data has been detected (step **266**). If so, the decompression routine is complete (step **268**). If not, one bit b from the input buffer is read (step **270**). It is then determined whether b=0 (step **274**). Is so, one byte from the input buffer is copied and written to the output buffer. The input buffer pointer is then advanced by one byte. The algorithm **262** returns to step **266** and continuously iterates until the end of the input data is detected (step **268**).

If in step **274**, b does not equal 0, the match length ML and the match position MP is retrieved from the input buffer (step **278**). ML bytes are copied from file **1** at position MP to the output buffer. The input buffer pointer is advanced by the sizes of ML and MP in bytes. The algorithm **262** returns to step **266** and continuously iterates until the end of the input data is detected (step **268**).

f. Wireless Data Format Encoding

Where the method of transmission is paging, all outgoing messages are preferably encoded to ⅞ bit data or true 8 bit

**20**

data for broadcast over paging networks. After the data is received at the user end, it is correspondingly decoded.

With respect to VBI and satellite transmission, all outgoing messages are preferably encoded to true 8 bit data.

g. Addresses

In accordance with the present invention, outbound data will be segmented and sent to the user by way of the user receiver **32** utilizing common and unique addresses. Addresses are numbers used by wireless receiving devices to identify messages targeted to a user. Addresses are usually stored in programmable read only memory (PROM) in the receiver hardware **32**. If the address to which a message is transmitted matches a address stored in the receiver **32**, then the receiver **32** will process the message. Otherwise, the message will be ignored. In a typical configuration, general "basic services" are wirelessly transmitted on global common addresses, electronic mail and point-to-point messages are transmitted on personalized or unique addresses, and combined premium services and pay-per-view events are grouped together and transmitted on common addresses. Alternatively, the combined premium services and pay-per-view events may be sent on unique addresses as well.

h. Request for Additional Services

The central broadcast server **34** additionally includes telephone and/or modem interfaces for receiving remote request from users to obtain additional or modify existing services. For example, a user from a personal computer **14** or other computing device, can request additional services or modify existing services by telephoning or modeming the central broadcast server **34**, which automatically and wirelessly transmits the new or modified services. Modification of subscribed services may also be performed via the Internet and World Wide Web.

i. Simultaneous Wired Transmission

In accordance with an alternate embodiment of the invention, as explained in detail below, the information provided from the information sources **12** and transmitted to the central broadcast server **34** to be consolidated in accordance with the present invention and then transmitted wirelessly nationwide to personal computers **14** and other computing devices as described in detail above can also be sent simultaneously via a wired connection to the same personal computers **14** and computing devices having Internet/World Wide Web access (direct or via on-line service providing Internet and Web access). In particular, the data processed at the central broadcast server **34**, in addition to being transmitted wirelessly, is simultaneously made available through wired connection to a specific web site on the Internet. A user can thus connect to the Web via the Internet and receive information through wired means.

Receiving Means

Referring to FIG. **1**, a user receiver **32**, connected to a personal computer **14** or computing device, receives wireless transmissions sent by the central broadcast server **34**. The user receiver **32** preferably includes an Industry-Standard Architecture (ISA) board with a I C interface to an external wireless receiver and utilizes on-board POCSAG, Motorola's FLEX™ protocol or other wireless receiving device receiving and decoding. In accordance with an advantage of the present invention, Motorola's FLEX™ decoding allows for upgradeability to future receiver protocols without requiring replacement of the internal ISA board. The user receiver **32** also includes an indicator, such as a flashing LED, which indicates reception of incoming messages. As described in detail below, the user receiver **32** includes physical addresses for filtering data prior to being transferred to the personal com-

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 57 of 64

US 8,601,154 B2

21

22

puter **14**. The user receiver **32** may be a specially designed or commercially available receiving unit.

Filtering

In accordance with the present invention, filtering of information can be accomplished both at the user receiver **32** and personal computer **14** or computing device. Messages are electronically sent to nationwide and local wireless broadcast networks using both physical and virtual addresses. Physical addresses are tags which reside in the hardware portion in the user receiver **32**.

In addition to standard physical addresses, the present invention implements a virtual address as illustrated in FIG. **14** and described in detail below. In particular, the virtual addresses reside in the software of the user computer **14**. Virtual addresses provide additional filtering of incoming data from the user receiver **32**. For example, a message may be received by all receivers **32**, but if the message is targeted to a specific virtual address, then only those installations in which that virtual address is activated will process the message. In accordance with an advantage of the present invention, virtual addresses may be activated and deactivated through the broadcast network, allowing for external control over the reception of services in a particular installation. It will be appreciated by those skilled in the art that information filtering can be accomplished utilizing virtual addresses only. Virtual addresses can allow for unlimited filtering of messages on the user end. However, this may increase the resource usage of the personal computer **14**. Correspondingly, information filtering can be accomplished by utilizing physical addresses only.

A higher level of filtering based on message category and content is also provided. Users can set various filters based on a variety of preferences at information category or specific content levels to allow for automated filtering of incoming information. At the category level, users can control which categories of information received from the broadcast network are processed and which are discarded. For example, if a user were not interested in sports, all sports information categories, such as baseball, football, golf, etc. can be selected for discarding. A the specific content level, a user can select which subcategories of information within a particular information category will be processed. The user selectable subcategories depend on the type of information contained in that category. Subcategories may include, but are not limited to, source providers for headline news stories, specific industry segments (e.g., electronics, computers, communications, industrial, etc.) for business news, specific teams for sports categories, particular states and games for lottery results, and stocks for which quotes are displayed. For example, a user that wishes to have scores displayed only for baseball games involving the New York Yankees or New York Mets can set the filter for the baseball viewer to discard game results for all teams except those two.

Filtering is accomplished prior to information being transferred to the personal computer's hard drive **14**, therefore conserving the computer's resources. Referring to FIG. **14**, a flow chart of an algorithm for message processing using filtering in accordance with the present invention is illustrated. An incoming message from the central broadcast server end **34** after processing as described above is applied to the receiver hardware **32** (step **200**). Physical address filtering in the receiver hardware is then used to determine whether the message should be passed on for further virtual address filtering (step **202**). If the message passes physical address filtering, the message is applied to virtual address filtering (step **204**). Otherwise, the message is disregarded (step **206**). Virtual address filtering is then used to determine whether the

message should be passed (step **208**) on for further message content filtering (step **210**). If not, the message is disregarded step **212**). Message content filtering then determines (step **214**) whether the message should be stored in the message database (step **216**) for further processing and transmission to the user or disregarded (step **218**).

The process of targeting data to an user utilizing real and virtual addresses is illustrated in FIG. **15**. Data blocks are built in the information gateway **134** and all applicable real and virtual addresses are determined based on the type of information in the data block and user subscription data from the subscriber database **130**. If a data block is to be targeted to a specific virtual address, the virtual address is inserted by the information gateway **134** into the virtual address field of the data block header and the virtual address flag is set. The wireless gateway **136** provides the interface to the wireless transmission network. It prepares data for transmission over the network and implements real addresses in the proper data frames as specified by the standard transmission protocol that is used. At the receiving end, arriving data is first filtered via real addresses in the wireless receiver **32** followed by virtual address filtering in the communications server **38**. The communications server **38** first checks the virtual address flag in the data block header. If it is not set, then the data block is passed onto the alert panel **50** for storage and display. If this flag is set, the communications server **38** determines if the virtual address in the data block header matches one in the virtual address database. If there is a match, then the data block is passed onto the alert panel **50**. If there is no match, then the data block is discarded.

Message Server Design

Referring to FIGS. **1** and **10**, the message server design **18** includes a communications server **38**, user interface alert panel **50** and viewer server **58**.

a. Driver

As is illustrated in FIG. **10**, the driver **44** is preferably a Windows 95 driver for the wireless device hardware **42**, although another compatible device may be used as well. The driver **44** provides an interface to access received data and control the hardware **42**, as well as inform applications as to the status of the receiver hardware **42**.

b. Interface

The interface **46** for the wireless device is preferably an AmFlex DLL **46**, although another compatible device may be used as well. The interface **46** is used to pass the data received from the wireless device to the communications server **38** for processing and distribution to other software components. It also provides a means by which the communications server **38** can program the device hardware to receive specific messages and also allows the communications server **38** to determine hardware status.

c. Communications Server

The communications server **38** receives data from the wireless device via the interface **46**, extracts the different types of data blocks (messages), passes public data blocks to the user interface alert panel **50** and processes private data blocks locally. The communications server **38** is also responsible for initializing the wireless device and maintaining the address database which determines which received messages will be processed. In addition, it provides diagnostic data on received messages for software debug purposes.

In operation, the communications server **38** is notified of incoming data packets by the driver **44** via the interface **46** through a software callback function. Once data packets are received by the communication server **38**, it recombines, decompresses, decrypts, filters via virtual addresses as previously discussed, and error corrects the data packets using

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 58 of 64

US 8,601,154 B2

23

techniques corresponding to the processing done at the central broadcast server **34** end. In particular, the communication server **38** initially verifies the integrity of the data packets received using common error correction techniques. After error correction, the data packets are unpacketized and entire messages are assembled. After assembly, the communication server **38** verifies once again that the integrity of the message is maintained. The message is then decrypted using the common password previously established. The data signature on the message is also checked to verify the integrity of the data. The messages are uniquely encoded so that it is known which data packet belongs to which message. The messages are stored in a database and when a complete message is formed, it is transmitted to one or more devices that are registered with the communication server **38**. As shown in FIG. **10**, the complete message may be transmitted to the user interface alert panel **50**, shown in detail in FIGS. **3** and **4** and discussed in detail below. Thus, once the data packets are successfully read off the driver **44**, the data is error corrected, decompressed, decrypted and assembled into a complete message. The communications server **38** then notifies the user interface alert panel **50**.

d. User Interface Alert Panel

Referring to FIG. **10**, the user interface alert panel **50** is the main user interface for the applications software. The user interface alert panel **50**, which appears to a user as shown in FIG. **20**, is the liaison for messages broadcast from the communications server **38** and delivered to the viewer server **20**. The user interface alert panel **50** performs all message archiving to the messages database. The main functions of the user interface alert panel **50** are (I) initialization, (ii) processing EMIT messages, and (iii) timing events. The user interface alert panel **50** is run when the user double clicks on a specific icon or selects the application from a start menu, such as the Windows 95 start menu, and is responsible for other applications, such as launching the communications server **38** and viewer server **20** and passing messages received from the communications server **38** to the viewer server **20**. The user interface alert panel **50** also displays "fly-in" graphics and icon buttons to alert the user that a new message has been received, allows the user to open a viewer **48** to examine a received message by clicking on the viewer icon button for that message, and maintains the received messages database. The latter includes saving new messages in the database and deleting old messages after a certain period of time, as explained in detail below. The user also accesses the remote control **54** from the user interface alert panel **50** by clicking a remote control icon.

(I) Initialization

FIG. **21** is a flow chart of an algorithm **300** for implementing the initialization procedure for the user interface alert panel **50** in accordance with the present invention. In step **302**, during initialization, the user is prompted for database management (compress the message database). In particular, the user interface alert panel **50** will determine if there are more than a predetermined number of messages written into the database **51**. In the preferred embodiment, the predetermined number of messages is 2000+, although one skilled in the art will recognize that any number of messages may be used. If the predetermined number is exceeded, records which have been previously marked for deletion are removed from the database **51**. Marked records are typically records which have been read by a viewer and are not targeted for any of the other viewers or applications, yet physically remain in the database. These records are removed when the predetermined number of messages is met, thereby only leaving those records which need to be read.

24

Following database management, the databases **51** are opened for non-exclusive read/writes (step **304**). In accordance with the present invention, the three mains databases are the (a) messages database which holds all the messages, (b) SYSAPPS database or systems applications database which holds the viewer specific information such as what is executable, what needs to be run for that viewer to be launched, etc. and (c) V groups database which contains a list of all viewers, their alias names and descriptions.

The next step during initialization involves reading the tool bar initialization information from the registry keys (step **306**). In particular, the docking location of the user interface alert panel **50** is determined. The user interface alert panel **50** is dockable at all the corners of the display and can also be floated at the center. The animation defaults are also determined because in the customization for the user interface alert panel **50**, the user can turn off the fly-in sequence, buttons animated and/or sound files being played. Which winsock ports need to be used to talk to the communications server **38** and viewer server **20** are also determined at initialization.

The next step is during initialization is to launch the communications server **38** and viewer server **20** (step **308**). After the executables for the communications server **38** and viewer server **20** have been launched, the communications server **38** is logged into as a client and the viewer server **20** is logged into as a server such that each knows about the user interface alert panel **50**.

Then, buttons are created in the user interface alert panel **50** for messages marked as not read (step **310**). For example, some records in the message database **51** are not read because the user closed the user interface alert panel **50** before reading them. In accordance with the present invention, buttons are created on the user interface alert panel **50** for those messages.

Finally, the communications server **38** is queried for valid service plans which include but are not limited to E-mail, premier services and power up services (step **312**).

(II) Process EMIT Messages

FIG. **22** is a flow chart of the algorithm for implementing process EMIT messages procedure for the user interface alert panel **50**. A message or feed from the communications server **38** via the winsock port is initially applied to the user interface alert panel **50**. In step **1**, the user interface alert panel **50** determines what feed type is present, i.e. whether the message is a binary, star or EMIT type feed.

A typical binary type feed is an E-mail message. The binary feed is, as discussed in detail below, decompressed into a common EMIT feed and processed as a normal feed.

A typical EMIT type feed involves common user information such as messages for football, scoreboard viewers, horoscope, lottery etc.

A typical star type feed involves a registry value change which creates or updates the appropriate registry key(s). In many cases, a star feed involves a visual change to one of the viewers **48**. For example, a star feed will create/write registry values to reflect a change in advertisement on a particular viewer **48** (step **2**). Star feeds are thus special feeds in that they can change register keys which point to bitmap files, source names, URL sources and so forth. In particular, referring to FIG. **23**, star feeds are received by the communications server **38** and passed to the user interface alert panel **50** for processing. The registry values updated by star feeds are read by other components and the changes programmed by the star feeds are then put into effect. In operation, the user interface alert panel **50** first determines if a message is a star feed by checking the message tag to determine if it contains the star feed indicator, preferably "*=". It then parses the star feed extract-

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 59 of 64

US 8,601,154 B2

25

26

ing the component code and the registry key values to be updated. The updated key values are then written to the registry **49** where they are accessed by other components, such as the remote control **54** and the viewers **48**. The basic structure of a star feed message is shown as follows:

```
FEED_TAG~V = COMPONENT_CODE~P =
REGISTRY_KEY_VALUES
   where
FEED_TAG = the message tag code ("*=" for star feeds)
COMPONENT_CODE = a two letter code indicating to which
component the star feed applies (e.g., BB for baseball
viewer, RC for remote control, etc.)
REGISTRY_KEY VALUES = one or more sequences of the
following parameters for the specified component: registry
key, full file path name flag (0 or 1) if the key
value contains a file name, and the registry key value.
```

In a typical example, bitmaps for the Internet-baseball score button are changed as well as the URL for the source:

```
*=~V=BB~P=Ad1;0;shared\bmps\SprtNet.bmp|TV
B;0;shared\bmps\SprtNetU.bmp|Adb;0;shared\
bmps\SprtNet.bmp|ADB;0;shared\bmps\SprtNet
U.bmp|Ad1U;2;http://www.sportsnetwork.com:
80
```

In the example, new bitmap files SprtNetU.bmp, SprtNet.bmp and new URL http://www.sportsnetwork.com are added to the registry settings for the Baseball viewer. Where a new bitmap or other file name is specified in a star feed, the new file will have been previously received from the wireless broadcast network by the communications server **38** via the binary file transfer capability. This process is transparent to the user.

If in step **1**, it is determined that the feed is a binary type feed, the binary feed is converted to a common EMIT string format (step **3**). When the message is in the EMIT string format, a record is added to the message database by first determining the preferred viewer for the feed (step **4**) and then by parsing out the EMIT string to common viewer fields (step **6**).

In particular, to determine the preferred viewer for the feed (step **4**), a filter field from the SYSAPPS table is compared to the EMIT string (step **5**). In a typical configuration, approximately thirty viewers **48** are available and the user interface alert panel **50** determines which viewer **48** will be able to read the information. The preferred viewer is the actual icon which will fly up to the user interface alert panel **50**. To obtain a viewer alias match, the user interface alert panel **50** obtains the necessary information by looking at the systems applications (SYSAPPS) table or database. By comparing a filter field from the SYSAPPS database to the EMIT string, the user interface alert panel **50** determines which viewer **48** is the preferred viewer and which viewer **48** should fly up to the user interface alert panel **50**. For example, for a football related message, the filter fields from the SYSAPPS database would be reviewed against the football related message to determine the viewer alias match.

In accordance with the present invention, level tags further define the EMIT message so when the comparison is executed in SYSAPPS table, it can be determined which feed is for which viewer (level tag 1 5). A typical sample preferred filtering string is as follows:
   1=N,2=N,N=*,R!=*,1=N,2=N,h=*,R!=*

Under the sample preferred filtering string, the level tags are 1=N, 2=N. By comparing 1=N, 2=N against the sample EMIT feed, it knows that this is a news marquee feed.

After a viewer alias match is achieved, a "Q" time flag or time flag reflecting the local time at which the message arrived at a user is created (step **6**). The EMIT string is then parsed into common viewer fields and written to a message database **51** (step **8**). The common fields include but are not limited to level tags, data and time, titles, source and content.

In the VGROUPS, there is a description for each viewer—a text typed out in a particular field. If you put the mouse over one of the buttons on the alert panel, on the bottom, it will say what this is. That description is pulled from VGROUPS (step **8**).

After the EMIT feed is recorded to the message database **51** (step **8**), the message is broadcast to the preferred viewer via the viewer server (steps **9** **14**). Initially, it is determined whether the viewer is running (step **9**). If the viewer is running, e.g. football viewer is already running, the message is sent directly to the viewer server (step **10**).

If the viewer is not running, it is determined whether the viewer should be auto launched (step **11**). If auto-launch has been turned on for this viewer, then the viewer with message playback is launched. For example, for a football type feed, the viewer preferences are reviewed and if the user is setup for automatic launch of football, the football viewer with message playback is launched (step **12**).

If the preferred viewer is not running, the fly-in sequence comprising a) creating a fly-in animation object, b) playing a viewer specific wave file, c) animating a button on the user interface alert panel **50**, and d) placing a static button on the user interface alert panel **50**, is initiated (step **13**). In particular, a fly-in animation object is initially created. The fly-in animation object is an actual icon shown flying in from the opposite edge to the user interface alert panel **50**. In accordance with an advantage of the present invention, fly-ins alert the user that new data is available for viewing. Fly-ins are small windows displaying animated graphics representing a particular message type, e.g. E-mail, which moves from the bottom right part of the user display screen to the user interface alert panel **50** whenever a new message of that particular type is received. If the user interface alert panel **50** is in a floating state, then the fly-in animation objects flies in from a random edge. At the same time the fly-in occurs, a viewer specific sound wave file is initiated. A button is then animated on the user interface alert panel **50**. Finally, a static button which the user can press to launch the viewer is placed on the user interface alert panel **50** (step **13**) and when depressed (step **14**), will launch a viewer with message playback (step **12**). For example, for a football feed, a fly-in animation object in the form of a football lands on top of the user interface alert panel **50**, a trumpet will play followed by a button animated on the alert panel **50**, which typically spins around and finally a static button appears on the alert panel **50**. Fly-in graphic and default sound effects reflect message type. For example, for a golf feed, a golf tournament fly-in includes an image of a golf ball and the sound of a golf ball falling into a cup.

When the static button on the user interface alert panel is pressed (step **13**), the viewer with message playback option is launched (step **12**). The message is sent to the viewer server **20** which is the actual application which physically launches the viewer **48**.

(iii) Timely Events

The user interface alert panel will periodically and automatically perform the following functions: (1) check messages that require a mark for deletion, (2) check for valid

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 60 of 64

27

service plans, (3) check for delayed broadcasts, and (4) implement fly-in graphics for new messages, each of which is described in detail below.

(1) Check Messages that Require a Mark for Detection

Each viewer has an entry in the SYSAPPS table that specifies the lifetime of the messages. A comparison is made to the message database and if a record needs to be marked for deletion, an "X" is placed in the MSG_READ field. In a preferred embodiment, this function is performed every 24 hours. The user interface alert panel **50** will decide, based on the information in the SYSAPPS table, how long a message should be kept for a particular viewer **48**. For example, for a football viewer, if it is only desirable to see messages 2 days old, the user interface alert panel **50** will check against that field and when 2 days has transpired, proceed to mark those records for deletion.

(2) Check for Valid Service Plans

The user interface alert panel **50** will also periodically check for valid service plans. Service plans typically dictate what kinds of feeds are available to a user. All valid plans are recorded in the registry so that other modules can read the information. The service plan checking preferably occurs at initialization and every 5 minutes thereafter. The user is also prompted with "plan expiration reminders."

(3) Check for Delayed Broadcasts

The user interface panel **50** also checks for delayed broadcasts which allow messages to be submitted for future broadcast. If a date and time has arrived for a delayed message, the MSG_READ field will be changed from "B" to "N" and a button will be placed on the user interface alert panel **50**. Delayed broadcasts are preferably checked every five minutes. The user interface panel **50** thus checks every 5 minutes for special records that need to be shown to the user and then will change a particular field in the message database—the "B" to "N" so that next time it will not rebroadcast the same message again.

(4) Implement Fly-In Graphics Means for New Messages

The user interface alert panel **50** performs fly-in graphics for new messages received from the communications server **38** if this option has been selected by the user.

e. Viewer Server

Referring to FIG. **10**, the viewer server **20** provides the means by which other components can initiate the execution of viewers **48** to display messages received from the broadcast network. This includes launching a particular viewer **48** upon command, parsing messages, and providing data extracted from the messages to the viewers **48** for display. The viewer server **20** also acts as the interface between the viewers **48** and the messages data base **51**. Functionality of the viewer server **20** is accessed through the Viewer Server Applications Programming Interface (VSAPI).

The viewer server **20** serves the global control preferences across all viewers and allows common controls to be shared by viewers requiring similar functions. In accordance with the present invention, three different classes of user interface are present. One class, the viewer class, views a particular type of information, such as baseball or electronic mail. A second class, the viewer controller, is able to start and stop the other class, the viewers class. For example, in operation, the viewer controller resembles a remote control and enables a user to turn the viewers on and off. By utilizing the remote control, a user can thus automatically bring up a baseball viewer and baseball information will be automatically displayed in that viewer. For illustrative purposes, FIGS. **24**(a), (b),(c) and (d) are depictions of a market scoreboard viewer, a football viewer, a newspaper viewer and stock ticker viewer, respectively.

28

In particular, in accordance with the feed format of the present invention, information is broken into logical information categories at the central broadcast server **34** end which matches viewers **48** which exist on the user end. The viewer server **20** ties into the viewers **48** so that an actual feed, such as an electronic mail notification feed, baseball sports feed or headline feed, is established. In accordance with the present invention, the data at the server end is classified into various formats to be able to indicate what type of a feed is present. This is accomplished by placing tags in front of various words that break it up into a type of information, such as a headline story, electronic mail story, financial story, and the like. This is the basis of the EMIT format which was described previously.

When this data arrives on the user side, the viewer server **20** reads the message including the codes and determines what type of message is being sent. Thus a viewer that is capable of displaying baseball information only receives baseball information.

In accordance with an alternative embodiment of the invention, another viewer controller which enables both incoming information as well as past information to be viewed can be utilized. Thus, for example, a user can bring up a baseball game that occurred earlier in the day. In operation, the viewer controller talks to the viewer server **20** and indicates that it wants to bring up a particular viewer. The viewer server **20** then activates and launches that particular viewer.

Preference viewers enable each of the viewers in a common user interface to show any preference information it has. The preferences viewers can be programmed to provide various kinds of information. For example, the preferences viewer can be directed to information relating to baseball teams. Another preferences viewer can be directed to stock market information. The preferences viewer can be further programmed to provide indication of events which are currently happening. For example, if the price of a stock, such as IBM, goes above a certain amount, such as $100.00 per share, a stock market crawl viewer will come up to the foreground immediately and flash a red light.

f. Remote Control

The remote control **54**, as shown in FIG. **7**, provides a user interface for opening, closing and controlling viewers (viewer management), for maintenance of user settings and preferences, and for viewing the latest broadcast network news. It also maintains a message history log which allows the user to view previously received messages. Viewer control functions include mute, pause and volume level control for the viewer audio device. The remote control **54** is launched through the user interface alert panel **50**.

g. Viewers

Viewers **18**, opened through the user interface alert panel **50** or remote control **54**, are the means by which data received from the broadcast network is displayed to the user. There are separate viewers for each of the different types of information provided over the network. Viewers **48** are capable of reading and displaying various message formats and contain preferences governing viewer actions. Viewers generally include, but are not limited to, graphics, data, sound files, and launch icons.

When each of the viewers **48** is installed, it goes through a registration process with the viewer server **20** and the viewer server **20** stores entries in the database that keep track of each of the viewers by way of the viewer table. A filtering means is provided for each viewer for filtering particular types of messages. For example, a baseball viewer who wants to look at messages relating to baseball information has two filtering means-one for saving information in a

US 8,601,154 B2

**29**

database and another filter for indicating that this is the type of information that should immediately be brought up to the viewer. Thus, if a viewer is interested in Dodger baseball games, such games would instantly be brought up by the second filter. Moreover, if a viewer desires to save all of the games in the national league, the filter for saving such information would be implemented

h. User Preferences Dynamic Link Library (DLL)

The User Preferences Dynamic Link Library (DLL) **53** allows the user to precisely specify what information is to be displayed by the Viewers **48** and how this information will be displayed and enters various related information, such as, the name of the user's Internet browser and activation codes for activating service plans. For example, the user can select the teams for which baseball or football scores will be shown, the sources of news stories, and the speed at which text is scrolled in Marquee type viewers. The User Preferences DLL **53** is accessed via the remote control **54** or through any open viewer **48**.

i. Address Reprogramming and Activation Code Parsing

The address reprogramming and activation code parsing DLL **57** parses and validates service plan activation codes received over the wireless broadcast network or entered by the user and address reprogramming messages received over the network. Activation codes and address reprogramming messages control what broadcast network messages the user is allowed to receive. The code parsing DLL is used by the communications server **38**, remote control **54** and user preferences DLL **53**.

j. Error Logging

Error Logging **55** provides a means by which all other components can record the occurrence of errors or potential problem conditions in a log file. The error log can be a valuable aid to technical support in diagnosing problems a user may encounter in running software: The log file is preferably in ASCII text format and can be viewed by any word processor or text editor, such as, Microsoft Word or Notepad.

k. Operation of Received Message Data Flow

In operation, when a new message is received from the broadcast network, the communications server **38** receives a new data block from the wireless device **42** via the driver **44** and wireless interface **46**. Depending on the data block type, the communications server **38** either processes it locally or passes it to the user interface alert panel **50**. The user interface alert panel **50** receives a data block from the communications server **38**, stores it in the messages data base **51**, displays an icon for the particular message type and generates a fly-in or other means for notification such as an audio and/or visual alert for the new message if that option is selected by the user. If the user clicks on the icon for the new message, the user interface alert panel **50** sends a command to the viewer server **20** to open the appropriate viewer **48** to display the contents of the message. Alternatively, a viewer **48** to display the new message can be launched through the remote control **54**. Upon receiving the command to open a viewer **48**, the viewer server **20** parses the message, launches the viewer **48** and passes to it the data to be displayed. The viewer **48** displays the message data received from the viewer server **20** and commands the viewer server **20** to mark the message as "read" in the data base. At any step in the process, if an error condition is detected, it is recorded in the error log **55**.

l. E-mail Alerts

FIG. **13** is a flow chart of an algorithm for generating and processing E-mail alerts in accordance with the present invention. In accordance with the present invention, a user may be instantly notified of E-mail messages without being connected to an E-mail service provider. Referring to FIG. **13**,

**30**

when a user receives an E-mail message (step **240**), the user's provider sends an E-mail notification to central broadcast server (step **244**). Upon receiving this notification, the central broadcast server transmits an E-mail alert message to the user's computer through the broadcast network (step **246**). When the alert message is received by the software application in the user's computer, an animated visual and/or audio notification is triggered, or the e-mail viewer automatically pops up, depending on the mode of operation selected by the user (step **248**). In the first case, an E-mail alert icon appears on the alert panel and the E-mail viewer can be launched in the same manner as viewers for news alerts (i.e. by clicking the icon or through the remote control). An E-mail alert contains the provider ID code number and the "From" name (E-mail address of the sender). One skilled in the art will recognize that the alert is not limited to the provider ID code number and name. Rather, the E-mail alert could include a header, whole message etc. The E-mail viewer displays an icon corresponding to the provider ID, the date and time the alert was received, and the sender's E-mail address. To read an E-mail message, the user simply clicks the associated icon (step **250**) which causes the E-mail program for the particular provider to be launched (step **252**). The user's E-mail can then be retrieved through a wired connection to the E-mail provider (step **254**). One skilled in the art will recognize that E-mail alerts may be received from more than one source. For example, a user may receive an E-mail alert from an Internet E-mail provider and America On-Line or CompuServe.

User Wireless On-Line Guide

In accordance with the present invention, a wirelessly transmitted on-line guide provides a detailed schedule of when certain information, such as upcoming events, forums and chat sessions, will be transmitted. With ongoing wireless broadcasts, the information in the on-line guide is maintained up-to-date. In particular, the on-line guide can notify a user just before an event is about to happen on the Internet, therefore eliminating the need to manually keep track of upcoming events. The user indicates which events are important, and the on-line guide reminds the user via an alarm including a visual and sound alert of the events at a predetermined time, such as minutes, before each occurs. The user can then click on the event and a connection to the event's location on the Internet is made through the user's standard Internet browser and Internet service provider. Alternatively, a user can specify that a connection to the event location via the user's Internet browser and Internet service provider be made automatically when the selected event is about to occur.

URL Broadcast and Hot Links

Referring to FIG. **1**, the URL broadcast and hot links **22** back to the information source **12** is shown. In accordance with the present invention, very short notification centric messages such as news headlines from information sources **12**, such as Internet, on-line services and other information providers, are transmitted to the computer **14** by wireless transmission. A user, from a computer **14**, can make a wired connection **24** back to the information source **12** to obtain more detailed information. In accordance with the present invention, attached to each of the notification centric messages is a universal resource locator (URL) code **22** as well as related Internet address information. This allows the user, by clicking on an icon that is embedded in the message, to make a wired or wireless connection **24**, either through a modem, TC/IP or LAN-type connection, and automatically establish a link back to the information source **12**. The user can thus go directly to the specific site that the information came from. In a typical example, the specific site can be ten pages deep. Thus, in accordance with an advantage of the present inven-

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 62 of 64

US 8,601,154 B2

31

tion, information sources **12** such as the Internet and other on-line services, which are typically overwhelming particularly with respect to locating a story, are easily accessible. The present invention allows a user to pinpoint and locate the specific information the user was alerted to. The user can thus hit one button which establishes the connection **24** and takes the user directly to the location where the information is located.

FIG. **12** is a flow chart of an algorithm for extracting and processing the Internet source URL for messages broadcast over the wireless communication network illustrated in FIG. **1**. In accordance with the present invention, the Internet source for a news item alert is broadcast as part of the alert message itself (step **260**). The message contains a number of tags delineating the various parts of the message. In the preferred embodiment, tags "S=" and "U=" identify the Internet source where detailed information about the news alert may be found. For those messages which always originate from the same list of default sources, the "S" tag only applies (step **264**). Following the "S=" tag is a letter code corresponding to the Internet URL. For example, the letter code for an alert from the Reuters News Service is "W". The actual URL, http://www.reuters.com, is obtained by using the letter code as an index into the alert source database of the present invention (step **266**). URL's in the alert source database may be updated by Star Feed messages in case changes in the default URL's are necessary (step **268**). For messages whose sources are not limited to a default set, the "U" tag conveys the Internet source (step **272**). Following the "U=" tag is the actual URL source of the message (e.g. U=http://www.universalnews.com). Wireless throughput is conserved by transmitting the full URL only in those cases where the source is not restricted to being a member of a fixed set. The source URL is displayed at the end of the alert message text (step **270**). A user with a wired or wireless connection to the Internet can go directly to the alert source simply by clicking the URL (step **270**). A connection to the alert source on the Internet is thus provided.

Over the Air Programming

Services received and various operational characteristics at the user end can be programmed by the central broadcast server **34** through the wireless broadcast network. This is accomplished primarily through Star Feeds and service activation/deactivation codes. Star Feeds, which have been described in detail above, are special messages which allow parameters controlling viewer operation to be modified from the central broadcast server **34**. Activation/deactivation codes determine which services a user is allowed to receive. For example, if a user subscribes to e-mail alerts, this service can be turned on for that specific user through an e-mail alert activation code message transmitted to the user site via the wireless broadcast network. Conversely, if a user stops subscribing to a service, that service can be turned off through a deactivation code message. Additionally, the capability exists for binary file transfer from the central broadcast server **34** to add new executable files or replace existing ones with newer versions. In this way, new or updated viewers can be installed directly through the wireless broadcast network.

Billing and Activation Server

Referring to FIG. **1**, users may remotely request additional services or modify existing services from the personal computer **14** or other computing device through a billing and activation server **64** which communicates with the central broadcast server **34**. By telephone or modem communication, a user can contact the billing and activation server **64** which in turn communicates with the central broadcast server **34**. Once such a request has been processed by the central broadcast

32

server **34**, the server **34** wirelessly transmits an activation code directly to the message server **18** to activate additional or modify existing services. By matching the serial number contained in the broadcast message with the users serial number, the user software will program a receiver board in the user receiver **32** to begin receiving additional or modified services. Thus according to an advantage of the present invention, users can remotely adjust services from their personal computers **14** or other computing devices.

Simultaneous Wired Transmission

In accordance with an alternate embodiment of the invention, the information provided from the information sources **12** and transmitted to the central broadcast server **34** to be consolidated in accordance with the present invention and then transmitted wirelessly nationwide to personal computers **14** and other computing devices as described in detail above can also be sent simultaneously via a wired connection to the same personal computers **14** and computing devices having Internet/World Wide Web access (direct or via on-line service providing Internet and World Wide Web access). In particular, the data processed at the central broadcast server **34**, in addition to being transmitted wirelessly, is simultaneously placed on Web pages on the Internet. A user can thus connect to the Web via the Internet. In operation, to access data sent by the central broadcast server **34**, a user makes a connection via the Internet to the World Wide Web server and delivers its URL request. The request is acknowledged by the Web server, which then sends the requested data to the user. Thus, a user can receive real time data/information in the form of voice, video data or a combination thereof by accessing the World Wide Web.

It will be appreciated by persons skilled in the art that the present invention is not limited to what has been shown and described hereinabove, nor the dimensions of sizes of the physical implementation described immediately above.

The invention claimed is:

**1**. A method to transmit data from an information source via a central broadcast server to remote computing devices, the method comprising:

(a) generating data at the information source, wherein the information source is associated with an online service relating to the generated data;

(b) identifying one or more users that have subscribed to receive a notification relating to the generated data;

(c) transmitting the generated data to a central broadcast server configured to process the generated data using at least one parser and transmit the processed data to receivers communicatively coupled with remote computing devices associated with subscribed users, wherein the central broadcast server:

(i) comprises one or more servers associated with a parser to parse the generated data received from the information source;

(ii) is communicatively coupled to at least one information gateway, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks; and

(iii) is communicatively coupled to at least one transmission gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to the receivers and configured to cause the addressed data blocks to be transmitted to the receivers, and wherein the transmission is made whether the remote computing devices are online or offline from a data channel associated with the remote computing devices.

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 63 of 64

US 8,601,154 B2

33

**2**. The method of claim **1**, wherein the information gateway is further configured to assign addresses to the data blocks based on information in a subscriber database.

**3**. The method of claim **1**, wherein the transmission gateway is further configured to transmit the addressed data blocks to the receivers wirelessly.

**4**. The method of claim **3**, wherein the transmission gateway is further configured to transmit the addressed data blocks utilizing one or more of a digital carrier, a cellular carrier, a GSM carrier and a PCS carrier.

**5**. The method of claim **1**, wherein the transmission gateway is further configured to transmit the addressed data blocks to the receivers by wired transmission.

**6**. The method of claim **1**, wherein the central broadcast server comprises a network of servers.

**7**. The method of claim **6**, wherein one or both of the information gateway and the transmission gateway form part of the network of servers.

**8**. The method of claim **1**, wherein the data channel comprises an established connection via the Internet between the remote computing device and the information source associated with the transmitted data blocks.

**9**. The method of claim **1**, wherein the remote computing devices are configured to provide a visual alert to notify users of the remote computing devices of the receipt of the transmitted data blocks.

**10**. The method of claim **9**, wherein the visual alert comprises one or more of an icon, a button, and a graphic.

**11**. The method of claim **1**, wherein the remote computing devices are configured to provide an audio alert to notify the users of the remote computing devices of the receipt of the transmitted data blocks.

**12**. The method of claim **1**, wherein the remote computing devices are configured to provide at least one of a visual alert and an audio alert to notify the users of the remote computing devices of the receipt of the transmitted data blocks, wherein the alert is related to the content of the transmitted data blocks.

**13**. The method of claim **9**, wherein the remote computing devices are configured to provide the visual alert via an alert panel.

**14**. The method of claim **9**, wherein the remote computing devices are further configured to launch a viewer associated with the transmitted data bocks upon receipt of a response by a user to the visual alert.

**15**. The method of claim **9**, wherein the remote computing devices are further configured to display the transmitted data blocks upon receipt of a response by a user to the visual alert.

**16**. The method of claim **14**, wherein the response comprises a user click or selection of an icon, button, or graphic.

**17**. The method of claim **15**, wherein the remote computing devices are further configured to display contextual graphics in a predefined format when the transmitted data blocks are displayed.

**18**. The method of claim **15**, wherein the remote computing devices are further configured to display the transmitted data blocks within a viewer associated with the transmitted data blocks.

**19**. The method of claim **15**, wherein the display of the transmitted data blocks includes the display of an advertisement or an Internet address location of the advertisement.

**20**. The method of claim **14**, wherein the launch of the viewer establishes an Internet connection between the remote computing device and the information source associated with the transmitted data blocks.

34

**21**. The method of claim **20**, wherein the connection between the remote computing device and the information source comprises at least one wireless connection.

**22**. The method of claim **9**, wherein the remote computing devices are further configured to cause an Internet browser to launch and establish an Internet connection between the remote computing device and the information source associated with the transmitted data blocks upon receipt of a response by a user to the visual alert.

**23**. The method of claim **22**, wherein the connection between the remote computing device and the information source comprises at least one wireless connection.

**24**. The method of claim **1**, wherein the transmitted data blocks comprise information relating to news, sports, financial markets, weather, an online chat, or an online forum.

**25**. The method of claim **1**, wherein the transmitted data comprises an Internet address.

**26**. The method of claim **25**, wherein the Internet address location further comprises a Uniform Resource Locator of the information source associated with the transmitted data blocks.

**27**. The method of claim **1**, wherein the transmitted data blocks comprise an advertisement or an Internet address location of an advertisement.

**28**. The method of claim **1**, wherein the transmitted data blocks further comprise information concerning the installation, activation, deactivation, or updating of one or more viewers.

**29**. The method of claim **1**, wherein the remote computing device and the receiver form part of a consumer electronic device.

**30**. The method of claim **1**:

wherein the information gateway is further configured to assign addresses to the parsed data blocks based on information in a subscriber database;

wherein the transmission gateway is further configured to transmit the addressed data blocks to the receivers wirelessly utilizing one or more of a digital carrier, a cellular carrier, a GSM carrier and a PCS carrier;

wherein the remote computing devices are configured to provide a visual alert to notify users of the remote computing devices of the receipt of the transmitted data blocks;

wherein the data channel comprises an established connection via the Internet between the remote computing devices and the information source associated with the transmitted data blocks;

wherein the remote computing device and the receiver form part of a consumer electronic device.

**31**. The method of claim **30**, wherein the remote computing device is further configured to launch a viewer associated with the transmitted data bocks upon receipt of a response by a user to the visual alert.

**32**. The method of claim **30**, wherein the remote computing device is further configured to display the transmitted data blocks upon receipt of a response by a user to the visual alert.

**33**. The method of claim **30**, wherein the transmitted data blocks comprise information relating to at least one of news, sports, financial markets, weather, an online chat, and/or an online forum.

**34**. The method of claim **30**, wherein the display of the transmitted data blocks includes the display of an advertisement or an Internet address location of the advertisement.

\* \* \* \* \*

GOOG 1001
IPR of U.S. Patent No. 8,601,154
Page 64 of 64

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 8,401 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 in 14 point Times New Roman.

/s/ Jon E. Wright
Jon E. Wright
*Counsel for Appellant*
June 24, 2016